## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

Evelyn Ramírez Lluveras et al
    Plaintiffs

v.

Javier Pagán Cruz, et al
    Defendants

Civ. Number 08-1486 FAB

JURY TRIAL DEMANDED

### PLAINTIFFS' OPPOSITION TO
### TO SUPERVISORY DEFENDANTS'REQUEST FOR SUMMARY JUDGMENT

**TO THE HONORABLE COURT:**

**NOW COME THE PLAINTIFFS**, the widow and children of Miguel Cáceres-Cruz, who was murdered by officer Javier Pagán on August 11, 2007, and respectfully oppose the Motion for Summary Judgment filed by Pedro Toledo-Dávila, Edwin Rivera-Merced, Víctor Cruz-Sánchez, Rafael Figueroa-Solis and Juan Colón-Báez (collectively referred to as "the supervisory defendants.")

Plaintiffs' opposition to the request for Summary Judgment is based on the following:

## I. INTRODUCTION

The underlying facts in this case are well-known, as is the video which shows Mr. Cáceres being murdered by Officer Pagán.  (A copy of the CD with the video is being submitted herewith.)  On August 11, 2007, Miguel Cáceres,  a 43-year old father of three, was assisting with the flow of traffic, when three officers, defendants Pagán, Zulma Díaz and Carlos Sustache, descended from a police vehicle to detain him.  An exchange of words ensued, and Officer Pagán proceeded to assault Mr. Cáceres amid cries of police abuse from dozens of citizens witnessing the event.  After wrestling Mr. Cáceres to the ground, Officer Pagán took out his service weapon and shot the man some four times, the last fatal shot to the head of the unarmed man.

In due time, plaintiffs filed an Amended Complaint, naming the five supervisory defendants,

in addition to the three officers mentioned above, as defendants.  Plaintiffs are submitting herewith an extensive factual statement, demonstrating beyond any serious question that the supervisory defendants are not entitled to summary disposition.

Plaintiffs have marshalled more than sufficient evidence to establish the viability of their causes of action.  The overwhelming proof in this case demonstrates beyond question that the supervisory defendants dismally failed in their duties to the citizenry, including the plaintiffs and their decedent, Miguel Cáceres.  Their actions and omissions were not "objectively reasonable." Their failure to act in a reasonable manner as police supervisors was the result of a "latitudinarian approach," which proximately caused the death of Miguel Cáceres, and clearly takes these defendants outside "the prophylaxis of qualified immunity." _Camilo-Robles v. Hoyos, 151 F.3d. 1, 14 (1st Cir., 1998)._

It is certainly striking that defendants' submission on summary judgment barely touches upon the _facts_, despite the extensive record in this case.  After all of the parties were put through months of depositions and extensions of the discovery deadline purportedly so that these defendants could take depositions regarding the first prong of supervisory responsibility — whether the "underlying facts" make out a constitutional violation —  none of these depositions were even used in defendants' summary judgment papers.  Rather, these defendants simply inform the court that "for purposes exclusively in this brief," they will _concede_ a finding of subordinate liability by a line officer." _Docket #249, page 13._[1]

In truth, on summary judgment, the supervisor defendants rely on the exact same argument on which they hung their hat on their "Iqbal" Motion to Dismiss, which is still pending before this court.

---

[1]  Plaintiffs argued many times, in motions and court hearings that there was _no need_ for the supervisory defendants to push back the discovery deadline for this purpose. They _already_ had the complete transcripts from the Pagán criminal trial and knew the what these witnesses would say.  Moreover, it was clear that their defense would not depend on the facts concerning Mr. Pagán's murder of Mr. Cáceres, but rather on the nature of the actions of the _supervisors_. At the current juncture, there is absolutely _no doubt_ as to the accuracy of plaintiffs' predictions.

*Docket 113. See, Iqbal v. Ashcroft, 129 S.Ct. 1937 (2009); Bell Antlantic v.Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).* Their long-awaited Summary Judgment papers really add nothing to the mix that their Motion to Dismiss failed to address. Defendants' very general *factual* averments — which can be summed up regarding each defendant with the phrase "No fui yo," ("It wasn't me; there's nothing I could have done.") Defendants' primary emphasis is on *legal* argument, based on their notion that there can be no supervisory liabiilty because *Iqbal* radically changed the landscape for such claims.

*Iqbal,* however, does *not* mean that all supervisory liability claims must be dismissed. The *evidence* in this case unquestionably establishes the potential liabiilty of each and every one of the defendants with specific facts demonstrating their abject failures to comply with minimal standards which would have protected the plaintiffs and their decedent Miguel Cáceres. The abundant factual record shows that whether the facts are analyzed on pre-*Iqbal* or post-*Iqbal,* these particular defendants failed to exercise reasonable care of regarding Officer Pagán to protect the citizenry from this dangerous officer. Defendants, moreover, cannot claim the protection of Qualified Immunity. Plaintiffs' evidence is unquestionably sufficient to allow a trier of fact to conclude that objectively unreasonable actions and omissions of the supervisory defendants caused the violation of clearly established constitutional rights.

## II. THE FACTS

Plaintiffs are submitting herewith an extensive factual statement ("SofF") and respectfully requests that this court consider the totality of the facts therein in its consideration of the motion for Summary Judgment. In this section, plaintiffs will provide a summary of the specific facts demonstrating the liability of each of the defendants in this case.

## 1. The cast of characters - the five supervisory defendants

The five supervisor defendants in this case and their rank at the time when Mr. Cáceres was killed are as follows: PRPD Superintendant Pedro Toledo-Dávila; Humacao Area Commander Edwin

Rivera-Merced; and three lower-level supervisors, Lieut. Víctor Cruz-Sánchez; Sgt. Rafael Figueroa-Solís; and Sgt. Juan Colón-Báez.  At all times relevant to this case, Toledo-Dávila was the Police Superintendent and Edwin Rivera-Merced was the Area Commander and highest official for the Humacao Area. The three other defendants --- Lieut. Cruz-Sánchez and Sgts. Figueroa-Solís and Colón-Báez directed the Humacao Tactical Operations Division (T.O.D.) at different points in time in the year before Miguel Cáceres was killed. *See, generally, Sof F,¶¶1.1 to 1.4.*

In order to assit this court in its understanding of the command structure, Plaintiffs' Statement of Facts contains three charts, showing the chain of command in the months leading up to Mr. Cáceres's death, from 2006 to 2007, and during the Impact Service of which Pagán, Sustache and Díaz were a part on the night of August 11, 2007.  *See, SofF, #'s 1.4 to 1.9.*[2]

## 2. The Impact Service and the shooting of Miguel Cáceres

Officers Javier Pagán, Carlos Sustache and Zulma Díaz were assigned on August 11, 2007 to a Special Impact Service in the Humacao Area, made up of individual officers from different units and precincts.  Commander Edwin Rivera-Merced instructed his staff of directors of units and precincts to designate particular agents to join the Service that week. The Impact Service was comprised of officers from the Yabucoa, Maunabo, Las Piedras, Humacao and Naguabo Districts, as well as from Transit and the Special Operations Division. It also included six Tactical Operations Division officers.

The officers selected for this special service were chosen by their respective unit heads. In the

---

[2]  The role of the three lower-level supervisors may cause confusion, because their positions changed over time. However, all three directed the Humacao TOD — where Mr. Pagán was assigned — at some point during 2006 and 2007. During most of 2006 and the early part of 2007,  Lieut. Cruz-Sánchez headed the division, with Sgt.Colón Báez as Assistant Director and Sgt Figueroa-Solís as a line supervisor. In about March, 2007, Cruz-Sánchez took over as the Commander of the Humacao *District*, (a Precincts in the Humacao *Zone* of the Humacao *Area*), and Colón Báez moved to the Humacao District with Cruz Sánchez who recruited him as Assistant Director. At the same time, Sgt. Figueroa-Solís became Acting Director of the Humacao Tactical Operations Divison, which at that time was short on supervisors, with no higher officers, such as Lieutenants.  The circle comes around in July, 2007, when Rafael Figueroa-Solís went on vacation, and Sgt. Juan Colón-Báez became the Interim Director of the Division. *See, SofF 1.4 to 1.9 and  #7.79.*

case of the Humacao TOD, both Javier Pagán and Carlos Sustache were selected for Service by the TOD Director, Sgt. Juan Colón Báez (since Sgt. Figueroa-Solís, the Acting Director, was on vacation) Zulma Díaz was selected for the Service by the Director of the Humacao Precinct, Lieut. Víctor Cruz-Sánchez.  Neither of these supervisors, however, used any criterion other than the agents' availability, to choose the officers who would comprise this special service. *See, generally, SofF #'s 2.1 to 2.9.*

On the night of August 11, 2007, Sgt.  Colón-Báez was on his day off.  Edwin Rivera-Merced was also not on duty, although he remained the officer with ultimate responsibility for the Impact Service that he, himself, had designed.  On August 11th, Rivera-Merced delegated his authority to Lieut. Cruz-Sánchez, an officer he trusted and selected as the Officer in Charge of the Area, i.e.the Area Commander's official representative on the shift. At that time, Lieutenant Víctor Cruz-Sánchez was the Commandant of the Humacao District, where Officer Díaz was asssigned.   Immediately before that assignment,which had begun in March of 2007, Víctor Cruz-Sánchez had been the Director of the Humacao DOT, where Officers Pagán and Sustache were assigned. *Id., See, also, SofF #'s 2.11 to 2.14.*[3]

On the evening of August 11, 2007, Lieut. Luis Rodríguez, in charge of the particular group forming the Impact Service, met with the group to impart instructions.  All officers were supposed to go out together, but because Zulma Díaz showed up late and Pagán had to get gas, these officers lagged behind, along with Carlos Sustache.  On their way to meet the rest of the group, they stopped at Punta Santiago, where a group of scooter enthusiasts, including Miguel Cáceres had gathered in order to escort a 15 year old girl who was celebrating her birthday (quinceañero).

---

[3]A year earlier,  Rivera-Merced has selected Víctor Cruz-Sánchez to direct Tactical Operation, but thereafter, he assigned Lieutenant Cruz-Sánchez to the Humacao precinct, leaving defendant Sgt. Figueroa-Solís in charge of the T.O.D. *See, fn. 2 above.* In both of the positions he was assigned to in 2006 and 2007, Lieutenant Cruz-Sánchez supervised police supervisors and communicated and implemented in the respective unit the policies and actions directed by police headquarters. *Id., 2.15-2.17.*

At paragraphs 2.22 to 2.79 of their Statement of Facts, plaintiffs describe in graphic detail the killing of Mr. Cáceres, and it is depicted on the video.  There is no doubt that that Officer Pagán, who was later found guilty of murder, shot this unarmed man for no good reason, apparently annoyed that he had dared to help out with the traffic flow, a job he felt was better left to police officers.  Defendants Sustache and Díaz, who are still facing criminal charges as collaborators, did nothing to stop the abuse, and in fact, prevented citizens from coming to the aid of Mr. Cáceres.

After the shooting stopped, the three officers simply got into their squad car and left the dying man bleeding on the street. The first officer to come to his assistance was Lieut. Rodríguez, who responded to an emergency call from Zulma Díaz. Díaz, however, talked only of any injury to OfficerPagán, who had shot himself in the leg, saying absolutely nothing about the fact that the citizen Pagán had needlessly shot,  and as it turned out, died as a result of the shooting.  Because of the clarity of these facts (and defendants' belated "concession,") they will not be discussed further herein, exept to the degree that they are relevant to the Substantive Due Process argument *infra,* at pp.  OJO -OJO.

### 3. The cover-up begins

The attempted cover-up began with the radio calls Zulma Díaz in which she conveniently omitted the fact that a civilian had been shot by an officer. *SofF #'s 3.1 to 3.4.*  When  Lieut. Rodríguez arrived at the scene less than 10 minutes later and was able to exchange words with a dying Miguel Cáceres, the three officers — Pagán, Sustache and Díaz ---- were no longer there, having abandoned the scene and failing to comply with their duty to assist Mr. Cáceres.

At Punta Santiago, Lieut. Rodríguez was approached by two men he knew and trusted, Ferdinand Rosa and Fermín Torres-López, who told him what had happened.The eyewitnesses told Rodríguez that the group had been on the side of the road, to escort the birthday party, when the three agents arrived on the scene.  Officer Pagán told Mr. Cáceres to move, but the man responded that he

was just trying to help out.  Pagán got annoyed, telling Mr. Cácers that "no, I am the police officer." The officers then got back into the patrol car.  Shortly thereafter, however, they descended from the vehicle again, aggressively telling Mr. Cáceres that they were going to arrest him.  Although Mr. Cáceres responded by saying that he had done nothing wrong, he proceeded to move the scooter.   Officer Pagán, however, began assaulting Mr. Cáceres, who fell to the floor, with Pagán punching him.  Mr. Cáceres tried to grab onto defendant Pagán's leg and a shot went off.  This was quickly followed by four shots by Mr. Pagán, who cocked the gun between shots. *Id., See, also SofF #'s 3.5 to 3.10.*

Lieut. Rodríguez, who understood that if the witnesses were telling the truth, Officers Pagán, Sustache and Díaz had not acted correctly, reported this immediately to his supervisors, Area Commander Rivera-Merced and his designated Officer in Charge, Cruz-Sánchez. Rodríguez informed both defendants that his preliminary investigation demonstrated that the officers had been unjustified in their actions, telling that that the situation "smelled" bad and that he had "no doubt whatsoever" that the officers had abused their power.  *Id., 3.14-3.15.*

As Officer in Charge, that night, defendant Cruz-Sánchez was supposed to arrive at the scene of the shooting, but he never made it there. Instead, he went to Ryder Hospital, to meet with the three agents involved in the shooting. Although Cruz-Sánchez by then knew that Mr. Cáceres had died, he never asked the agents how many how many times Officer Pagán had shot him.  Nor did he inquire as to why Mr. Pagán had shot the unarmed man. *Id., 3.16 to 3.26.*

Sgt. Colón-Báez, who was off-duty at the time, heard about the shooting and went to Ryder, where he, like Víctor Cruz-Sánchez, stayed with the agents and got their stories.  Although these two defendants heard many eyewitnesses saying that the shooting was unjustified, they did not even listen to them. They concentrated their efforts, rather on one  "Héctor Huertas," who claimed to have been on the scene, and who, unlike all of the other citizen witnesses, stated that "Mr. Cáceres almost took

Officer Pagán's gun from him" (a version belied by the videotape.) Although Cruz-Sánchez and Colón-Báez had no interest in hearing from any of the other credible eye-witnesses, they were most interested in Mr. Huertas, who they referred to the Homicide Agent investigating the incident. *Id., 3.26 to 3.31.*

Sgt. Juan Colón Báez and Lieutenant Víctor Cruz-Sánchez were alone with  Díaz and Sustache at Ryder well into the night.  As late as 10PM, four hours after the shooting, they were still there with the two officers.  Thereafter, Cruz-Sánchez sent Díaz and Sustache to the station, allowing these two officers — who had been with Officer Pagán at the shooting — to travel there in the same patrol car in which they arrived, with their weapons on them.  He decided not to separate them so as not  to contaminate their respective versions.  *Id., 3.32 to 3.34.*

It was not until about 11:00 PM, five hours after these officers had left Mr. Cáceres dying on the street, and well after defendant Víctor Cruz-Sánchez had allowed Officers Sustache and Díaz to go to the station in their own patrol car, without being separated, that their guns were finally occupied. It was the prosecuting attorney who made the decision to seize these officers' weapons and not to allow them to be re-armed.  *Id., 3.37-3.38.*[4]

Defendants Cruz-Sánchez and Colón-Báez made certain to inform the first Homicide investigator, José Rivera-Rodríguez, about their star witness, Héctor Huertas.  Of course, they told him nothing about the versions of the other eye-witnesses. This led to what can only be described as an astounding report by the Homicide investigator, who repeats the versions of events obtained from Officers Díaz and Sustache, as well as a brief description of the patently absurd version offered by Héctor Huertas, and then ends the report with the following remarkable comment:

---

[4] Remarkably, there is no practice in the PRPD to remove police weapons from the custody of officers involved in shootings of civilians.  The weapons are seized only when there is clear knowledge of the facts.  In this case, at 11:00 PM, Mr. Cruz-Sánchez says there was "not a clear picture of what had happened, only a struggle ("forcejeo") [and] a person who was injured." *Id.*

> In addition, several persons were interviewed at the scene, but they provided information which was adverse and against the agents. *Id., translation provided.*

Not a single one of these other witnesses, with information "adverse" to the agents, is even identified in the report. *Id., 3.49-3.54.*

Víctor Cruz also prepared a report that night, prevaricating with respect to the facts and attempting to deflect blame from the agents.[5]  As noted by plaintiffs' expert in police practices, Lou Reiter, it is clear that both Cruz-Sánchez and Colón-Báez were attempting to steer the investigation in such a way as to clear the officers of wrong-doing.  Had the recording not surfaced, they might well have been successful in these efforts. *3.42 to 3.48; 3.55; 8.40-8.43.*

The bias displayed by Colón-Báez and Cruz-Sánchez is also reflected in the PRPD Press Release on August 11th, which states that Mr. Cáceres "attempted to take the officer's weapon from him," leading to the "hearing [of] a shot," followed by the "hearing [of] four other shots, resulting in injury to different parts of Mr. Cáceres Cruz's body." Cruz-Sánchez is listed as the "Source" for the information  in the PRPD Press Release. It is also evident in a second report prepared by Cruz-Sánchez later that week-end, purportedly to "amplify" his initial report. The most notable "amplification," however, is just more information about how to contact the very same Héctor  Huertas, whose "version ... corroborates part of the version of the version offered by agent Pagán." *Id., Id., 3.57- 3.59.*

Area Commander Edwin Rivera-Merced was also quick to  rely on the facts given to him by Cruz-Sánchez to cover up what really happened on August 11th.  Over the week-end, the Area commander told a newspaper reporter that there were "two contradictory versions" and that "several

---

[5]Víctor Cruz stated in his deposition that he "believed that what [Zulma Díaz] was saying was the truth, sure" and that he "had to understand that agent [Pagán] was telling the truth."  He also made the patently false claim that at the time he wrote the report, no one else had given a version which "created doubts"about her account, testimony which is directly contradicted by the fact that Lieut. Rodríguez had already told him about what the eyewitnesses had said. *Id.*

witnesses" other than the police officers who supported the officer's story, which included the fabrication that Mr. Cáceres had pushed Díaz, that he had refused to obey the officer's orders, that he cursed at the female officer, and that he had assaulted Officer Pagán and grabbed Pagán's weapon. Without further investigation, Rivera-Merced repeated for the press a version which tracked almost word-for-word the account which had been provided by Víctor Cruz-Sánchez, despite the fact that the Area Commander had already heard from Lieut. Luis Rodríguez. Rather than credit the information provided by Lieutenant Rodríguez, who had spoken to eye-witnesses at the scene, he made the conscious choice to rely on information told to him by Lieutenant Cruz who said that "there were eye witnesses stating that Mr. Cáceres tried to grab a weapon from one of the agents." *Id., 3.64 to 3.66.*[6]

**4. The video-taping of the killing of Miguel Cáceres - the cover-up is exposed**

Plaintiffs are submitting with this Opposition a copy of the CD containing the video recordings made by eye-witness Ricardo Lebrón on August 11th. The killing was preserved on videotape for all to see, discrediting the fabricated versions of the incident which the defendants were trying to promote Plaintiffs obtained a copy of that CD from the Institute of Forensic Science *Id., 4.1.* Section 4 of plaintiffs' Statement of Fact establishes the authenticity of the tape. *Cf, Asociación de Periodistas v. Mueller, 529 F.3d 52, 57 (1st Cir., 2008)* (discounting a video which had not been authenticated).

**5. Javier Pagán's Disciplinary Record**

Javier Pagán had a dismal disciplinary record at the PRPD, with several complaints involving allegations of assaults against citizens, as well as a complaint filed by a supervisor for insubordination and verbal abuse, one related to theft of government property, another for falsifying a police report,

---

[6] To his credit, Unlike the Humacao Area Supervisors, Superintendent Pedro Toledo-Dávila did not attempt to disguise the truth. After seeing the video, Mr. Toledo publicly stated that the event was nothing more or less than an "execution." He has explained that "the victim was on the floor immobilized and the officer kept shooting." He summarily suspended the three officers, convince that at the least, the final shot by Mr. Pagán was clearly unjustified and that both Sustache and Díaz had failed in their responsibilities.

another for failing to appear at a court hearing after being cited to appear (for which he was arrested), and another for refusing to attend to a citizen attempting to file a complaint. *Sof F #5.1.*

The most serious complaint involved grave domestic violence, and it ultimately resulted in two separate expulsion proposals by successive PRPD Superintendents. It eventually resulted in a 60-day suspension less than a year before Mr. Pagán murdered Mr. Cáceres. The complainant stated that she had met Pagán in mid-1998,when he stopped her for a traffic violation. Instead of giving her a ticket, Pagán flirted with her, and within a week's time, the two had begun an intimate relationship. Almost immediately, Mr. Pagán became violent. A PRPD investigation found that Pagán assaulted the woman, and and upon seeing her with another police officer, threatened to use his service weapon against her if she ever spoke to the agent again. Pagán was also found to have broken into her residence to commit acts of aggression against her. He played with the service revolver in front of the woman, letting her know that he was prepared to use it on her. He also held on to evidence seized from a criminal, including a weapon with a laser pointer, which he also let the young woman know he was ready and prepared to use. *Id., 5.7 to 5.9.* Although a prosecuting attorney decided that no criminal charges should be filed, his supervisors at the Juncos Precinct made certain that Mr. Pagán was disarmed and sent to the Domestic Violence Unit of the PRPD. *Sof F #'s 5.2 to 5.5.*

Within a month's time, however, Mr. Pagán was re-armed, based on the excuse that  no criminal charges were filed. Meanwhile, the administrative investigation continued, even though Pagán had been re-armed. Thereafter, Officer Pagán had pointed his service weapon at the woman and threatened her life. About two months later, Officer Pagán pushed her against a wall and cursed at her. After she filed a first Domestic Violence criminal complaint, the witness testified that she felt threatened by Pagán, who would frequently pass by the area of her residence and make threatening gestures. *Id.*

Although in August of 2000, the Domestic Violence Unit concluded that Mr. Pagán had

committed serious violations of the Police Regulation, it was not until four years later, on August 30, 2004, when the Administrative Complaint process finally reached Superintendent Agustín Cartagena, that Cartagena issued a Resolution of Charges, proposing that Officer Pagán be *expelled* from the police department, upon a conclusion that Mr. Pagán had committed no less than six serious offenses. *Id., 5.10 to 5.11*. However, it was only two months later, after the Superintendent had proposed that Javier Pagán be expelled from the force, that this officer was transferred to the Tactical Operations Division of Humacao, to work in a specialized group within the Division, which required an even higher level of skill and training. *Id., 5.13 to 5.16.*

Although there is no magic number of disciplinary complaints which should cause a supervisor in the PRPD to be concerned, supervisors should be on the look-out for complaints alleging verbal abuse or physical abuse.  There are many officers who have no such complaints in their files.  Two or three such abuse complaints should be cause for concern and for strict implementation of General Order 87-14 and Special Order 90-5 regarding discipline of agents.  *Id., 5.17*.  Mr. Pagán's file clearly exceeded that minimum.

As required by the PRPD General Orders, the disciplinary complaint files in the PRPD contain histories ("historiales") setting forth the disciplinary complaints the officers have had in the past.  The primary purpose of these 'Historiales" is to allow the department to identify patterns of misconduct and to take appropriate measures, depending on the circumstances. *See, Gutiérrez v. Cartagena, 888 F.2nd 553 (1ᵉ Cir., 1989)*.  Between 2002 and 2004, a period of less than three years immediately preceeding Mr. Pagán's transfer to the elite Tactical Operations Division, four administrative complaints were filed against him and at least one Arrest Order had been issued against him.  Also, during that time frame, the Superintendent of the Police Department had proposed that he be expelled from the force. *See, SofF # 5.11 above. See, also Exh. Z, 2008 Historial and Exhibit KK, Arrest Order issued on April 29, 2002.*

Between August,  2004, when  Cartagena first proposed that Pagán be expelled to the end of Cartagena's tenure later that year, Pagán remained on the force.  After Pedro Toledo began again as Superintendent, it was not until about a year and a half  later that he issued a second resolution, again recommending that Pagán be expelled.  At the end of the administrative process, Toledo lowered the sanction from expulsion to a 60-day suspension.  Javier Pagán, notified of that final determination in May of 2006,  served his suspension from the PRPD between August 23, 2006 to October 22, 2006, returning to work some nine and a half months before he killed Miguel Cáceres.*Id., 5.21 to 5.24.*

### 6. The failure of the defendants at the Area-level and the two high-level supervisor to implement measures to identify Officer Pagán's dangerous tendencies.

#### A. No one was paying attention to Mr. Pagán's disciplinary files

General Order 87-14 requires every supervisor to examine the file of every officer under his or her supervision, including the administrative complaint files, with special emphasis on the nature of the complaints. Special Order 90-5 requires supervisors to be aware of any kinds of problems which would show the need for retraining or emotional counseling.  Every supervisor has the "duty and obligation" to ascertain whether or not agents within the unit have a violent character or fail to respect the civil rights of citizens, independently of whether particular administrative complaints are sustained *Id, 6.1-6.3.*

In each Area, there is a personnel file for each officer which includes pertinent information on the nature of and number of complaints filed against the officer and the resolution thereof.  According to Mr. Toledo, supervisors were required to review these files.  Area Commanders like Rivera-Merced are presumed to know of the disciplinary history of Area agents and should certainly know when there is a recommendation that an officer be expelled.  Lower-level supervisors  also have the authority and the responsibility to review the files of the officers under their supervision.  *Id., 6.1 to 6.9.*  Supervisors within the PRPD also know that if officers have problems of domestic violence, they should be sent for counseling and if based on an investigation, should be banned from being officers. *Id.*

All of the defendants in this case were long-term supervisors at the PRPD by August of 2007, when Miguel Cáceres was killed.  Toledo had been Superintendent for about 10 years.  Rivera-Merced had been with the PRPD for three decades and a supervisor for two. Lieutenant Cruz-Sánchez had been a supervisor in the PRPD for over years, having risen to the rank of Sergeant in 2002 and Lieutenant in 2004.  Sgt. Figueroa-Solís had been a PRPD officer for 16 years and a supervisor for eight.  He had been a supervisor in Tactical Operations for six years, and was directing the division for most of 2007, as he had done at several intervals in the past.[7]  He had also held leadership roles in the KM Unit and in the Command Center.  Sgt. Colón-Báez had been a PRPD supervisory for three years and had held leadership positions as Assistant Director of the TOD and of the Humacao District and had held supervisory positions in the CIC Special Arrest Unit, in Internal Affairs, and in Special Operations.  He had headed the Seizure Section of the Humacao Special Operations Division.  In the year and a half leading up to the death of Miguel Cáceres, all three of these lower-level supervisors ---- defendants Cruz-Sánchez, Figueroa-Solís and Colón Báez ----  headed up the Humacao T.O.D. at different periods of time (Cruz-Sánchez from March, 2006 to March, 2007;  Figueroa Solís from March, 2007 to August, 2007; Colón-Báez, who had been the Assistant Director of the T.O.D. for a year, assumed the directorship of the Division on an interim basis in July of 2007.  All three of these defendants had also been at the Tactical Operations Division in Humacao in the latter half of 2006, when Officer Pagán served his 60-day suspension. *See, generally, SofF #'s 6.10 to 6.13.*

Nonetheless, these supervisor claim to have been completely blind as to the underlying facts leading to this imposition of a disciplinary sanction against Mr. Pagán.   These defendants showed a remarkable ignorance of PRPD policies with respect to disciplinary records, with Figueroa-Solís and

---

[7] On the day when Mr. Cáceres was killed, Figueroa-Solís was the highest-ranking officer assigned to Humacao Tactical Operations.  This defendant, however, seems to want to hide this fact, leaving it out of sworn declarations or minimizing the role he played. *See, generally, SofF 6.11 to 6.12.*

Colón-Báez both asserting incorrectly that they were not authorized to review Pagán's disciplinary files. This, despite Rivera-Merced's testimony that these officers certainly could have accessed the disciplinary files of their subordinates, merely by requesting that information (as specified in G.O. 87-14). Such officers are "responsible for the people under their charge ... and they are supposed to request the information concerning the conduct of the people who work with them." *Id., 6.15 to 6.19*.

Given the failure of these supervisors to know and implement the rules, it is not surprising that they knew virtually nothing about Mr. Pagán's dismal disciplinary record. None of these officers thought they had any responsibility to find out why Officer Pagán was being disciplined or why expulsion had been recommended by *two* police superintendents. They thought that their responsiblity ended with the act of serving the suspension papers on Mr. Pagán or of notifying him of the expulsion proposals. *Id., 6.21 to 6.25*. In fact, it is the ultimate irony that in their request for summary judgment, these officers *rely* on the fact that they were supposedly *ignorant* of the charges against Pagán, as if this somehow excuses them from liability in this case. *See, eg., Defendants'Statement of Facts, #190*. In point of fact, just the opposite is true. The failure of these defendants to review Pagán's files is proof of their failure to act in an objectively reasonable manner and perform as reasonable officers should perform.

Also professing ignorance was Area Commander Edwin Rivera-Merced. As Area Commander with some 500 officers under his indirect or direct supervision,Rivera-Merced should have known about his officers' disciplinary records, especially about a proposed expulsion. However, in his deposition in 2009, Rivera Merced claimed to have no knowledge of the May, 2006 notification lowering the proposed expulsion of Officer Javier Pagán to a sixty-day suspension, either at the time the notification was sent or thereafter. He claimed not to have known that Mr. Pagán was found by two Police Superintendents and by Internal Affairs and the Domestic Violence Unit to have committed grave

violations of the rules governing conduct of police officers. *Id., 6.25.*[8]

The importance of supervisors being aware of disciplinary records cannot be over-stated. The unit directors in divisions like Tactical Operations, such as Cruz-Sánchez, Figueroa-Solís and Colón-Báez , have the power to recommend that particular agents do only clerical work and to assign different agents of the T.O.D. to different tasks within the unit. They can refer officers to the psychological for counseling if they deem this appropriate. Area Commanders such as Edwin Rivera-Merced have that same authority within the entire Area. *Id., 6.33.*

Superintendent Toledo also contributed to the ignorance the other supervisors professed as to Pagán's disciplinary record. Toledo-Dávila modified the format for the memoranda setting forth the department's proposed disciplinary action against an officer. The earlier proposed suspension notices would include details of the incident or incidents giving rise to the proposed disciplinary sanction, as well as a brief statement of the underlying facts. On Mr. Toledo's watch, however, the facts are missing from the "me propongo" documents, which now included only a statement of the particular proposal and nothing more, making it more difficult for a supervisor to monitor his officers, since the officer my not have been assigned to the same unit when the underlying incident occurred. *6.27. See, SofF #'s 6.28 to 6.30, comparing the earlier documents with the ones used by Toledo.*

## B.  No one ever looks at the issue of repetitive conduct

General Order 90-5, issued in 1990, established a system for identifying problematic agents, those with "repetitive conduct." The heads of units are supposed to examine and evaluate the files of agents they supervise in order to see if they have such conduct and take appropriate measures. This, however, is yet another of the PRPD policies which is simply not enforced. Police supervisors do not

---

[8]Mr. Rivera-Merced's claim, however, is belied by the documentary evidence, which shows that on August 24, 2006, he was notified of the newly proposed reduced 60-day suspension. *Id., 6.26.*

even know they exist, as evidenced by the answers to interrogatories by Cruz-Sánchez, Colón-Báez and Figueroa-Solís, who complained that they did not know what this term meant. *See, SofF # 6.35 to 6.37.*

Lieut.Cruz-Sánchez's own complaint file includes three complaints for illegal searches, one for illegal arrest and one for verbal abuse. Three of those cases were in the two years before Miguel Cáceres was killed. Two complaints against Cruz-Sánchez in 2007 — one for illegal arrest and the other for verbal abuse ---- were still pending resolution three years later, when Mr. Cruz-Sánchez answered the interrogatories in this case. Nonetheless, despite Cruz-Sánchez's lengthy disciplinary record, Rivera-Merced thought it was critical for this officer to first command Tactical Operations and then the Humacao Precinct during 2006 and 2007, believing him to be an appropriate officer to lead the Humacao District, which was "very important for the area," because it is a large town, with a lot of problems, and he wanted to assign a supervisor who was "more competent" to cover it. *Id., 6.38 to 6.39.*

### C. Pro-forma evaluations are the norm

Evaluations were also given minimal importance in the PRPD. Although the form for evaluating officers in the PRPD has a scale from "1"to "5," with "5"being the highest, supervisors routinely give high marks to *all*of their agents. Lieutenant Cruz-Sánchez would give "4's" and "5's" to every officer, never rating an officer "1"or a "2" and only rarely a "3." Rafael Figueroa-Solís acted in the same way, rarely giving "1's" or "2's" to the agents he supervised. *Id., 6.39-6.40.* As Javier Pagán's direct supervisor in the Tactical Operations Division in 2006 and early 2007, Cruz-Sánchez evaluated Officer Pagán in January of 2007, covering the period from July 1, 2006 to December 31, 2006, during Mr. Pagán's suspension for two months for disciplinary reasons. Defendant Cruz-Sánchez gave Mr. Pagán a glowing recommendation, including the highest mark - "5" - in the category "self-control," as to which he noted that Mr. Pagán "in difficult situations, he keeps calm and in the proper mood," ("en situaciones difíciles mantiene serena y en buen estado de ánimo.") He gave Mr. Pagán this glowing evaluation at a time

17

when he knew that both Superintendent Cartagena and Toledo-Dávila had proposed that Javier Pagán be expelled from the force, and that he had just returned from a 60-day suspension. *Id., 6.41-6.42.*

### D. The policies regarding officers who return from suspensions are not followed

An officer who returns from a suspension for disciplinary reasons is supposed to report to the "Replacement Center" ("Centro de Reemplazo") at the Police headquarters. If the officer is sent back to the Area where he or she was originally assigned, the Area Commander has the authority to decide where to place the officer within the Area. Upon the return of an officer from a lengthy suspension, an Area Commander such as Rivera-Merced, as well as the Superintendent has the authority to decide whether the agent should be sent for evaluation by a mental health professional. The Director of the Unit where the officer worked could also request an evaluation. *Id., 6.43 to 6.44.* Before being rearmed, the officer is supposed to go through retraining on the use of weapons. If the suspension was for violence, Toledo has testified that he or she would have to go to the psychological unit. *Id., 6.45.*

However, none of these rules were followed in the case of Javier Pagán who, after his sixty- day suspension, was immediately reincorporated into the Humacao Tactical Operations Division . On the day his suspension concluded, Pagán, with the complicty of T.O.D. Director Cruz-Sánchez and defendants Rivera-Merced and Toledo, was back on the job at the T.O.D. by 9:20 AM. *Id., 6.46-6.47.*

### 7. The failure of the high-level supervisors to establish protocols which would have provided for adequate supervision of Javier Pagán

#### A. The authority of the two high-level supervisors

The two highest-level supervisory defendants are Pedro Toledo and Edwin Rivera-Merced. As PRPD Superintendent, Mr. Toledo had the authority to issue General Orders and Special Orders as well as circulars concerning management issues in the PRPD, including discipline of police officers and the conduct of the administrative complaint system and policies on the referral of officers for psychological evaluation and treatment. He also had the authority to summarily suspend officers. He could instruct

high-level supervisors to closely monitor agents with disciplinary problems or tendency toward violence and to assure that there was compliance with measures intended to identify such agents.[9] As Area Commander, Rivera-Merced was "in charge of organizaing, directing, planning and controlling" entire Humacao Area, comprised of five municipalities. He was also in charge of specialized divisions such as Tactical Operations and Special Operations and other units.  He supervised about 400 to 500 police officers. Rivera-Merced also had the authority to recommend summary suspensions of officers, to send officers on vacation leave, to send officers for psychiatric evaluation and to disarm officers. *Id.7.1 - 7.8*

**B. There is no specific record-keeping and analysis of Officer-Involved Shootings**

One of the most important issues in law enforcement is keeping track of Officer Involved Shootings (OIS's)  In the PRPD, however, there is no specific method of monitoring statistics on OIS's or of analyzing data related thereto. Nor is there any requirement of reports other than the preparation of a standard "Incident Report Memorandum," which is the same report filled out with respect to a crime alleged to have been committed by any citizen. Even if the actions of an officer result in the death of a citizen, the matter is not subject to any special treatment. The PRPD Homicide Division performs an investigation to make a preliminary determination whether or not a "criminal violation" has occurred, after which the matter is referred to either the NIE or for administrative investigation. *Id. 7.8-7.13*.

The record in this case clearly establishes that neither Edwin Rivera-Merced nor Pedro Toledo-Dávila were paying any attention to this matter.  Neither knew whether the PRPD analyzed this data or where statistics would be kept.  Nor did they know anything about the rankings of the Humacao Area

---

[9]Superintendent Toledo also had the authority to mandate psychological testing of *all* agents. It was not until *November 2007*, however, that the PRPD established a system for regular psychological evaluations of officers.  The requirement was instituted just three months *after* Mr. Cáceres was killed.  Even after that change was made, however, the PRPD did not mandate mandatory counseling for officers alleged to be involved in the use of *excessive force*. Nor was there any requirement that officers involved in shootings be referred to the PRPD Division of Psychology and Social Work. *Id, 7.23 to 7.24*.

and of the Tactical Operations Division, as compared to other units, with respect to the frequency of Officer-Involved Shootings or cases of misconduct. *Id., 7.15-7.16.*

In early 2010, plaintiffs issued a deposition subpoena to the PRPD pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, with the purpose *inter alia* of ascertaining where such statistics, if any, were kept. Quite remarkably, the Police Department responded by presenting two witnesses who knew absolutely nothing about the matter and whose testimony confirmed that the issue is simply not subject to monitoring in the agency. *Id., 7.17 to 7.21; 7.25.* Amazingly, the PRPD does not track which cases they attend to arise from officer-involved shootings or whether allegations of use of excessive force or unreasonable force played any part in the referral of the officer for services. *Id., 7.26.*

Before becoming PRPD Superintendent, Pedro Toledo-Dávila was an FBI agent for 25 years and was aware of FBI policies regarding OIS. He knew that before the 1990's the FBI had mandated complete documentation and analysis of all Officer Involved Shootings by FBI Agents and that the analysis included whether or not each such shooting was justified and whether or not it was consistent with policy, training and/or acceptable field tactics. Toledo has also been a member of the International Association of Chiefs of Police (IACP) for close to two decades and has gone to their annual conventions and receives their publications. Despite his active membership in the IACP, Toledo did not know about the IACP policies and standards respecting the monitoring of OIS's. He also expressed remarkable ignorance about the use of review boards to monitor such incidents. *Id., 7.26 to 7.34.* Edwin Rivera-Merced professed similar ignorance.

In his 34 years in the PRPD, Edwin Rivera-Merced never saw an analysis of the number of disciplinary complaints by Area or by unit. He testified that in his entire time in the PRPD, there was no practice of providing this kind of information to Area Commanders. *Id., 7.35 - 7.41.* Nor did defendant Cruz-Sánches know anything about the treatment of OIS's in the PRPD. *Id. 7.42.* He (and

the other T.O.D. Commanders) had no idea whether any data was collected or analyzed comparing either the Humacao Area or the T.O.D.. with respect to the discharge of weapons by officers or injuries or deaths to citizens due to the use of weapons by officers in the Area or the Division, or the rankings of the Division with respect to OIS's. *Id., 7.43 - 7.45.*

### C. Pagán and Sustache witness a police killing one week earlier and no one finds out.

The issue of OIS's is not an *abstract* matter in this case.  On August 5, 2007, barely a week before Mr. Cáceres was killed, both Officer Pagán and Officer Sustache were present on the scene at a Youth Festival in Las Piedras immediately after a fellow officer, Abdel Morales, killed Nelson Santiago, a 21 year-old youth who is a son of a police officer in the Area, shooting him several times.  Javier Pagán, who one week later killed Miguel Cáceres after a "struggle," ("forcejeo"), describes what he saw as follows: : "Officer Abdel is there firing off some shots, but before that he was in a struggle ("forcejeo") with the youth and he pushed the kid away from him and fired." *Id., 7.48-7.49.* Neither Pagán nor Sustache were even questioned about the August 5th shooting. In fact, their supervisors, the defendants herein, up to and including the Area Commander, all insisted that they did not even *know* that Pagán and Sustache had witnessed the earlier shooting.  *Id., 7.50-7.57; 7.59* Although the shooting, itself, was discussed briefly at a staff meeting, Rivera-Merced treated it like like any other incident, leaving the details to the investigative authorities.  According to Colón-Báez, there was not a great deal of attention paid to the matter because "there were tons of other matters" which had to be addressed. *Id., 7.60.*

Although Pedro Toledo claims that the officers' supervisors would be the ones to assure that officers who are present at an OIS resulting in the death of a citizen be referred for appropriate counseling, there was no specific protocol which must be followed when an officer shoots a civilian. There is no protocol requiring that officers such as Sustache and Pagán who observe a shooting resulting in the death of a citizen receive any kind of aid or counseling. *Id., 7.61-7.64.*

According to Mr. Toledo, when there is a preliminary finding of "negligence" in an OIS, the officer is disarmed, transferred to an administrative post or sent on "vacation." If he or she is "relieved of his weapon because of negligent conduct" must "complete a series of psychological tests and examinations," and "could also be required to undergo psychological treatment if the incident produced — or could have produced — adverse psychological effects on the agent." In the case of Officer Abdel Morales, however, this was not done. On August 5, 2007, Officer Morales shot young Nelson Santiago several times and the NIE assumed jurisdiction.   By the very next morning, just hours after the shooting, the PRPD had given Officer Morales a "spare"weapon to replace the one seized for evidentiary purposes. *Id., 7.66-7.67*. One week before Officer Pagán killed Miguel Cáceres, he had observed Abdel Morales kill a young man in the context of a "forcejeo," only to be re-armed immediately. Neither he nor Sustache received counseling or were even interviewed with respect to what they observed. And, the supervisors in the Humacao Area, defendants Rivera-Merced, Cruz-Sánchez, Figueroa-Solís, and Colón Báez all claim to have absolutely no knowledge that Officers Pagán and Sustache were on the scene that night. *Id., 7.68*.

**D. <u>The excessive delays in the disciplinary system</u>**

PRPD disciplinary complaints often take years to resolve, as the disciplinary process goes through many steps. First, a citizen out an Adminstrative Complaint. The complaint is then endorsed by the Superintendency (of Public Integrity, as it was called at that time). Then it goes to the Office of Public Integrity at the Area level, where it can either be taken up at that office or referred to another nearby Area. All complaints are first investigated at the Area level. The individual investigator provides a report to the head of the Area's Public Integrity. The Director of the Area Public Integrity Office then can reject or accept the report, finally approving a document which makes findings and points out violations of the Regulation, if applicable, and can make a recommendation as to an administrative

sanction ranging from a warning to expulsion.

The report, in turn, goes from the Area Public Integrity Office to the island-wide Assistant Superintendency of Public Integrity, which has the authority to accept or reject the recommendation. The determination by the Assistant Superintendency is then sent to the Legal Division, which also has the power to modify the recommendation. From there, it goes to the Superintendent, who decides what punishment, if any, to impose. The superintendent then drafts a letter, which is commonly referred to as a "Me Propongo." The "Me Propongo, proposing a disciplinary sanction is not a final decision, even in the case of an expulsion proposal, but rather a proposed sanction, from which the officer may appeal internally. The officer has the right to appeal for an administrative hearing before hearing officers assigned to the Legal Division. The hearing officer then renders a report to the Director of the Legal Division, along with a recommendation. The matter then goes back to the Legal Division which reviews the evidence and can make additional recommendations.The matter then returns to the Police Superintendent or his Associate Superintendent, who can either accept or reject the recommendation of the hearing officer and/or the legal division.This last decision is a "final" agency decision, which the Officer can then appeal to the CIPA. *Id., 7.70.* [10]

The excessive delays in the PRPD disciplinary process are well-known to officers like Javier Pagán who have seen the process first-hand, and who has testified that delays of "seven, eight, ten years"are "typical." *Id., 7.73.* Pagán knew he escaped the expulsion sanction on the domestic violence case for over *two years (*during which time he was promoted to Tactical Operations), and that the entire investigative process had lasted almost a decade. Clearly, he had a sense of impunity, in light of the

---

[10] At the time defendant Pagán killed Cáceres, two of the complaints against him were *still* pending resolution. One, ironically, was resolved *against* him just three days *after* Mr. Cáceres was killed. This complaint had been filed a full eight years earlier. Edwin Rivera-Merced's own disciplinary record showed that a complaint which had been filed in 1999, alleging an illegal arrest, was still pending final resolution in 2008, as were two complaints which had been filed in 2004 and 2005. *Id., 7.71; 7.74.*

PRPD's lack of action with respect to disciplinary complaints. *Id., 7.74 to 7.75*.

**8. Lou Reiter's expert opinion confirms the supervisory failings in this case**

Plaintiff's police expert, Lou Reiter, is a well-recognized expert in law enforcement and police management practices, whose qualifications are unassailable. *See, S of F #'s 8.1-8.12*. Mr. Reiter has been involved with police practices litigation in Puerto Rico since the <u>*Gutiérrez*</u> case in the late 1980's. Since that time, he has served as a police practices expert in approximately 40 civil cases in Puerto Rico, about two thirds of which involve officers from the PRPD.

In the context of earlier cases in Puerto Rico, Mr. Reiter has been able to obtain a historical view of the the PRPD's administrative investigations protocol. In addition to the depositions and documents reviewed specifically for the instant case, Mr. Reiter has reviewed many other depositions of other police supervisors, and of at least four Police Superintendents. He has also reviewed several hundred administrative investigations in the PRPD, dating back to the 1970's, as well as the General Orders of the PRPD, including General Order 87-14 and 90-5, which deal with disciplinary matters. *Id., 8.14*.

After reviewing extensive materials in this case, Lou Reiter analyzed the conduct of each of the supervisory defendants with respect to this case. He concluded that "**the supervisors .... were deliberately indifferent in their supervision, control and monitoring of field officers' uses of force, including use of deadly force.**" Based on his review of the applicable standards and the facts of this case, Mr. Reiter concluded that each of the supervisory defendants failed in their respective responsibilities as police supervisors.[11] *Id. 8.15*. For a complete description of the basis of Mr. Reiter's

---

[11]Mr. Reiter also concluded that the police intervention by Officers Sustache, Díaz and Pagán was unjustified, "objectively unreasonable and contrary to generally accepted police practices" He concluded that there was an unjustified use of force by Pagán and a failure on the part of Díaz and Sustache to "prevent this use of police deadly force," and of all three to fail to provide medical care to the dying man. *Exh. II, LR Rep, page 7-11*. Since these defendants have not filed for summary judgment, and the supervisors have now "conceded" this point, there will be no further discussion herein of Mr. Reiter's opinions with respect to defendants other than the supervisory defendants.

opinions, reference is made to paragraphs 8.16 to 8.51 of the accompanying factual statement, along with the Reiter report under penalty of perjury, submitted as Exhibit JJJ to the Statement of Facts.

In broad summary, Mr. Reiter opined that the defendants in this case followed the long-standing practice in the PRPD which insulates errant officers from accountability for misconduct and for abuse of citizens, which practice and agency environment can result in unreasonable uses of force and deadly force. One area in which the system deficiencies are clear is in the practices of the PRPD with respect to administrative investigations. Another is the treatment of OIS's.

The dismal failures of the disciplinary system in Puerto Rico are well-known to field officers such as Javier Pagán. This defendant had personal knowledge of the lengthy delays and ineffective discipline in the PRPD system, particularly in its treatment of the domestic violence complaint. His line supervisors, moreover, clearly dropped the ball with respect to this issue. Although G.O 87-14 mandates that all supervisors research and know the disciplinary history of the agents under their charge, the practice is not implemented in general, and defendants Figueroa-Solís, Colón-Báez and Cruz-Sánchez clearly paid no attention to it.

Figueroa-Solís failed in his responsibilities with respect to Officer Pagán, since he was a supervisor at the time of Mr. Pagán's suspension in 2006, and he even served Officer Pagán with papers imposing a disciplinary sanction, yet he did absolutely nothing to find out what the underlying facts were. He made a conscious choice not to consider the suspension documents or request information related thereto. In violation of 87-14, Sgt. Figueroa-Solís never reviewed Mr. Pagán's disciplinary files. Defendants Juan Colón-Báez and Víctor Cruz also demonstrated complete ignorance of the requirements of 87-14. They never reviewed Mr. Pagán's disciplinary files, despite having the obligation to do so. These two officers were also directly involved in the handling of Officers Pagán, Díaz and Sustache after the events took place and acted in such a manner which was designed to forestall and

cover up the actions of these three errant office.

Defendant  Cruz-Sánchez directed Tactical Operations for critical periods in the year prior to Mr. Cáceres's death and on the night of the shooting was the highest level official on duty. He evaluated Pagan and gave him the highest ranking in his evaluation despite the fact that some of those evaluations were done for the period of time while he was in his 60-day suspension, failing to even mention the disiplinary suspension in the evaluation.

The failings of these officers and Area Commander Rivera-Merced are also evidenced by what happened after Mr. Pagán returned from his 60-day suspension.  Rivera-Merced, who had the authority to reassign Officer Pagán within the Area, did not do so.  Defendant Cruz-Sánchez took no special precautions within his discretion as to assignments within the division, including assignments which would not bring him into contact with citizens.  Instead, Officer Pagan was immediately reassigned to Tactical Operations coming off of a 60-day suspension with no retraining whatsoever and without assuring that the officer had no residual effects from this lengthy suspension.

In his actions with respect to Officer Javier Pagán-Cruz, Area Commander Edwin Rivera-Merced violated reasonable norms of police administration.  As Area Commander, he is the person who must ensure that the supervisors "directly over an officer who has a significant suspension like 60 days has evaluated it properly and taken reasonable supervisory steps to ensure that when the person comes back, there would be no furtherance of misconduct."  Yet, although Rivera-Merced received and transmitted documents related to Pagán's suspension, he never even bothered to inquire about the matter.  Despite Rivera-Merced's knowledge of the failings in the disciplinary system and the abject failure of the department to have reasonable policies regarding officer involved shootings, he failed to exercise any of his authority to assure accountability of the officers under his charge.

Another failure to employ reasonable police practices, which Mr. Reiter opined is attributable

to both Rivera-Merced and Toledo-Dávila, concerns PRPD's treatment of officer involved shootings. The IACP has long emphasized "the seriousness of officer-involved shootings"and "the critical nature of these investigations."  "An accurate and complete investigation of these deadly force incidents" requires adequate planning and the "establishment of protocols that must be followed..."   As early as 1999, the IACP  issued a "Concepts and Issues Paper" on the issue of "Investigation of Officer Involved Shootings, " stating that there should be independent investigations by a Force Review Committee, Shooting Review Committee or similar entity.  Such a committe examines such shootings "in a risk management context to improve the agency's response to these critical incidents and **to make any corrections in agency practice or procedure that will help avoid identified problems in the future."**  Despite Rivera-Merced's and Toledo's professed ignorance on the issue, it is clear that "the scope and intent of these forums is to assess such incidents to determine whether they have any implications for the department's training function, policies and procedures." Whatever model is used, "superficial or cursory investigations of officer-involved shootings in general and parciularly in instances where citizens are sounded or killed can have a devastating impact on the professional integrity and credibility of an entire law enforcement agency."

In a department with over 15,000 officers, officer involved shootings are an inevitability.  To ensure that both officers and citizens are protected in these situations, there must be a written protocol on how to handle such officer involved shootings, so as to ensure that there is no exacerbation with respect to the potential ramifications for the officers, for the citizens present, and for the department. The fact that there is no such policy in the PRPD is a deficiency attributable to defendants Pedro Toledo-Dávila and Edwin Rivera-Merced. In Mr. Reiter's opinion, the "lack of any .... protocol or administrative review" of officer-involved shootings "is most disturbing."   These officers showed remarkable ignorance about the policies and directives concerning the handling of officer involved

shootings and the concept of a Force or Shooting Review committee.  Under theirleadership, the PRPD maintained no separate statistics for analyzing officer-involved shootings.  High-level supervisor such as Rivera-Merced did not even know whether, in fact, statistics on officer involved shootings were kept and if so, where.  In point of fact, in the PRPD, headed by defendant Toledo for 12 years of the last 17, there is no system of maintaining separate statistics regarding officer-involved shootings.  Former FBI Agent Pedro Toled never instituted a policy or a directive specifically addressing PRPD handling of officer involved shootings.  He was not aware of any specific statistics regarding that matter.  Nor did he institute any specific measures for reviewing the same.  Mr. Toledo, as Police Superintendent, had to "ensure that there was a consistency in how the agency handles [officer-involved shootings], what kine of administrative investigation was going to be conducted, and a critical analysis of what caused the shooting to occur."  According to police expert Lou Reiter, Mr. Toledo "has to have his head stuck in the sane not to realize that this is a vital issue for any police department and to control officers' uses of deadly force.  These are essential agency protocols which have to be in place." *Id, page 209, line 16-21*.

The manner in which the Cáceres shooting was handled is emblematic of the lack of adequate protocols in the PRPD.  In the initial hours after an officer involved shooting, strong supervisory controls are required.  Although standard protocol requires separating the officers present at the scene and interviewing them separately, this was not done in the hours following the shooting of Miguel Cáceres.  Rather than exercising "strong supervisory control" after the fatal shooting, assuring that the scene is preserved and managing the officers, as well as protecting potential evidence, Colón-Báez and Cruz-Sánchez were more concerned with protecting their subordinates from possible accountability, and theyremained at the hospital dealing with the officers directly involved in the shooting, rather than going to the scene. These defendants violated generally accepted police practices by allowing Officers Díaz and Sustache to remain together at Ryder Hospital hours after the incident, before ordering them

to return to the station, without even requiring them to be separated.  Also, despite having already heard from his subordinate that night, Lieut. Luis Rodríguez, that the officer's version "smelled,"Lieut. Víctor Cruz-Sánchez assumed that officers Pagán and Díaz were telling the truth.  According to Mr. Reiter, these defendants made conscious choices to protect these officers from criminal and administrative scrutiny, demonstrating the manner in which they approached the issue of monitoring errant officers.

The absence of protocols and systems for monitoring officers involved in shootings is demonstrated by the fact that both Officers Pagán and Sustache were present at the scene of another fatal shooting of a citizen just one week before Mr. Cáceres was killed.  Mr. Reiter found it "very concerting" that none of the supervisors in this case were even aware of that fact.  None of these defendants ever bothered to ascertain whether or not Pagán and Sustache had observed the killing of Nelson Santiago just a few days earlier.  The defendants in the Area knew that Tactical Operations officers would be at the Youth Festival, and they knew about the shooting.  Yet, consistent with the absence of any protocol for OIS's, these took no action to interview these agents and/or to intervene with them to deal with the trauma that such an event provokes.

"The Department **has elected to overlook any ability to learn from these tragic critical incidents and analyze its policies, training, tactics, equipment and supervision."**  This is not an innocent oversight, but rather a "**conscious choice to ignore this vital and necessary control accountability."**  This failure, according to Mr. Reiter, is attributable not only to Superintendent Toledo, but also to his "top command officers," such as Edwin Rivera-Merced.  "Their **collective failures have continued to place the public at serious risk."**

The environment within the agency is critical to the behavior of officers in the field, who independently make the decision to arrest a citizen or to use force against a person.  "This grave responsibility is controlled through proper selection, training and supervision.  **Supervision of the field**

**officer is the most essential element to ensure that he/she exercises this authority in a reasonable manner."** This is so because "the ultimate aim of reasonable discipline is to correct individual and agency misuse of this authority and the improper use of discretions .... **Without effective discipline the exercise of this authority and discretion to use force and deprive a person of his/her liberty is compromisedand the public good is placed in serious jeopardy."**

## II. ARGUMENT

As noted above, the defendants' argument on Summary Judgment is simply a replica of their extensive Motion to Dismiss; in fact, their argument focuses in great part on the *allegations* in plaintiffs' *complaint*. Plaintiffs' response to each of their arguments follows:

### A. Iqbal and supervisory liability

Defendants are stuck to their notion that after *Iqbal*, all has changed, and supervisors are now off the hook for almost anything. This is not, in fact, the case. Not a single Court of Appeals has adopted defendants' grandiose reading of *Iqbal* or have understood the Supreme Court to have sounded the death knell for supervisory liability in police misconduct cases.

A review of the opinions of the various Circuit Courts of Appeals which have addressed the issue reveals the folly of defendants' position: The *Tenth* Circuit has held post-*Iqbal* that supervisory liability may lie if he or she "creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement ... of which subjects [the plaintiff] or causes to be subjected.... the deprivation of any rights secured by the Constitution," *Dodds v. Richardson, 2010 U.S. App LEXIS 16326, August 10, 2010, at page *33*. It remains a viable basis for liability when a supervisor exercises "control which may create the affirmative link" while not involving "on the ground, moment-to-moment control" of the sort posited by the defendants. *Id., internal citations omitted.* An officer with "policymaking authority" (like defendants Rivera-Merced and Toledo) may

"face personal liability" for his own acts in "creat[ing], actively endors[ing] or implement[ing] a policy which is constitutionally infirm" causing constitutional violations. *Id., internal citations omitted.*

The *Ninth* Circuit, in *al Kidd v. Ashcroft, 580 F.3d 949 (2009), rehearing den'd, 2010 U.S. App. LEXIS 5604 (2010),* reaffirmed its traditional standards for imposing supervisory liability, noting that "direct, personal participation is not necessary to establish liability for a constitutional violation. Supervisors can be held liable for the actions of their subordinates (1) when they set in motion a series of acts by others, or knowingly refusing to terminate a series of acts by others, which they knew or reasonably should have known would cause others to inflict constitutional injury; (2) for culpable action or inaction in training, supervision, or control of subordinates; (3) for acquiescence in the constitutional violations by subordinates; or (4) for conduct showing "reckless or callous indifference to the rights of others....  Any one of these bases will suffice to establish the personal involvement of the defendant in the constitutional violation." *Id.,at 965,* quoting *Larez v.Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991).*

The *Eighth* Circuit has also not shown any inclination to abandon the concept of supervisory liability.  In two recent cases arising from assaults of detainees, *Whitson v. Stone County Jail, 602 F.3d 920 (8th Cir., 2009)* and *Parrish v. Sheriff, 594 F.3d 993 (8th Cir., 2009),* the court noted that despite the fact that the landscape may have changed, supervisory responsibility still lies, respectively, on an official's "deliberate indifference to the risk [of] assault,"*602 F.3d at 928,* and when an official received notice of unconstitutional acts by subordinates," demonstrated deliberate indifference to or tacit authorization"of such acts, "failed to take sufficient remedial action" and caused the injury.  *Id, at 1002.*

The *Seventh* Circuit furthered this consensus in *Roe v. Grindle, 599 F.3d 583 (7th Cir, 2010),* holding that supervisors could be held liable if they "encouraged a climate to flourish where innocent children were victimized," presented a "viable" theory of liability, and that pre-*Iqbal* cases supporting a due process theory of liability upon a showing "that the defendants created a risk of harm, or exacerbated

an existing one" *Id, 590 (internal citations omitted).*[12]  It is important to note that *Grindel*, like *Iqbal*, is an

*equal protection* case, which requires discriminatory *intent.*[13]  Nonetheless, the Seventh Circuit held that the

facts alleged were sufficient to support a permissible inference that a school principal  was responsible

for the gender discrimination, based on evidence of a policy of deliberately refusing to respond to

complaints of sexual harassment. *599 F.3d at 589.*   Of course, this same language and these same

concepts could be directly applied to the case at bar.

The *Fifth Circuit* addressed the issue briefly in a case alleging that police supervisors were liable

for an illegal search and false arrest. *Floyd v. City of Kenner*, 351 Fed. Appx 890 (5th Cir., 2009).  Rejecting

the particular claims against two supervisors in that case as "speculations" and "bare assertions without

detail or content," lacking "specific facts that constitute a deprivation of [Constitutional] rights," the

court nonetheless held that supervisors may still be held liable if there is "a sufficient causal connection

between the supervisor's wrongful conduct and the constitutional violation." *Id., 898 -99.*

The *Third Circuit* has also not provided support for the defendants' premise.  In one post-*Iqbal*

case, *Bayer v. Monroe County Children and Youth Services*, 577 F.3d 186 (3rd Cir., 2009), the court explicitly

left open the standard for supervisory liability upon a finding that the defendants were entitled to

Qualified Immunity.  In another, *Laffey v. U.S. Marshal*, 364 Fed. Appx. 791 (2010), the court deferred

any formulation of the precise standard for supervisory liability because the complaint was totally

lacking in *any* allegations supporting the theory of liability in that case, under *any* standard. In yet

---

[12]The Seventh Circuit also rejected the principal's qualified immunity defense, finding the law
sufficiently established as to substantive and procedural due process violations, employing the long-standing
"deliberate indifference" theory questioned by the defendants in the instant case. *Id., 589–590.*

[13]To the degree defendants imply that such *intent* is required for all alleged constitutional violations,
this is clearly incorrect.  In fact, their isolated snippet from *Grindle*, at page 10 of their motion fails to include
the language immediately preceding their citation, in which the Seventh Circuit clearly states that the
requirement of "discriminatory intent"(as opposed to "deliberate indifference") is applicable "in the *equal
protection* context.

another, *Santiago v. Warminster Township*, *2010 U.S. App. LEXIS 25414 (3rd Cir., December 14, 2010)*, the court reaffirmed that "there are two theories of supervisory liability, one under which supervisor can be liable if they *established and maintained a policy, practice or custom* which directly *caused the constitutional harm*, and another under which they participated in violating plaintiff's rights, directed others to violate them, or, *as the persons in charge*, had *knowledge of and acquiesced* in their subordinates violations." *Id, at page \*14-\*19. (emphasis supplied, internal citations and quotations omitted.)*

The *First Circuit* approach to date has been consistent with that of the other Circuits. Affirming the continuing viability of supervisory liability claims after *Iqbal*, the Circuit has eschewed unnecessary definitions of the precise standards for imposing such liability, either because in the case before it, plaintiffs had "not pled facts sufficient to make at a plausible entitlement to relief under [the court's] previous formulation of the standards for supervisory liability," *Maldonado v.Fontánez, 568 F.2d 263, 275 (1st Cir., 2010)*, or because the particular complaint did "little more than assert a legal conclusion about the involvement of the [supervisory] defendants in the underlying constitutional violation." *Sánchez v. Pereira 590 F.3d at 49*. Throughout, it has been clear that the *concept* of supervisory liability has survived *Iqbal* and that the determination in each case will be made in the context of the particular factual allegations therein. *Id, pages 50-52.* Just a few weeks ago, in the latest *Iqbal* case from the Circuit, former Supreme Court Justice Souter, the author of the *Twombly* decision (and a dissenter in *Iqbal*) clarified that the "new" standard set forth in those cases is, in reality, an expression of the earlier case law requiring a complaint to be based on more than "bald asserions" and "unsupportable conclusions."*Penalbert-Rosa v. Fortuño-Burset, 2011 U.S. App. LEXIS 1780 (January 28, 2011), at page \*6. (quoting Aulson v. Blanchard, 83 F.3d 1 (1st. Cir., 1996).*

Defendants' reliance in their motion on the recent decision in *González-Pérez v. Toledo-Dávila, 2010 U.S.Dist. LEXIS 43654 (D.P.R. 2010)* is misplaced. In that case, Magistrate Judge Arenas granted

a Rule 50 motion filed by Superintendent Toledo because the *evidence* of a causal link was missing.  The only witness who even implied any responsibility on the part of Toledo, described as the "linchpin" of plaintiffs' case, was a sergeant who testified as to the agents' disciplinary file.  In the absence of any theory of liability, other than the fact that the officer had five complaints in his file, there was no notice of possible civil rights violation.  This is a far cry from the case at bar, in which there is concrete, precise *evidence* of the failure of all of the defendants — including Superintendent Toledo — to comply with their responsibilities.  There is evidence of the overall failings in the disciplinary system andthe failure to comply with recognized norms inpolice administration, as well as the abysmal handling of OIS's (like the one which Officers Pagán and Sustache witnessed just one week earlier).  Plaintiffs have presented extensive evidence on *all* of these points, including expert testimony demonstrating the *causal* and *affirmative link* between the actions of the defendants and the harm they caused.

Defendants'next argue that the lower-level supervisors cannot be held liable for a slew of reasons:   Pagán had never killed a citizen before; there were no prior incidents involving the Impact Unit that week; Lieut. Rodríguez was supervising the group that night; the Impact Unit had a different supervisory structure; Mr. Figueroa was on vacation; none of the defendants had access to disciplinary files.[14]  Not a single one of these arguments holds water.  They will be addressed briefly below:

- It is totally illogical to posit that unless an officer kills before, his supervisors cannot be held responsible for their own failings.  Similarly illogical is the notion that unless a particular unit, formed less than a week earlier, has had prior incidents of misconduct, there can be no liability.  No case law, of course, supports these propositions.  An officer is not entitled to one bite of the

---

[14]They also argue that there is no factual support for the averment that Commander Rivera-Merced acted in a manner designed to further officers' sense of impunity by attempting to discredit eyewitnesses versions attesting to the officers'misconduct. *See, Docket #249, at page 18.*  Defendants neglect to consider the *facts*, establishing that despite being told of the eye-witness accounts by Lieut. Rodríguez, the *only* supervisor who arrived at the scene, Rivera-Merced gave false information to the press regarding those accounts.

apple.  Nor is police discipline measured by the microcosm of a particular unit assigned a particular task for one week.  The entire thrust of Mr. Reiter's testimony, which has been accepted time and again by the First Circuit, is the causal relationship between the failure to anticipate potential problems and take appropriate remedial measures, and the tragedies which befall innocent citizens.  *See, eg., Gutiérrez v. Cartagena, supra; Camilo-Robles v. Hoyos, supra* (finding liability against supervisors *inter alia*, because of their display of "indifference," being "put on notice"of the likelihood of risk and failing "to take obvious steps ... to eliminate that risk," as establishing a sufficient causal relationships.) *151 F.3d at 14.*

- The fact that these agents were temporarily assigned to the Impact Unit, of course, does not relieve their *regular* supervisors from the obligation to perform their supervisory functions in an adequate manner.  These regular supervisors had a recognized duty to monitor their subordinates, to know their disciplinary records, to know when they witnessed other Officer Involved Shootings, to assist them with their problems, yet they failed to do so.

- Mr. Figueroa's vacation is entirely irrelevant.  As in *Camilo-Robles,* in which a supervisor made the exact same argument, the pre-vacation actions and omissions of this supervisor — failing to even inquire about the complaints which had led to the expulsion recommendation, or in any other way to monitor Mr. Pagán ---- are sufficient to find the requisite causal relationship.

- Finally, it is absurd for these defendants to rely on the clearly erroneous assertion that they had no access to the disciplinary records.  They *did* have the access; they just *chose* not to comply with their responsibilities in this regard, acting in a manner which was objectively unreasonable and in contradiction to their fundamental duties as police officers.

## B. Qualified Immunity

Defendants' next salvo is the old favorite — Qualified Immunity. Since defendants dedicate a

full eleven pages of their motion to the recitation of the legal doctrine on qualified immunity, which for the most part, is accurate, plaintiffs will not bore this court with yet another recitation of the doctrine.

 Where defendants and the plaintiffs part ways, however, is on the novel notion which defendants put forth that because "supervisory liability" is supposedly in flux after *Iqbal*, that no supervisor can ever be held liable under Section 1983. Their argument boils down to the  notion that because the precise standards which apply to supervisory liability are a work in progress, no supervisor can now be held to have violated clearly established law.

This extraordinary argument ---- that no supervisors can be held liable pursuant to the enduring doctrines in cases such as *Gutiérrez*,  *Camilo-Robles*, and *Sánchez* ----- has no support in applicable precedent.  In seeking to eliminate *all* supervisory liability claims, defendants clearly misconstrue the current debate on supervisory liability.   Nothing in *Iqbal* means that all supervisors are now simply off the hook.   Reasonable police supervisors in the months leading up to Mr. Cáceres' death in 2007 unquestionably would have known that the failures and actions described in the extensive factual record could cause the violation of clearly established rights, and that they would be responsible therefor.

Defendants also neglect the basics on Qualified Immunity.  On Summary Judgment, the test for determining whether a public official is shielded from liability is oft-stated and well-known.  It is the *legal* question whether plaintiffs' evidence, assuming the truth thereof, establishes the violation of a constitutional right which was clearly established at the time the challenged conduct took place. *See, eg., Sánchez, op. cit; Camilo-Robles v. Hoyos, 151 F.3d at 6*.  A court looks at "objective legal reasonableness," taking into account what a reasonable official should have known at the time of his/her conduct. *Id.*

In their Motion for Summary Judgment, as in their lengthy Motion to Dismiss, the supervisory defendants provide no specific analysis of the "framework of applicable law" within which they acted or failed to act, or their  "objectively reasonable belief that their actions did not violate plaintiffs'

constitutional rights" or those of Miguel A. Cáceres-Cruz. Their "Qualified Immunity" argument is wholly without merit.

## C. Standing

Defendants' next argument is based on a fundamental misunderstanding of both the facts in this case and the import of the Supreme Court decision in _Robertson v. Wegmann, 436 U.S. 584 (1978)_. Defendants' standing argument ignores decades of case law on the right of the _heirs_ of a citizen wrongfully killed by government officials to claim constitutional violations under Section 1983. Plaintiffs are not merely claiming standing based solely on their status of being married to or the child of an individual whose rights were violated. In a wrongful death action, plaintiffs clearly have the right to assert the claim they inherited from Mr. Cáceres.

As noted recently by a judge in this district, '[t]he Supreme Court has held that under 42 U.S.C. §1988, state law determines the survivorship of a §1983 action." _López-Jiménez v. Pereira, 2010 U.S. Dist LEXIS 9178 (Feb. 3, 2010), at p. *5 (citations omitted)._ Plaintiffs have alleged _inter alia_ that "prior to his death, Miguel Cáceres-Cruz suffered excruciating pain, fear, desperation and other emotional and physical sufferings, and survived in that condition for a period of time after officers Pagán, Sustache and Díaz abandoned the scene." _Am. Compl, Dkt #64, at ¶4.39._ Pursuant to the Civil Code and the Puerto Rico rules of survivorship, plaintiffs, as the sole heirs of Mr. Cáceres, they have standing to bring this action. _Rossi-Cortés v. Toledo_ 540 F.Supp. 2d 318 (D.P.R. 2008); _Vargas v. González,_ 135 F.Supp. 2d 305 (D.P.R. 2001); _González-Rodriguez v. Alvarado,_ 134 F.Supp 2d 451 (D.P.R. 2001).[15]

---

[15] Defendants now assert that Ms. Ramírez cannot claim damages as the widow. In any event, however, she would be entitled to one half of the community property of society with her husband, as well as the viudal share. Moreover, she is the mother of a young child, whose interests she represents in this action. Finally, as discussed _infra,_ she claims the protection of substantive due process. To suggest, as defendants do, that she should be removed from the instant action because of a parallel state claim is to present a result which defies logic, goes against the norm in favor of the exercise of supplemental jurisdiction and which would run counter to basic principles of judicial economy.

## D. <u>Fourth Amendment</u>

Defendants' next argument is, quite simply, inscrutable.  Apparently, defendants believe that because neither they nor the plaintiffs were on the scene in Punta Santiago, a Fourth Amendment claim cannot lie.  This is patently absurd.  The Fourth Amendment violation for the use of excessive and deadly force stems from the actions of the officers on the scene. If supervisory liability is established, then the Fourth Amendment violation is imputable to the supervisor, even if he or she was on a beach, at home, at a country fair, or anywhere else.

## E. <u>Substantive Due Process Claim</u>

While defendants correctly observe that in *most* cases, a Fourth Amendment claim will suffice to address a claim of excessive force, they do not recognize that there are *exceptions* when the actions of government officials rise to the level of being "shocking to the conscience" or were carried out "with intent to do harm."  Plaintiff *explicitly* pled the Substantive Due Process  claim which, if proven, would assure their *standing*, precisely because of the exceptionally unspeakable acts which occurred in this case.

Plaintiffs assert this claim in full recognition that there is a very high bar for claims of this nature.  While the First Circuit has stated that such a case might exist, it has yet to find a factual pattern which would rise to the level of egregiousness necessary to invoke the doctrine. *See, eg., <u>Meléndez-García</u> <u>v. Sánchez</u>, 2010 U.S. App LEXIS 25227 (1ˢᵗ Cir., Dec. 10, 2010)* (implementation of UPR non-confrontation policy does not "shock the conscience"); *<u>J.R. v. Gloria</u>, 593 F.3d. 73, 80 (1ˢᵗ Cir., 2010)* (failure to protect children from risks in foster case not sufficient); *<u>Ramos-Piñero v. Commonwealth</u>, 453 F.3d 48, 52-53 (1ˢᵗ Cir., 2006) (*death of an adolescent who fell into an uncovered manhole may be "tragic" and caused by "deliberately indifferent" attention to safety concerns," but plaintiffs did not and could not allege that "defendants actually *intended* to harm the boy.") (*emphasis supplied.)*

The U.S. Supreme Court has stated that in order to make out a substantive due process claim,

a plaintiff must allege conduct which is extremely "egregious" and "outrageous" *County of Sacramento v. Lewis, 523 U.S. 833, 847, n.8 (1988).*  The First Circuit, in turn, takes the *Lewis* language to mean that there must be "stunning evidence of arbitrariness and caprice that extends beyond mere violations of state law, even violations resulting from bad faith, to something more egregious and more extreme." *J.R. v. Gloria,* 593 F.3d at 80.  While the standard is very strict, the Court of Appeals has nonetheless continued to affirm the viability of such claims, even in the *post-Iqbal* climate. *See, Maldonado v. Fontanés,* the case involving the killing of dogs in Barceloneta, in which the First Circuit recently *reaffirmed* that certain governmental actions *could* be so "shocking" as to be "beyond the constitutional pale." *568 F.3d at ** 21.*  "[O]fficial conduct most likely to rise to the conscience-shocking level is conduct intended to injury in some way unjustifiable by any government interest." *Id, at **22 (internal quotes and cites omitted.)*

In a recent Ninth Circuit case, the issue was discussed in a factual context quite similar to that presented in the case at bar.  The plaintiffs in *Porter v. Osborne, 546 F.3d 1131 (9th Cir., 2008)* were *the parents* of an adult son who was killed by a State Trooper.  They were *not* his heirs and did not assert a survivorship claim. Their 1983 claim, rather, was founded on their substantive due process right to the enjoyment of the familial relationship with their son, on the basis of egregiousness of the conduct of the officer in question. *Id., 1140-41.* While not actually deciding whether the particular claim proceeded, the Ninth Circuit observed that the facts in that case might well fall beyond the strict dictates of a Fourth Amendment reasonableness test governing the use of deadly force. *See, Tennesse v. Garner, 471 U.S. 1 (1985).*  The Appeals Court remanded the case to the district court for a determination as to whether, pursuant to the particular facts in that case, the officer had the "purpose to cause harm unrelated to the legitimate object of arrest," noting that the in the Substantive Due Process calculus, the determination as to whether a particular conduct is "shocking to the conscience" or results from an "intention to do harm" would have to be based on the "totality of the circumstances." *546 F.3d at 1140-*

*1141 (internal citations omitted.)*[16]

In the case at bar, Officer Pagán and his fellow officers had no legitimate purpose when they intervened with Mr. Cáceres, or when Pagán pushed him to the ground, threatened him with arrest, shot him several times, and then, when the man was completely immobilized, delivered the fatal shot to his head. These are egregious *facts,* giving rise to plaintiffs' averment that "[t]he actions of defendant Pagán amounted to a summary execution of a citizen, which was shocking to the conscience, and which was deliberately meant to do harm, and which had the effect of depriving the plaintiffs herein of the company, affection and companionship of their father and husband and of the strong family ties and relationship they had before the incident." *Complaint, ¶4.37.* The supervisory defendants, whose *own* actions and omissions led to that fateful day and proximately caused Mr. Cáceres's death, are subject to suit on this ground with respect to a police killing which defendant Toledo, like the fellow officer in *Porter*, considered to be sufficiently "shocking" as to constitute an "execution." Plaintiffs' averments clearly make out a "substantive due process" violation, which plaintiffs have standing to assert.

## F. <u>Fifth Amendment</u>

Defendants' Fifth Amendment argument ignores the only basis for plaintiffs' Fifth Amendment allegation ---- the *particular* constitutional status of Puerto Rico, which requires that *both* the Fourteenth Amendment and the Fifth Amendment be alleged when addressing due process violations, since it is still not clear — ---- whether it is the former or the latter amendment which serves to limit the excesses

---

[16]The Court of Appeals considered several factors as "relevant to an unlawful purpose to harm:" that the young man's car posed no overt threat to officer safety; that another officer stated that he felt no threat; despite this, that the defendant officer drew his weapon; that he sprayed the vehicle's occupant with pepper spray, which might be viewed as 'punishing or harassing'"; and that the officer had "escalat[ed] the situation, where [the young man's] only violation was noncompliance, [the officer's] extraordinary response was to fire five shots, which even shocked [his fellow officer.]" *Id., 1141-42.* It certainly does not take a leap of faith to conclude that the facts in the case at bar are at least as "shocking to the conscience" as were those in *Porter,* or that Officer Pagán, in shooting an unarmed man who had committed no criminal acts and presented no threat, "intended to do harm" unrelated to any legitimate law enforcement objective.

of governmental power in Puerto Rico.

      This is discussed in a number of cases. In *Rodríguez v. PDP, 457 U.S. 1, (1982),* for example, involving an equal protection challenge to the electoral law of Puerto Rico, the Supreme Court evaded the issue, stating as follows: "We have never found it necessary to resolve the precise question whether the guarantee of equal protection is provided to Puerto Ricans under the Equal Protection Clause of the *Fourteenth Amendment* or the Due Process Clause of the *Fifth Amendment." 457 U.S. at 8, fn. 6, emphasis supplied. Accord,* Examining Bd v. Flores de Otero*, 426 U.S. 572 (1976).* The First Circuit has applied the same reasoning, with the most recent recognition of this unresolved constitutional debate in the latest of the *Iguartúa* cases, decided in the First Circuit late last year, in which the Court of Appeals notes that "Puerto Rico residents are given procedural due process rights *under either or both the Fifth and Fourteenth Amendments."* Igartúa v. United States*, 626 F.3d 592, 599 (1ˢᵗ Cir., 2010) (emphasis supplied.)*

      Plaintiffs are not claiming a *separate* Fifth Amendment violation, but rather the extension of other constitutional protections to restrain the actions of Puerto Rico officials, either through the Due Process Clause of the Fifth Amendment or through the same clause of Fourteenth.  If Puerto Rico were a State, these claims would be incorporated through §§1 and 5 of the FourteenthAmendment.  Given the particular status of Puerto Rico, however, it is unclear whether the protections are incorporated through the Fourteenth or the Fifth Amendments. Defendants' entire argument that plaintiffs do *not* have a "Fifth Amendment" claim misconstrues plaintiffs' allegation and is based on a notable ignorance about the application of Section 1983 claims to actions by individuals vested with authority by the Commonwealth of Puerto Rico.

## G. State law claims

      Since plaintiffs' federal law claims are clearly viable, there is no reason whatsoever for this court to dismiss the state law claims.  Judicial economy and fundamental justice demand that they be tried in

the same court as the federal claims.

### III. <u>CONCLUSION</u>

This is a case about a death foretold.   Miguel Cáceres's death could have been avoided, had these defendants acted in an "objectively reasonable" manner consistent with fundamental police practices and their obligations to the public.   The evidence in support of plaintiffs claims is overwhelming.  Summary Judgment should be denied.


I hereby certify that I am filing this motion through the ECF filing system, which will automatically notify all counsel of record.

In San Juan Puerto Rico, this 15th day of March, 2011.


**Respectfully Submitted**

/s/ <u>Judith Berkan</u>
Judith Berkan
Berkan/Mendez
Calle O'Neill G-11
San Juan, Puerto Rico 00918-2301
Tel.: (787) 764-0814
Fax.: (787)250-0986
bermen@prtc.net
US DC No. 200803
berkanj@microjuris.com