**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

Evelyn Ramírez Lluveras et al
    Plaintiffs

v.                                     Civ. Number 08-1486 FAB

Javier Pagán Cruz, et al
    Defendants

**PLAINTIFFS' STATEMENT OF FACTS
IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT ON LIABILITY**

**TO THE HONORABLE COURT:**

    **NOW COME THE PLAINTIFFS**, through the undersigned attorneys, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, and Rule 56 of the Local Rules of this court, respectfully present the following statement of facts in opposition to the request for summary judgment by the supervisory defendants.

    The *First* Section of this factual statement is submitted in compliance with the Local Civil Rule 56(c), which permits a party opposing summary disposition to file "a separate section [containing] additional facts," with the citations to references as required under Rule 56(e) of the Local Rules.  The *Second* Section addresses the factual assertions made by the defendant in support of summary judgment, in compliance with the requirement of L.Cv.R 56(c) to "admit, deny or qualify" each one of the numbered paragraphs in defendants' Statement of Facts.

**SECTION I - PLAINTIFF'S STATEMENT OF MATERIAL FACTS**

    It is important to note that this First Section of plaintiffs' Factual Statement includes facts which are *both contested and uncontested.*  This is because as the party opposing summary

disposition, plaintiffs are entitled to all inferences in favor, and unlike defendant, is *not* bound to a description of "uncontested" facts. "All reasonable inferences helpful to the party resisting summary judgment" must be drawn. *Cortes-Irizarry v. Corp. Insular, 111 F.3d 184, 187 (1st Cir. 1997); Hahn v. Sargent,523 F.2d 464 (lst Cir. 1975), cert. den 425 U.S 904 (1976); Greenburg v. P. R. Maritime Ship. Auth, 835 F.2d 932, 936 (lst. Cir. 1987)*).   The court must assume all facts submitted by plaintiff and supported by competent evidence, adopting "*her version of any contested facts* which are material to .... the issues." *Vega-Rodriguez v. PR Tel. Co, 110 F.3d 174, 178 (lst Cir 1997) (emphasis supplied); Lipsett v. Univ of Puerto Rico, 864 F.2d 881, 895 (1ˢᵗ Cir., 1988).* As non-movant, plaintiffs need only show either that there is controversy on material facts, *or* that there are sufficient facts in the record from which a trier could find in her favor.  This is in contrast to defendants, as movant, who must base their request solely on facts <u>not</u> in controversy and which lead inexorably to one conclusion: that plaintiff's claim must fail.


A. <u>The cast of characters - the five supervisory defendants</u>

1.1 The five supervisor defendants in this case and their rank at the time when Miguel A. Cáceres was killed are: Police Superintendent Pedro Toledo-Dávila; Humacao Area Commander Edwin Rivera-Merced; Lieutenant Víctor Cruz-Sánchez; Sgt. Rafael Figueroa-Solís; and Sgt. Juan Colón-Báez. *See, Amended Complaint and Answer.*

1.2  At all times relevant to this case, Pedro Toledo-Dávila was the Superintendent of the Puerto Rico Police Department ("PRPD") and Edwin Rivera-Merced was the Area Commander and highest official for the Humacao Area. *Id.*

1.3 The three other defendants --- Lieutenant Víctor Cruz-Sánchez and Sgts. Rafael Figueroa-

Solís and Juan Colón-Báez — all were supervisors in the Humacao Area during 2006 and 2007.

Their positions, however, changed over time. All three, however, directed the Humacao Tactical

Operations Division at different points in time in the year before Miguel Cáceres was killed. *See,*

*SofF #6.13 infra.*

    1.4  In order to understand the precise chain of command during the relevant period, and on

the night of August 11, 2007, plaintiffs present the following chart describing the positions occupied

by each of the defendants:

| Defendant | Position at time Miguel Cáceres was killed | Experience as Supervisor |
|---|---|---|
| Pedro Toledo-Dávila | Superintendent | 12 years as Superintendent (1993 to 2000; 2005 to 2009) |
| Colonel Edwin Rivera-Merced | Humacao Area Commander | Police Captain in 1995. Was Dep. Dir of the Vice and Drugs Bureau; Was highest ranked officer in Caguas Bureau of Criminal Investigations, in PRPD Violent Crimes Bureau, in San Juan Region of Crim. Investigations Bureau. Was Area Commander for Guayama for two years and Area Commander of Humacao beginning in 2006. |
| Lieutenant Víctor Cruz-Sánchez | Director, Humacao District | Sergeant since 2002; Lieutenant since 2004. Had been Asst. Director of the Humacao District and was Director of the District in August, 2011. Was the Director of the Humacao Special Operations Division; Was Director of the Humacao T.O.D. from March, 2006 to March, 2007. |
| Sgt. Rafael Figueroa-Solís | Acting Director, Humacao Tactical Operations Unit | Supervisor since 1999. Worked at the T.O.D. since 2001. In 2007, was also head of the Humacao Command Center, Unit Director of the Motorcycle Unit of Humacao. |
| Sgt. Juan Colón-Báez | Interim Director Humacao Tactical Operations Unit | Sergeant since 2004. Had been supervisor in Criminal Investigations, in Internal Affairs, and in Special Operations. Had been Asst. Director in the Humacao T.O.D. for a year up to February of 2007. Was Asst. Director of Special Operations and Director of the Seizure Section for the first half of 2007, and was the Acting Director of the T.O.D. while defendant Figueroa-Solís was on vacation in July and August, 2007 |

*See, Exhibit A, Excerpts from Víctor Cruz-Sánchez Interrogatory Answers*, ("VCS Interrogs"), *Questions #4(e) to (j); Exhibit B, Excerpts from Juan Colón-Báez Interrogatory Answers ("JCB Interrogs"), Questions #3( I ) to (l); Exhibit C, Excerpts from Rafael Figueroa-Solís Interrogatory Answers ("RFS Interrogs"), Questions # 3 (d) to (I); Exhibit D,  Excerpts from Edwin Rivera-Merced Interrogatory Answer ("ERM Interrogs"), Question # 1; Exhibit E, Excerpts from Toledo Answers to Requests for Admissions ("PTD Adm"), page 1.*

1.5   The pertinent chain of command with respect to line agents Javier Pagán, Carlos Sustache and Zulma Díaz during 2006 to 2007 shifted on more than one occasion during that year. During most of 2006 and the early part of 2007, the Tactical Operations Division ("T.O.D.") of the Humacao Areas was headed by defendant Víctor Cruz-Sánchez, with defendant Juan Colón Báez as his Assistant Director.   Defendant Rafael Figueroa-Solís was a Sergeant in that Tactical Operations Division at that time.   In approximately March of 2007, Lieutenant Víctor Cruz-Sánchez took over as the Commander of the Humacao District (one of the Districts comprising the Humacao Zone of the Humacao Area.)  Sgt. Juan Colón Báez moved to the Humacao District with Lieut. Cruz-Sánchez who recruited him to be his Assistant Director in that precinct. *See, SofF #'s 6.10 infra and references cited therein.*

1.6  At the same time, Sgt. Rafael Figueroa-Solís became the Acting Director of the Humacao Tactical Operations Division.   There were no higher officers, such as Lieutenants, at the T.O.D. at that  time. *See, SofF #'s 7.79 infra.*

1.7  The circle comes around in July of 2007, when Rafael Figueroa-Solís went on vacation, and Sgt. Juan Colón-Báez became the Interim Director of the Division. *See, SofF #7.79 infra.*

1.8  The following chart lays out the chain of command in the Humacao Area in 2006 to

2007, and the changes which occurred in the period between March of 2006 and August of 2007, the

year and a half before Mr. Cáceres was killed:

| Dates | Chain of Command |
|---|---|
| <u>March, 2006 to Feb, 2007</u> | Superintendent **Pedro Toledo** ⇓ Area Commander **Col. Edwin Rivera-Merced** <br><br> T.O.D.. Director **Lieut. Víctor Cruz-Sánchez** ⇓⇓⇓ Assistant T.O.D.. Director **Sgt. Juan Colón Báez** ⇓⇓⇓ **Sgt. Rafael Figueroa Solís** <br><br> **Javier Pagán**   **Carlos Sustache** <br><br> Director, Humacao District ⇓⇓⇓⇓ Sergeants Humacao District ⇓⇓⇓⇓⇓⇓ **Zulma Díaz** |

| Dates | Chain of Command |
|---|---|
| March, 2007 to July, 2007 | Superintendent **Pedro Toledo**<br>⇓<br>Area Commander **Col. Edwin Rivera-Merced**<br>↙           ↘<br>**T.O.D.. Director**              **Director, Humacao District**<br>**Sgt. Rafael Figueroa Solís**      **Lieut. Víctor Cruz-Sánchez**<br><br>Assistant Director Humacao District<br>**Sgt. Juan Colón Báez**<br>↙   ↘<br>**Javier Pagán**   **Carlos Sustache**      Sergeants Humacao District<br>⇓<br>**Zulma Díaz** |

1.8. On the night shift on *August 11, 2007*, Officers Javier Pagán, Carlos Sustache and Zulma Díaz were part of an Impact Service, which was comprised of agents from different units in the Area. The immediate supervisor on that particular service was Lieut. Luis Rodríguez.  The person on duty who was in overall charge of the Area was defendant Lieut. Víctor Cruz-Sánchez.  By that time, defendant Sgt. Rafael Figueroa-Solís had begun his planned vacation, and defendant Sgt. Juan Colón-Báez had been the Interim Director of the Humacao Tactical Operations Division for several weeks, being the only Sergeant in that division.  Colón-Báez and Edwin Rivera-Merced were both off duty when the killing of Miguel Cáceres took place.  *See, generally, Sof F #'s 7.79 infra, and supporting references therein.*

1.9 The chain of command in the Humacao Area on the night of August 11, 2007 is reflected on the next table, as follows:

6



**B. The death of Miguel Cáceres - the events at Punta Santiago on August 11, 2007**

**1. The Impact Unit goes on duty on August 11, 2007**

2.1. Police Officers Javier Pagán, Carlos Sustache and Zulma Díaz were assigned on August 11, 2007 to an Special Impact Service in the Humacao Area.   The Impact Service was created due to concern about the high crime rate in certain sectors.  Personnel from different units and different districts were assigned to the Impact Unit. *Exhibit F, Excerpts from Luis Rodríguez Deposition ("LRG Depo"), page 24, line 11-19.*  The Service was comprised of officers from the Yabucoa, Maunabo, Las Piedras, Humacao and Naguabo Districts, as well as one officer from Transit, one from D.O.E. (Special Operations Division) and six Tactical Operations Division (D.O.E.) officers.

The Impact Service was headed up that night by Lieutenant Luis Rodríguez. *Exhibit G, Service List for Impact Service.*

2.2. Area Commander Edwin Rivera-Merced made the decision to create the specialized Impact Service. Each district was to assign a certain number of agents, who would work in conjunction with selected agents of the Tactical Operations Unit. *Exhibit H, Deposition of Edwin Rivera Merced ("ERM 2009 Depo"), page 45, line 7; page 45 lines 9-17.*

2.3. The Plan for the Impact Service was written by defendant Víctor Cruz-Sánchez. *See, Exhibit I, Excerpt, first page of Impact Service Plan for August of 2007.*

2.4. The purpose of the plan was to impact upon high-crime sectors. The Area Commander, defendant Edwin Rivera Merced, asked all of the commanders of districts and specialized units in the area to work on the plan, resulting in the development of a master plan for the area. *Exh. F, LRG Depo, page 23, lines 18-24.*

2.5 The officers who were selected for this special service were chosen by their respective unit heads. In the case of the Humacao Tactical Operations Division, both Javier Pagán and Carlos Sustache were selected for the Impact Service by the then Director of the Division, defendant Sgt. Juan Colón Báez. *Exh. F, LRG Depo, page 25, line 5-22; Exhibit J, Excerpts from Deposition of Juan Colón-Báez (" JCB Depo"), page 27, lines 9 to 18; page 29, line 24 to page 30, line 10.* Officer Zulma Díaz was selected for the Impact Service by the then Director of the Humacao Precinct, defendant Víctor Cruz-Sánchez. *Exhibit K, Excerpts from Deposition of Víctor Cruz-Sánchez ("VCS Depo"), page 67, line 20 to page 68, line 23.*

2.6 At the time Lieut. Cruz-Sánchez selected Officer Zulma Díaz or the service, he had not reviewed her personnel file, as required. *Id., page 68, line 24 to page 69, line 2.*

8

2.7 Lieutenant Cruz-Sánchez used no criteria in selecting this officer except that it would be easier to remove an officer from the particular shift that she worked on.  He did not consider whether she was particularly suited for the Impact Service. *Id., page 67, line 20 to page 68, line 23.*

2.8. Sergeant Juan Colón-Báez, Interim Director of the Humacao Tactical Operations Division at that time, received instructions from Commander Edwin Rivera-Merced to send two agents from Tactical Operations in Humacao to serve in the Impact Unit.  He selected Officers Pagán and Sustache for the Impact service "based on the work plan made for the Tactical Operation Unit."  To this day, Sgt. Colón-Báez has no knowledge of any documents describing the purpose of the Impact Service or the criteria which should have been used to select agents for that service. *Exh. J, JCB Depo, page 27, lines 9 to 18; Exh. H, ERM 2009 Depo, page 79, line 19 to page 80, line 1; Exh. B, Excerpts from Interrogatory Answers of Juan Colón-Báez, Answer to Interrogatory #12.*

2.9. Since no one indicated to Sgt. Colón-Báez the criteria which should be used to select personnel, he simply sent to the special Impact Service those officers who he thought were available. *Exh. J, JCB Depo, page 29, lines 16-20.*

2.10. At that time, on August 11, 2007, there were no lieutenants and only one sergeant in the Humacao Tactical Operations Division.  Defendant Juan Colón-Báez was taking on the functions of Director on an interim basis, while the only other supervisor, defendant Rafael Figueroa-Solís, was on vacation for about 6 weeks.  *Id., page 29, line 24 to page 30, line 10.*

2.11 On August 11, 2007, Mr. Colón-Báez was on his day off.  *Id., page 32, line 5-7.* Accordingly, there were no sergeants or lieutenants at all in the Tactical Operations Division in Humacao that day. *See, Defendants' Statement of Facts ("D's SofF"), at #196.*

2.12 On the night of August 11th, 2007, the focus of the work of the Impact Unit was to be

on the Municipality of Naguabo. At the regular Monday staff meeting in the Area, the crime rate was discussed, and Naguabo was selected for the Impact Service, since it was the area where drug-trafficking was most problematic. *Exh. H, ERM2009 Depo, page 65, line 25 to page 66, line 11.*

2.13 On that night, the officer with ultimate responsibility for the Impact Service was Commander Edwin Rivera-Merced. *Exh. L, Excerpts from Pedro Toledo-Dávila Deposition ("PTD Depo"), page 183, lines 19-25.* Mr. Rivera-Merced delegated his authority to Lieutenant Víctor Cruz-Sánchez who he had selected as the Officer in Charge of the Area and the Area Commander's Official Representative at the time. *Exh. F, LRG Depo, page 40, lines 11-12; page 51, lines 20-25.*

2.14 At that time, Lieutenant Víctor Cruz-Sánchez was the Commandant of the Humacao District within the Humacao Area, where Officer Zulma Díaz was assigned. Immediately before that assignment, which he had begun in March of 2007, Víctor Cruz-Sánchez had been the Director of the Tactical Operations Division of Humacao, where Officers Javier Pagán and Carlos Sustache were assigned. *Exh. A, Excerpts from Interrogatory Answers of Víctor Cruz-Sánchez, Interrogatory #3, at sub-sections (I) and (j); See, also Exhibit G, Service list.*

2.15 In August of 2006, Edwin Rivera-Merced had selected Víctor Cruz-Sánchez to direct the Area's Tactical Operations Division, but thereafter, he assigned Lieutenant Cruz-Sánchez to Humacao, leaving defendant Rafael Figueroa-Solís in charge of the T.O.D. *Exh. H, ERM2009 Depo, page 42, line 2-8; line 14-17.*

2.16 In both of the aforementioned positions, Lieutenant Cruz-Sánchez supervised police supervisors and communicated and implemented in the respective unit the policies and actions directed by police headquarters. *Exh. A, Excerpts from Interrogatory Answers of Víctor Cruz-Sánchez, Interrogatory #3, at sub-sections (I) and (j).*

10

2.17 On the evening of August 11, 2007, Luis Rodríguez met with the group at about 6:00 PM to impart instructions.  Although the group was supposed to go out together,  Zulma Díaz showed up late.  Javier Pagán, on the other hand, said that his vehicle needed gasoline, because the vehicle, which should have been gassed up the previous day, had been switched.  Accordingly, neither Pagán nor Díaz left with the group.  *Exh. F, LRG Depo, page 27, line 11 to page 28, line 4; page 29, line 22-23.*

2.18   Lieutenant Rodríguez instructed defendant Pagán to fill up the car, noting that the Lieutenant and the rest of the group would leave in the meantime, taking the highway towards Naguabo.  *Id.,, page 28, line 5-15.*

2.19. Defendant Zulma Díaz arrived later, and Lieut. Rodríguez called Pagán on the radio and instructed Pagán to go by and pick her up and then to continue on Route #53 towards Naguabo. (Had Pagán followed these instructions, the officers would not have passed by Playa Santiago).  *Id., page 31 line 10-18.*

2.20. According to Lieut. Rodríguez's instructions, the officers on the Impact Service were to intervene exclusively with delinquents.  Although the officers had the authority to intervene with persons who violated the rules of transit, the important work involved intervening with criminals.  *Id, page 32, line 22 to page 33, line 15.*

2.21 The officers of the Impact Service were also to "guarantee the civil rights of all people stopped [by the police]." *Exh. G, Service List for Impact Service (translation provided.)*

## 2. **The events at Punta Santiago**

2.22  At the time of the events leading to the killing of Miguel A. Cáceres in August of 2007.

Fermín Torres-López ("Mr. Torres-López")was the President of a scooter club in Punta Santiago. *Exhibit M, Deposition of Fermín Torres-López (FTL Depo), page 32, line 17 to page 33, line 10.* Mr. Torres-López, 54 years old resident, is a resident of Punta Santiago, Humacao Puerto Rico, and has lived in that area for his entire life. *Id., page 8, lines 2-4; page 13, line 3-14*

2.23  The Punta Santiago Scooter Club was a not-for-profit organization, which did activities as a group, such as outings, and would also escort family events such as weddings and 15th birthday parties ("quinceañeros"). *Id., page 34, line 6 to  line 15.*

2.24. Miguel A. Cáceres, known by his nickname, "Tony," was a member of the club.  He asked Mr. Torres-López how to become a member, and he met the requirements, which were to be "respectful, decent" and "responsible," and to acquire the T-shirts used by the club members for their activities.  *Id., page 35, line 6 to  line 15; page 101, line 8 to line 10.*

2.25  On August 11, 2007, the club was in Punta Santiago because they were going to provide an escort for a young girl named Nicole, whose grandmother lives in the area, across from an establishment called "Playerito."  *Id., page 36, line 1-22.*  Alejita Cruz, the grandmother of the girl, had asked Mr. Torres-López to provide an escort for her 15th birthday party on that date.   The club agreed to do so free of cost.  *Id., page 39, line 1 to  line 17.*

2.26  The club members met at a gas station near the area, so as to be ready to escort Nicole at 6:00 PM. *Id., page 40, line 9 to  line 16.*

2.27.  Another person in the Punta Santiago area that evening was Ricardo Lebrón-Rivera. ("Mr. Lebrón").   Mr. Lebrón finished his shift at a local factory that day at about 4:30 to 5:00 pm and headed to a bar in the Punta Santiago area, arriving there about 15 to 20 minutes later. *Excerpts from Deposition of Ricardo Lebrón Rivera, ("RLR Depo"), Exh. N, page 52, line 20 to page 53, line*

*5; page 59, line 15 to page 60, line 13; page 60, line17to page 61, line, 2; page 61, line 17 to line 18; page 65, lines 1 to 6; page 74,line 16to 19.*

2.28.  Mr. Lebrón took out a camcorder which he had bought the previous day and started playing with it, filming people inside and outside of the establishment. *Id., page 67, line 6 to page 68, line 5; page 74, line 16-19.*

2.29  The camcorder was an Optimus.  Mr. Lebrón also bought an SD Card for use in the camcorder.  This is a memory card which stores images made from using the camcorder. *Id., page 73, line 18 to line 24; page 75, line 9 to line 14; page 76, line 5 to 18.*

2.30  The first clip Mr. Lebrón filmed was on the sidewalk, an area where he had noticed the group from the motorcycle club. *Id., page 78, line 9 to 18.* He then continued filming inside the bar, playing with the camera. *Id., page 78, line 21 to 24.*

2.31. Outside, Mr. Lebrón saw scooters and some cars  from the car club parked between the lane and the sidewalk, mostly on the sidewalk, taking up just a small portion of the driving lane. There were people assisting in directing the flow of traffic so as to prevent a traffic jam. *Id., page 81, line 13 to page 82, line 11, page 83, line 4 to 14.* The members of the scooter club were dressed in yellow T-shirts. *Id., page 88, line 6-7.*

2.32  The road where the members gathered, Highway Number 3, is a two-lane highway, with each lane approximately eight to nine feet wide. *Exh. M, FTL Depo, page 41, lines 9-18.*

2.33  The group of motorcyclists, about eleven in number, gathered at a nearby gas station at about 5:30 PM. They then left for Punta Santiago, parking their scooters in front of the home of Nicole's grandmother, Alejita. *Id, page 41, line 24  to page 42, line 8;  page 44, line 19  to  line 25.*

2.34  There were also a group of Lancer cars parked in the area, partially on the sidewalk and

13

partially on the road. The scooters parked in front of the Lancers, on the same side of the street. The scooters took up about a quarter of the lane, blocking a small portion of the lane. Since no one was parked on the other side of the street, the other lane was entirely free. *Id., page 45, line 23 to page 46, line 15; page 47, line 3 to line 6; page 47, line 17 to page 48, line 4; page 48, line 16 to page 48, line 4.*

    2.35 When the members of the scooter club arrived, two members of the Lancer club were directing traffic. Some time thereafter, Ricardo Lebrón observed two to three members of the club, in yellow t-shirts, directing traffic. *Id., page 49, line8 to line 9; See, also. Exh. N, RLR Depo, page 89, line 13 to page 90, line 14.*

    2.36 Mr. Cáceres began helping the Lancer club members direct traffic. He stood between the two members of the Lancer club, with the three persons letting one side of the traffic pass through first, communicating with each other, then letting the other side go past the area. *Exh. M, FTL Depo, page 49, line 13 to page 50, line 5.*

    2.37 The traffic was flowing very well. There was no traffic jam. Cars would be stopped for a short period of time, two to three cars at a time, and then, they would proceed to pass the spot. *Id, page 50, line 6 to line 7; page 58, line 17 to 23.*

    2.38 After about five minutes from the time Mr. Cáceres began helping out with the flow of traffic, a PRPD Ford Explorer driven by Officer Javier Pagán, arrived at the area, with Officer Carlos Sustache in the back seat and a female officer (Zulma Díaz) in the front passenger seat. *Id., page 53, line 3 to line 6., page 54, line 4 to line 9; page 55, line 3 to line 7; line 14-22; page 56, lines 2 to 11.*

    2.39 The police vehicle was stopped for a short period awaiting someone to direct them to go forward. *Id., page 58, line12 to line 17.*

14

2.40  Miguel Cáceres then instructed the Explorer to move forward so as to access the traffic lane.  When Mr. Cáceres told them it was now their turn to move on, Officer Javier Pagán responded that the officers were the only ones who had the authority to tell someone to move on.  *Id., page 54, lines 4 to 17*. Mr. Cáceres responded by telling the officer, "that is OK.  That is fine," and he moved to the side of the road.  *Id., page 59, line 6  to line 14.*

2.41 Rather than simply continuing passed the spot, the police car came to a stop in the lane opposite from where the scooters were parked, obstructing the flow of traffic and causing a traffic jam. *Exh. N, RLR Depo, page 83, line 15 to page 84, line 13; page 85, line 12 to page86, line 1; Exh. M, FTL Depo, page 58,  line 20 to page 59, line 1.*

2.42 Officer Pagán told Mr. Cáceres that the club members had five minutes to move the scooters to the sidewalk.  Mr. Cáceres responded by saying that it would be only about two minutes until Nicole got in a car and everybody would leave.  However, Javier Pagán's response was that the club members no longer had five minutes to move the cycles and that the scooters had to be moved immediately.  *Exh. M, FTL Depo, page 59, line 19 to page 60, line 8.*

2.43. Ricardo Lebrón observed the interchange.  He though that  the officers seemed to be looking for a fight, to do some harm to someone.  He describes them as having "an attitude, a bad attitude."  They were angry*,* and they were waiving their hand at the persons on the street, telling the people to " move this;  move that."  *Exh. N, RLR Depo, page 88, line 5 to line 24;  page 91, line 13 to line 19;  page 100, line 9 to page 101, line 4; page 111, line 6 to line 17.*

2.44   The attitude was such that  Mr. Lebrón thought that the officers were going to hit someone, that "something is wrong here.  Something is going to go wrong here." *Id., page 88, line*

*8 to line 12; line 21 to page 89, line 2.*

2.45  As soon as Officer Pagán told the club members no longer had five minutes to move their scooters, but had to move them immediately, Mr. Torres-López instructed the club members to move the scooters to the sidewalk as Officer Pagán had told them to do.  *Exh. M, FTL Depo, page 61, line 13 to page 62, line 1.*

2.46  The club members started to move the scooters.  Miguel Cáceres was the first one to move his scooter to the sidewalk, moving it about 25 to 30 feet from where it had been originally parked near the patrol car. He stayed there, leaning on his scooter and not saying anything.  *Exh. M, FTL Depo,  page 61, line 4 to line 8;  page 63, line 7 to line 22.  page 68, line 13 to line 17; page 69, line 1 to line 7.*

2.47 Officer Pagán got out of the police vehicle and put on his bullet proof vest.  The other officers also descended from the vehicle, and the three of them moved towards Mr. Cáceres.  *Id., page 69, line 19 to line 23.*

2.48. Ricardo Lebrón observed the officers as they got out of the vehicle.  According to Mr. Lebrón, the expression on their faces was one of anger. *Exh. N, RLR Depo, page 81, lines 2-4.*

2.49  Officer Pagán proceeded to walk towards Mr. Cáceres.  He stood in front of him and pointing at him, said to him, "you are a charlatan."  Mr. Cáceres responded by saying, "if I am a charlatan, you are too," noting that Mr. Pagán had said it first, and it was disrespectful  *Exh. M, FTL Depo, page 69, line 23 to line 24; page 70, line 1 to line 8; page 70, line 9 to line 16.*

2.50 At that time, Officers Sustache and Díaz were close by, no more than five feet away.  *Id., page 70, line 17 to page 71,1ine 13*

2.51 Officer Zulma Díaz immediately told Mr. Cáceres that he was being arrested.  Mr.

Cáceres asked her for the reason why he was being arrested, to which she responded, "because I want to arrest you." *Id., page 72, line 5 to line 14.*  She gave the same answer to Mr. Torres-López, who also asked why Mr. Cáceres was going to be arrested.  *Id., page 77, line 17 to line 19.*

2.52  Mr. Cáceres started moving backwards, repeating that he had not done anything wrong to justify his arrest.  Walking backwards, with his hands up, directly in front of him, Mr. Cáceres implored Officer Pagán not to push him, not to hit him, but Officer Pagán kept going straight at him. *Id., page 72, line 15 to page 73, line 1; Exh. N, RLR Depo, page 117, lines 6-15; page 117, line 17 to page 118, line 15.*

2.53   Both Mr. Torres-López and Ferdinand Rosa attempted to intervene with Officer Pagán, who pushed both of them to the side and continued walking towards Mr. Cáceres.  *Exh. M, FTL Depo, page 76, line 15 to line 20; page 77, line 8-11; line 23 to page 78, line 1; line 18-23.*

2.54  Officer Pagán tried to grab Mr. Cáceres by his shirt, on his shoulder, at which point Mr. Cáceres pushed Officer Pagán and said "don't touch me." *Id., page 83, line 21 to page 84, line 4.*

2.55  At that time, the two officers, Mr. Pagán and Ms. Díaz enclosed Mr. Cáceres between a chain and the road, causing him to fall down.  Officer Pagán threw punches at Mr. Cáceres and he stumbled after being hit.  Mr. Cáceres fell between the street, a chain and the gate of a carport of a house on the street.  *Id., page 81, line 13 to line 18; page 83, line 3 to line 4; page 83, line 21 to page 84, line 4; See, also, Exh. N, RLR Depo, page 120, line 6 to page 121, line 1.*

2.56  At that point in time, Officer Pagán was in front of Mr. Cáceres, and Officer Sustache was next to him.  Officer Pagán started punching Ms. Cáceres, who was on the ground.  The officer started punching him in the face. *Exh. M, FTL Depo, page 85, line 4 to line 7;  page 87, line 22 to line 25;*

17

2.57   People on the scene, observing the assault on Mr. Cáceres, began screaming and yelling, while Officer Sustache was holding everyone back, so as to prevent anyone from coming to Mr. Cáceres's aid. *Exh. N, RLR Depo, page 112, lines 8-21; page 113, line 14 to page 114, line 2.*

2.58   The officers did not make a serious attempt to arrest Mr. Cáceres.  Although three of them were on the scene, and they could have done so easily by grabbing his hands, they did nothing to avoid or mitigate the violence. Id., page 121, lines 1-9.

2.59.   Mr. Cáceres weighed approximately 140 to 145 pounds.  *Exh. M, FTL Depo, page 98, line 23 to line 24.*

2.60   While on the ground, Mr. Cáceres tried to defend himself from being punched by Officer Pagán.  He grabbed onto Officer Pagán's leg, trying to hold it so as to defend himself from Officer Pagán's punches.  He tried holding on to Officer Pagán's leg, to protect himself, because the officer kept punching him. *Exh. N, RLR Depo., page 122, lines 4-11; lines 15 to 23.*

2.61   Mr. Cáceres accidently touched Officer Pagán's holster as he was trying to get up. Officer Pagán kept punching him.  Officer Pagán put his hand on top of Mr. Cáceres's hand, and a struggle between the two men ensued.  *Exh. M, FTL Depo, page 91, line 7 to line 18; page 92, line 6-15; page 94, line 12 to line 14; page 95, line 2 to line 13; page 96, line 24 to page 97, line 4.*

2.62   At no time did Mr. Cáceres try to grab the gun. He was, rather, holding on to Mr. Pagán's thigh, embracing it, trying to avoid being hit.  This was all he could do, because he was on the ground, and Officer Pagán was hitting him from above.  *Exh. N, RLR Depo, page 124, lines 13-16; page 124, line 24 to page 125, line 8.*

2.63   Officer Pagán, on the other hand, was trying to grab onto the gun.  *Id, page 124, lines 8-14.*

18

2.64   During the entire incident, Officers Zulma Díaz and Carlos Sustache were holding people back, so as to prevent anyone from coming to Mr. Cáceres's aid.   All the while, Officer Sustache continued to do what a witness describes as an "isolation move." *Id., page 112, lines 8-21. Id., page 121, lines 1-2; See, also, Exh. M, FTL Depo, page 93, line 9 to line 14; page 100, line 15 to line 18.*

2.65   Some people tried to intervene, but they were told to back off.   They also were deterred by the fact that Officer Sustache had pepper spray in his hands. *Exh. N, RLR Depo, page 125, lines 9 -18.*

2.66   People in the area started shouting, "abuser" and screaming at the officer to leave Mr. Cáceres alone.  *Exh. M, FTL Depo, page 103, line 1 to line 8; page 103, line 24 to page 104, line 3.*

2.67   At some point during the struggle, Officer Pagán shot himself in his left leg.   Officer Pagán had the gun in his hand, with Mr. Cáceres continuing to hang on to his thigh, sort of embracing Mr. Pagán's leg. *Exh. N, RLR Depo, page 126, line 23 to page 127, line 18; Exh. M, FTL Depo, page 109, line 2 to line 12.*

2.68   When the shot went off, Officer Pagán had control of the holster and was exerting pressure on the area of the holster.   His hand was on top of the holster.   Although Mr. Cáceres had lowered his hand and may have touching the lower part of the holster, trying to get up, Officer Pagán had complete control of his holster.  *Exh. M, FTL Depo, page 109, line 13 to page 110, line 4.*

2.69. Officer Pagán was trying to access the gun, to twist it out of the holster in order to take a shot at Mr. Cáceres.  *Exh. N, RLR Depo, page 142, lines 9-13.*

2.70.  As soon as Officer Pagán fired the first shot, Mr. Cáceres let go of Mr. Pagán's leg.

The Officer, however, pulled the gun out of the holster, cocked it and fired it at Mr. Cáceres. *Id., page 128, line 17 to page 129, line 3.*

2.71.   After the first shot, the people in the crowd were yelling and screaming; some were cursing. The crowd became panicky and started screaming more loudly.   All were attempting to prevent further violence against Mr. Cáceres. *Id., page 133, lines 11 to 23; Exh. M, FTL Depo, page 111, line 10 to line17.*

2.72. After Mr. Pagán fired the first shot, Mr. Cáceres's body fell to the side.  Officer Pagán then pointed the gun towards Mr. Cáceres's face, but the weapon jammed more than once. *Exh. M, FTL Depo, page 113, line 15-22.*

2.73.   Officer Pagán fired several more shots after the first one.  Two shots were fired after the first.  Then, Officer Pagán's gun jammed.  Then, there were more shots. *Id., page 113, line 4 to line 14.*

2.74.   Officer Pagán cocked the pistol and fired several times, hitting Mr. Cáceres three or four more times, shooting him in the back and in his head.  *Exh. N, RLR Depo, page 133, line 24 to page 134, line 3.*

2.75.   Officer Pagán shot Mr. Cáceres several times while the man was lying on the ground. Mr. Cáceres was shot in the back and in his head at very close range. *Id., page 144, lines 16 to 19.*

2.76.   Officer Zulma Díaz was on the other side of the street at that time, holding people back.  She did nothing to prevent Officer Pagán from further acts of violence against Mr. Cáceres. *Id., page 132, line 3 to 14.*

2.77.   After the first shot, Officer Sustache started running away.  Mr. Torres-López stated that he "took off running like a guinea chicken."  *Exh. M, FTL Depo, page 116, line 9 to line 12;*

*page 118, line 19 to page 119, line 1.*

2.78.   The three officers offered no help to Mr. Cáceres, who they left bleeding on the ground.  After Officer Pagán had shot the man four times, in his back and in his head, they just got in their car and turned around and left. *Exh. N, RLR Depo, page 136, lines 4-8.*

2.79.   All three officers left in the same vehicle as the one they had arrived in.  *Exh. M, FTL Depo, page 119, line 17 to line 22.*

2.80.   The officers turned the police vehicle around and headed off in the direction of Humacao.  About one or two minutes after the last shot, they took Officer Pagán away to get medical care, after one of the officers helped him board the patrol car.  *Id., page 116, line 20-24; page 119, line 9 to line 19.*

## C.  The actions of the agents and their supervisors on August 11th - the cover-up begins

### 1. Zulma Díaz's radio calls and the scene at Punta Santiago

3.1 After the shooting of Mr. Cáceres, Lieut. Rodríguez had arrived in Naguabo with the impact unit, was informed that defendant Zulma Díaz issued a "1050" emergency call on the radio, to the effect that Officer Javier Pagán was injured.  *Exh. F, LRG Depo, page 28, line 14 to 17; page 33, line 19-23.*

3.2   Lieut. Rodríguez took the radio and communicated with defendant Zulma Díaz, speaking to her on two occasions.  Officer Díaz informed him that defendant Pagán was injured and bleeding profusely.  Lieut. Rodríguez instructed her to take Mr. Pagán to Ryder Hospital.  *Id., page 34, line 3 - 6; page 65, line 15-17.*

3.3 Officer Díaz, however, said nothing about the injuries to Miguel Cáceres.  Lieutenant

Rodríguez asked Zulma Díaz twice if there was anything else he should know, but she did not respond, telling him nothing about what had happened to Mr. Cáceres. Lieutenant Rodríguez wanted to know if Mr. Pagán was the only injured person, or if there was any other situation he should know about, but he got no response from Ms. Díaz. *Id., page 34, line 19- page 35, line 3; page 65, lines 4-8; lines 15-22.*

3.4 Defendant Víctor Cruz heard Officer Zulma Díaz make the radio call after the shooting. He heard Officer Díaz state there was a "riot" in Punta Santiago and that a fellow officer was wounded. She said nothing about there being a civilian who was also wounded (and dying). *Exh. K, VCS Depo, page 71, line 24 to page 72, line 2; page 72, line 7 to line 15; page 73, line 9 to 11; page 73, line 15 to page 74, line 4; page 77, lines 3-6.*

3.5 Lieut. Rodríguez rushed to Punta Santiago, the area where the incident occurred, arriving there in about 7 to 8 minutes. By the time he arrived at Punta Santiago, the three officers — Pagán, Sustache and Díaz ---- were no longer there. *Exh. F, LRG Depo, page 35, line 9-14, 20-25;  page 36, lines 1-3.*

3.6 When Lieut. Rodríguez arrived, Miguel Cáceres was still alive and able to talk. Mr. Cáceres begged Lieut. Rodríguez to "help him." *Id., page 36, line 13-16; page 39, lines 3-10; See, also, Exh. M, FTL Depo, page 121, line 24 to page 122, line 2..*

3.7  Lieut. Rodríguez requested an ambulance. However, he was faced with an extremely grave situation, requiring immediate attention.   Accordingly, he instructed officers to put Mr. Cáceres in a police vehicle and to take him to the hospital. He did this after those on the scene asked him to please take Mr. Cáceres for treatment. Two of the eye-witnesses, Fermín Torres López and Ferdinand Rosa, asked Lieutenant Rodríguez to take Mr. Cáceres to Ryder Hospital, because they

feared that Mr. Cáceres would bleed out if left on the street awaiting the ambulance. *Exh. M, FTL Depo, page 119, line 23 to page 120, line 18 page 121, line 7 to line 15; See, also, Exh. F, LRG Depo, page 36, lines 16-21.*

3.8  At Punta Santiago, Lieut. Rodríguez was approached by Ferdinand Rosa and Fermín Torres-López, both of whom he knew from before and as to whom he had a high opinion.  Messrs. Rosa and Torres-López told him what had happened, and Lieut. Rodríguez made the commitment to them that there would be a serious investigation of the incident. *Exh. F, LRG Depo, page 37, line 2-13.*

3.9. Ferdinand Rosa and Fermín Torres-López told Lieut. Rodríguez what had happened. They explained that the group had been on the left side of the road, in order to escort a 15-year birthday party, when the three agents arrived in a police vehicle.  The agent told Mr. Cáceres to move, but Mr. Cáceres said he was just trying to help out.  The officer said, "no, I am the police officer," after which the officers got back into the patrol car.  Shortly thereafter, however, the officers came out again and started an argument, announcing that they were going to arrest him.  Mr. Cáceres responded by saying that he had done nothing wrong.  Mr. Cáceres then moved the scooter a little and crossed the street, followed by defendant Pagán who was picking a fight.  Mr. Cáceres fell to the floor, with defendant Pagán hitting him.  Mr. Cáceres tried to grab onto defendant Pagán's leg and a shot went off.  This was quickly followed by four shots by Mr. Pagán, who cocked the gun between shots. *Exh. F, LRG Depo, page 41, line 21 to page 42, line 22; page 43, line 2-16.*

3.10  Upon hearing the versions of these two trustworthy witnesses, Lieut. Rodríguez immediately saw that the situation was quite difficult and that something which was "unjust" had occurred in the shooting of Mr. Cáceres, for which there had been no good cause. Lieutenant

23

Rodríguez immediately understood that if the witnesses were telling the truth, Officers Pagán, Sustache and Díaz had not acted correctly. There were three officers there. What they should have done, if appropriate, was to arrest Mr. Cáceres and take him to the station, to charge him with an appropriate offense. That is what officers are trained to do. *Id., page 43, line 2-22; page 48, lines 7-15.*

3.11 While he was still on the scene at Punta Santiago, Lieutenant Luis Rodríguez spoke to both Víctor Cruz-Sánchez and Edwin Rivera-Merced, informing both defendants that his preliminary investigation demonstrated that the officers had been unjustified in their actions. *Id., page 56, lines 5-9.* Lieut. Rodríguez called these two defendants because it was his duty to do so. They were, respectively, the Area Commander and the person in charge that night, defendant Víctor Cruz-Sánchez. He was required to notify the Area Commander of incidents of this nature, and Víctor Cruz-Sánchez was in charge that night and acting as his supervisor that night. *Id., page 40, line 18-22; page 41, lines 1-2; lines 8-13.*

3.12 In his first conversation with each, Lieutenant Rodríguez said, "look, this smells like they acted incorrectly." This was followed by second calls to both Cruz-Sánchez and Rivera-Merced, in which Lieutenant Rodríguez told them that he had "no doubt whatsoever" that the officers had abused their power. *Id., page 56, lines 5-18.*

3.13 Early the next day, Lieutenant Rodríguez saw the video of the incident on television. The recording confirmed the accounts he had received from the eye-witnesses. *Id., page 73, lines 7-13; page 74, lines 1-3.*

3.14 Lieutenant Rodríguez told Col. Rivera-Merced that the officers had acted incorrectly, that there was no justification for the intervention, that the persons at Punta Santiago were helping

24

out with the traffic, and that they were serious and decent people. *Id., page 74, lines 10-21.*

3.15  Lieutenant Rodríguez prepared a report dated August 13th which analyzed the data and reached certain conclusions and made recommendations.  The report, which was sent to Area Commander Edwin Rivera-Merced, provided an account of the versions offered by Fermín Torres-López and Ferdinand Rosa-Ortiz, witnesses on the scene. Lieut. Rodríguez noted that Officer Pagán attempted to shoot Mr. Cáceres no less than four times, and that he in fact fired his weapon at the man, who was on the ground helpless, on three separate occasions.  He also noted that Officers Sustache and Díaz ran away from the scene following the shooting. *See, Exhibit O, Memo # SAOC-AH01-64-610, from Lieutenant Rodríguez to Area Commander Edwin Rivera-Merced, August 13, 2007.*

3.16  Lieutenant Rodríguez concluded that there had been an excessive use of force by Officer Pagán and that Officers Díaz and Sustache had failed in their duty to help with an arrest, if justified, and that moreover they had run away from the incident.  *Exh. F, LRG Depo, page 52, line 20 to page 53, line 8; See, also, Exhibit O, Memo # SAOC-AH01-64-610, from Lieutenant Rodríguez to Area Commander Edwin Rivera-Merced, August 13, 2007.*

3.17 A report of this nature was supposed to have been written by Lieutenant Víctor Cruz-Sánchez, who was required to show up at the scene, but did not do so. As the official in charge of the Area that night, Cruz-Sánchez should have arrived at the scene.  He was also responsible for preparing the overall report on the incident.  Lieut. Cruz-Sánchez was supposed to set an example. He was expected to prepare the reports and report to higher-level officials with respect to that which had occurred. However, since Lieut. Cruz had remained with the three officers at Ryder Hospital, Luis Rodríguez was the only supervisor in the chain of command who was at the scene and the only

one who had heard any version other than that of Officers Pagán, Sustache and Díaz.  He wrote up this report because if he did not do so, there would be significant gaps in the information provided up the chain of command. *Exh. F, LRG Depo., page 46, lines 2-12; page 51, lines 8-21; page 53, lines 9-16; page 60, lines 2-3; 5 -10; page 60, line 24 to page 61, line 5; page 90, lines 11-18.*

### 2. <u>Ryder Hospital and the Area Command - followed by the "official story"</u>

3.18 Lieutenant Cruz-Sánchez admits that as the officer in charge of the Area that night, he had the responsibility to arrive at the scene, which he never did. *Exh. K, VCS Depo, page 77, lines 10-14.*

3.19 Although he was only a couple of kilometers from Punta Santiago, Lieut. Víctor Cruz-Sánchez never made it to the scene of the shooting. He was on his way there when he saw an ambulance carrying Javier Pagán and he turned around to go to Ryder. *Id., page 76, line 7 to page 77, line 2; page 82, line 10-14.*

3.20  Instead, Lieutenant Cruz-Sánchez went to Ryder Hospital, where he remained with the three officers.  He instructed Lieutenant Rodríguez to remain at the scene at Punta Santiago. *Exh. F, LRG Depo, page 45, lines 9-19; See, also, Exhibit O, Memo # SAOC-AH01-64-610, from Lieutenant Rodríguez to Area Commander Edwin Rivera-Merced, August 13, 2007.*

3.21 Although defendant Cruz-Sánchez claims that he did not hear of the shooting of Mr. Cáceres until after he was in the hospital, this assertion is contradicted by the sworn testimony by Lieut. Luis Rodríguez, who has stated that throughout this time, he had been informing Lieutenant Cruz-Sánchez about the shooting and what the witnesses on the scene were telling him about what had really happened at Punta Santiago. *Exh. F, LRG Depo, page 48, lines 3-6. See, also, SofF #'s*

*3.11 to 3.12 above; See, Exh. K, VCS Depo, page 84, line 20 to page 85, line 1.*

3.22  While at Ryder Hospital, Lieutenant Víctor Cruz-Sánchez interviewed Javier Pagán and the other two agents who had been at the scene. *Exh. F, LRG Depo, page 45, lines 19-21; See, also, Exhibit O, Memo # SAOC-AH01-64-610, from Lieutenant Rodríguez to Area Commander Edwin Rivera-Merced, August 13, 2007.*

3.23.  Javier Pagán told Lieut. Cruz-Sánchez that there had been a "struggle" with Mr. Cáceres ("que había forcejeado.")  Officer Pagán said nothing about the fact that he had shot a citizen. *Exh. K, VCS Depo, page 83, line 23 to page 84, line 13; page 84, line 17-19.*

3.24  Officer Zulma Díaz told Cruz-Sánchez that Mr. Cáceres had hit her in the chest. *Id., page 88, line 21 to page 89, line 7.*

3.25 Officer Carlos Sustache emphasized that all he had done was to give "cover."  Officer Sustache spoke of a "struggle" ("forcejeo") between Officer Pagán and Mr. Cáceres.  He did not tell Mr. Cruz-Sánchez how many times Mr. Pagán had shot Mr. Cáceres. *Id, page 90,  line 19 to line 25; page 91, line 8-20.*

3.26 Although Víctor Cruz-Sánchez found out almost immediately upon his arrival at Ryder that Mr. Cáceres had died from bullet wounds, none of the officers told him how many times Officer Pagán had shot him.  Lieutenant Cruz-Sánchez did not ask Officer Pagán why he had shot Mr. Cáceres, nor did he inquire as to how many shots the officer had fired.  He did not ask the officer why he felt it was necessary to shoot the unarmed man four times. *Id., page 90, lines 1-18; page 117, lines 20-23.*

3.27  Defendant Juan Colón-Báez also talked to Officer Pagán at Ryder.  Although he had been off-duty at the time of the shooting, Sgt. Colón heard about it and went to Ryder, where he saw

that Víctor Cruz-Sánchez had already arrived. He stayed with Officer Pagán until a nurse ordered the officers to leave the room, in order to attend to Mr. Pagán's medical needs. *Exh. J, JCB Depo, page 34, lines 9 to 20.*

3.28  While Víctor Cruz-Sánchez was at Ryder Hospital, he heard a great number of citizens saying that Officer Pagán had shot a citizen several times.  The citizens were saying that the officers had committed an abuse against Mr. Cáceres, who he had shot without any reason.  *Exh. K, VCS Depo, page 84, line 23 to page 85, line 1; page 92, lines 11-18.*

3.29  Although he was aware of many people at the hospital who were talking about the misconduct of the officers, Víctor Cruz-Sánchez paid no attention to this version of the events.  At his March, 2010 deposition, defendant Cruz-Sánchez could  remember the specifics of only one conversation with a civilian who claimed to have been on the scene.  This citizen (whose name is Héctor Huertas, according to a report Lieut. Cruz-Sánchez wrote up on August 11th), unlike all of the other citizen witnesses, is alleged to have told Mr. Cruz-Sánchez, the highest level officer at the Hospital, that "Mr. Cáceres almost took Officer Pagán's gun from him." *Id, page 84, line 20 to page 85, line 1; page 86, line 25 to page 87, line 14; See, also, Exh. P, Memo SAOC-AH-1-20-829, Víctor Cruz-Sánchez to Edwin Rivera-Merced, August 11, 2007 on "Dead Person."*

3.30  Defendant Cruz-Sánchez claims that while he was at Ryder, he did not interview any eye-witnesses and that his function at the hospital was to control the many citizens and police officers who went to the hospital that night. He claims not to have interviewed anyone who had been an eye-witness, except this one witness, Héctor Huertas, who he referred to the Criminal Investigation Corps officer who was investigating the incident.  He also took the time to inform the homicide agents about Mr. Huertas's version of the events. *Exh. K, VCS Depo, page 87, line 10 to*

28

*page 88, line 20; page 92, lines 11-23.*

3.31 After hearing the version Mr. Huertas was offering, Mr. Cruz-Sánchez made certain to take down his name. He did not do so with any of the other persons, who were describing a case of police abuse. This is despite the fact that "todo el mundo" ("everybody") was saying that the officers had abused their authority. Lieut. Cruz did not even ask any of the many people who were so stating what the basis for that conclusion was. *Id., page 87, line 7-22; page 93, line 17 to page 94, line 9.*

3.32 While Lieut. Cruz-Sánchez was at Ryder, he constantly talked to his supervisor, Edwin Rivera-Merced, to keep him informed about the incident. It was Cruz-Sánchez's duty to keep Mr. Rivera-Merced abreast of what was going on. *Id., page 91, line 24 to page 92, line 8. page 94, line 23 to page 95, line 2.*

3.33 Sgt. Juan Colón Báez and Lieutenant Víctor Cruz-Sánchez were alone with police officers Zulma Díaz and Carlos Sustache at Ryder well into the night. When Lieutenant Luis Rodríguez finally left Punta Santiago at about 10:00 PM, i.e. after about four hours, he saw defendants Sustache and Díaz with supervisors Colón-Báez and Cruz-Sánchez. Officer Pagán was also still there. *Exh. F, LRG Depo, page 49, line 22 to page 50, line 3; page 69, line 24 to page 70, line 14; page 71, line 1-5; line 24 to page 71, line 1.*

3.34 Thereafter, Víctor Cruz-Sánchez decided to send Officers Zulma Díaz and Carlos Sustache to the Area Command Office. Lieutenant Cruz-Sánchez allowed these two officers — who had been with Officer Pagán at the shooting — to travel to the Office in the same patrol car in which they arrived. He did not decide to separate them in order to not contaminate their respective versions. *Exh. K, VCS Depo, page 96, line 25 to page 97, line 15.*

3.35 When he was asked in his March, 2010 deposition whether it would not have been

better to separate Officers Díaz and Sustache, in order to ascertain the truth about what had happened, defendant Cruz-Sánchez could provide no explanation for his action other than to say that he thought it was the most "prudent" thing and the "best" for him to do at the time he sent them to the station, together, in their own patrol car. Even though it was by then some four hours after the shooting, Mr. Cruz-Sánchez felt it was perfectly acceptable to send these officers to the station, on their and own maintaining possession of their own weapons, because it was more "important"to get the agents away from the hospital in order to prevent an incident between the family members and the agents. *Id., page 97, line16 to page 98, line 1; page 98, lines6-7;page 109, line 18 to page 110, line 8.*

3.36  It was not until about 11:00 PM, five hours after these officers had left Mr. Cáceres dying on the street, and well after defendant Víctor Cruz-Sánchez had interviewed Officers Sustache and Díaz and had allowed them to go to the Station in their own patrol car, without being separated, that their guns were finally occupied.  When Lieutenant Cruz-Sánchez arrived at the Area Command, defendants Sustache and Díaz were still together, meeting with a prosecutor, another agent and defendant Sergeant Juan Colón Báez. The two agents still had their weapons on them, and they were still together at that time.  *Id., page 99, lines 1-8; page 100, lines 2-14.*

3.37 Lieutenant Cruz-Sánchez has explained that it is not the practice in the PRPD to remove police weapons from the custody of officers involved in shootings of civilians.  The weapons are seized only when there is clear knowledge of the facts.  In this case, at 11:00 PM, Mr. Cruz-Sánchez says there was "not a clear picture of what had happened, only a struggle ("forcejeo") [and] a person who was injured." *Id., page 100 to page 101, line 5.*

3.38  It was the prosecuting attorney who made the decision to seize these officers' weapons

and not to allow them to be re-armed.  *Exh. J, JCB Depo, page 39, line 16 to page 40, line 8.*

3.39  On the night of August 11th, a Homicide Agent was assigned to investigate the case. Lieut. Cruz-Sánchez met with the Homicide Agent, José Rivera-Rodríguez both at the hospital and at the station.   Mr. Cruz-Sánchez told the Homicide Agent José Rivera-Rodríguez the version he had been given by witness Héctor Huertas (which, at least in part, supported the version of the officers.)  This was the only witness he talked about with the Homicide Agent.  *Exh. K, VCS Depo, page 103, lines 4-8;  page 103, line 17 to page 104, line 17.*

3.40  At the Humacao Station that night, a meeting was held among defendants Víctor Cruz-Sánchez and Colón-Báez and Homicide Agent José Rivera-Rodríguez and the prosecuting attorney. The purpose of the meeting was to give the investigators input to assist them in understanding of what had happened. *Exh. J, JCB Depo, page 49, line 13-24.*

3.41  Defendant Juan Colón-Báez knew Homicide Agent José Rivera well, having worked with him previously when this defendant had been a supervisor at the C.I.C. (Criminal Investigations Corps.) *Id., page 36, line 19 to page 37, line 3.*

3.42   Before leaving the station that night, Lieut. Víctor Cruz-Sánchez prepared a report. He left a hand-written version of the report at the Area Command at about 12 midnight or 1AM the next day, so that the Area Commander, Edwin Rivera-Merced could review it that Sunday.   The information contained in the report was based on what the agents involved in the incident had told him at Ryder Hospital and at the station.  *Exh. F, LRG Depo, page 60, lines 10-11; Exh. K, VCS Depo, page 112, lines 14-23; page 113, line 19 to  page 114, line 2 to 16; 21 to 23. See, Exh. P, SAOC-AH-1-20-829, Report from Cruz-Sánchez to Rivera-Merced, August 11, 2007.*

3.43  In the report, Lieutenant Cruz-Sánchez noted *inter alia* that the motorcyclists had

"obstructed the road," that the agents had "oriented" Mr. Cáceres, but that he had responded with dirty language, that the agents tried to place Mr. Cáceres under arrest, and that Mr. Cáceres had attempted to grab Officer Pagán's weapon.  He also stated that Officer Pagán had been punched in his left eye.  He described the shooting as arising from a "struggle," resulting in a situation in which "several shots were fired, hitting Mr. Cáceres in different parts of his body."  *See, Exhibit P, Report # SAOC-AH-1-20-829, from Lieutenant Cruz-Sánchez to Area Commander Edwin Rivera-Merced. August 11, 2007.*

      3.44 Having relied on information obtained from Officer Zulma Díaz,  Lieut. Cruz-Sánchez was asked in his deposition if he was accepting Officer Díaz's version as the truth, he stated that he was "believed that what she was saying was the truth, sure."  He claimed that at the time he wrote the report, no one else had given a version which "created doubts"about her account, testimony which is directly contradicted by the fact that Lieut. Rodríguez had already told him of the versions he had obtained from witnesses on the scene. *See, Exh. K, VCS Depo, page 115, line 2-19; See, also SofF #'s 3.11 and 3.12 above.*

      3.45  Lieut. Cruz-Sánchez based other information which he included in his report on information he had obtained from defendant Officer Javier Pagán. *Exhibit K, VCS Depo, page 115, line 20 to page 116, line 5.*  He claims that at the time he wrote his report, he had no reason to doubt the version given to him by Mr. Pagán, who had just said that there had been "a couple of shots" and who did not tell this supervisor whether or not he had fired the shots. *Id.,page 116, lines 6-8; page 119, lines 4 - 17.*

      3.46 Despite the fact that he knew that Mr. Cáceres had been shot four times, on his forearm, his rib-cage area, and his head, Mr. Cruz-Sánchez said that since he had not gone to the scene, and

had "not interviewed anyone," he "had to understand that agent [Pagán] was telling the truth." *Id., Depo, page 118, line 10 to 16, and line 19 to page 119, line 3; translation provided.*

3.47 When he was asked about this in his deposition, Lieut. Cruz-Sánchez said that at the time he wrote his report, although he already knew that Officer Pagán had killed Mr. Cáceres by shooting him several times, "I had to write down [in the memo] what agent Pagán had told him." *Id., page 116, line 9-14 (translation provided).*

3.48 Defendant Cruz-Sánchez, of course, admits that while he was in Ryder Hospital, he heard rumors that Pagán had fired without any justification.  He notes, however, that he did not "interview anyone as such."  *Id., page 120, lines 10-18.*  This asseveration provoked the following remarkable colloquy during Mr. Cruz-Sánchez's deposition.

| | |
|---|---|
| Q: | It seems so strange to me.  Perhaps I'm not understanding how you remember a person who approached you and said ... that Cáceres was trying to take away Pagán's weapon.  But weren't there other people who said other things? |
| A: | It's that this report, usually, ... is an informal thing done for the Area Commander and certain facts are explained.  You don't enter into detail as such.  That's in order for him to know about this.  Then, during the week, Monday, well, we keep on working .... |
| Q: | But you don't understand that you put details in this report? |
| A: | Yes, I put in details, but I wasn't very specific about what happened. |
| Q: | Details from the Police version. |
| A: | Exactly. |
| Q: | But no details from the versions of the citizens. |
| A: | Because I didn't interview citizens. ...  *Exhibit K, VCS Depo, page 121, line 16 to page 122, line 5 (translation supplied).* |

33

3.49 The faulty and misleading information supplied by police supervisors Lieut. Cruz-Sánchez and Sgt. Colón-Báez also found its way into an August 13th report written by the Homicide Investigator, José A. Rivera Rodríguez, with whom defendants Cruz-Sánchez and Colón Báez had met on August 11th.  The Homicide investigator includes interviews of only three witnesses.  Not surprisingly, they are Officer Zulma Díaz, Officer Carlos Sustache, and Héctor Huertas  *See, Exh. Q, SAIC -AH-CIC-2-532*

3.50. In the August 13th memo, the Homicide Investigator, José Rivera, provides a lengthy account of Zulma Díaz's version of the events.  Officer Díaz's account does not even *mention* the fact that Miguel Cáceres received multiple bullet wounds.  It does not mention that Officer Pagán shot the man. Nor does it say that the three officers fled the scene, leaving the father of three to die on the street. *Id.*

3.51 The Rivera memo of August 13th also provides a somewhat shorter version of the events, as told to the Homicide Investigator by defendant Carlos Sustache.  This Police Officer, like Zulma Díaz, presents a version of what happened that does not even identify the fact that Miguel Cáceres was shot by Officer Pagán. *Id.*

3.52 The third witness in the Homicide Investigator's memo of August 13th is the very same "Héctor Huertas," whose name was taken by defendant Víctor Cruz-Sánchez and who Cruz-Sánchez referred to Agent Rivera for an interview. *Id; See, also, SofF #'s 3.30 and 3.31 above.*  Using bold letters for emphasis, the Homicide Agent repeats Mr. Huertas's claim that Miguel Cáceres had attempted to **take away** Officer Pagán's gun, which **provoked** the situation. *Id., translation provided.*

3.53 Perhaps the most astounding language in the Memo prepared by the Homicide

Investigator, who had met with Officers Zulma Díaz and Carlos Sustache and with their supervisors, defendants Juan Colón-Báez and Víctor Cruz-Sánchez is found on the last page of his memo:

> In addition, several persons were interviewed at the scene, but they provided information which was adverse and against the agents.  *Id.,*
> *translation provided.*

Not a single one of these other witnesses with "information... adverse and against the agents" is even identified by name in the memo.  *Id., translation provided.*

    3.54  Former Police Superintendent Pedro Toledo was shown the report by Homicide Agent José Rivera-Rodríguez during his deposition in April of 2010.   He stated that it was against police procedure to omit the names of witnesses merely because the information they had was "adverse and against the agents," noting that "they should have included names and the people as witnesses." *Exh. L, PTD Depo, page 88, lines1-24.*

    3.55  It is beyond serious question that defendants Cruz-Sánchez and Colón-Báez were attempting to steer the investigation in a way which would preclude accountability for the officers on the scene.   They provided only partial information, and their bias (as well as that of the Homicide Investigator) is reflected in the Report prepared by José Rivera-Rodríguez, who had met with Lieut. Cruz-Sánchez and Sgt. Colón-Báez that night. The report of the Homicide Investigator mentions the name of only one civilian — Héctor Huertas — the only "eye-witness" mentioned by Víctor Cruz-Sánchez and the only one to support the versions being provided by the officers.  Although Rivera-Rodríguez noted that other persons were interviewed, because their versions did not support that of

the officers, he did not even identify those witnesses, and defendants Cruz-Sánchez and Colón-Báez certainly did not assist him in getting that information. *See, generally, SofF #'s 3.20 to 3.36 and 3.39 to 3.53 above.*

3.56  Bias such as that displayed by José Rivera-Rodríguez, the Homicide Investigator, can have critical consequences with respect to the consequences of a police killing of a citizen. According to Area Commander, Edwin Rivera-Merced, the initial investigation by the Homicide Division is used to make a preliminary decision as to whether or not "criminal violations" are implicated in the killing.  If so, the matter is referred to NIE; if not, the matter is referred only for a PRPD internal administrative investigation. *Exh. D, ERM Interrogs, Answer to Question #2, at page 2.*

3.57  The bias promoted by the actions of defendants Colón-Báez and Cruz-Sánchez is also reflected in the Press Release by the Humacao Area Command, dated August 11, 2007, regarding the killing of Miguel Cáceres. The Press Release states that the incident took place as part of the "surveillance of high crime areas," and that after the agents "stopped to intervene with a group of motorcyclists who were obstructing traffic," an argument had ensued.  It goes on to say that a "struggle" ("forcejeo") had ensued while Agent Pagán had tried to place Miguel Cáceres under arrest, and that Mr. Cáceres had "attempted to take the officer's weapon from him," all of which led to people "hearing a shot," which was followed by them "hearing four other shots, resulting in injury to different parts of Mr. Cáceres Cruz's body." *Exh. R, PRPD Press Release regarding the death of Miguel Cáceres, translation provided.*

3.58  Lieut. Víctor Cruz-Sánchez is listed as the "Source" for the information provided in the PRPD Press Release. *Id.*

3.59 After August 11th, the cover-up continued.   On Sunday, August 12th, Lieut. Cruz-Sánchez prepared an "amplification" of his report on the incident. *See, Exh. S, SAOC-EH-1-20-830, Report from Víctor Cruz Sánchez to Edwin Rivera-Merced ("amplification by Cruz-Sánchez"); See, also, Exh. K, VCS Depo, page 128, lines 12-13.* The "amplification" provides more detail on such matters as the attempts to revive Mr. Cáceres and the transport of both Mr. Pagán and Mr. Cáceres to the hospital.   The most notable "amplification," however, is with respect to the very same Héctor Huertas.   This time, Mr. Cruz-Sánchez provides the name of the municipality where Mr. Huertas lives and his home and cellular telephones, and affirms that "his version ... corroborates part of the version of the version offered by agent Pagán." *Id., page 2; translation provided.*   Mr. Cruz-Sánchez also indicates that he spoke to the Director of the Criminal Investigations Corps in Humacao, to siggest to him that he should speak to Mr. Huertas, and that he, Cruz-Sánchez had arranged for a telephone conference call through Cruz-Sánchez's telephone. *Id.*

3.60 At the time he was making this connection between Héctor Huertas and the Homicide Investigators, Víctor Cruz-Sánchez still had not seen the video.   He did not see it until Sunday, in the afternoon.   At that time, he must have thought the with a witness like Mr. Huertas, the police officers might escape accountability. *See, Exh. K, VCS Depo, page 123, lines 2-5; page 134, lines 9-20.*

3.61 Even once he saw the video, however, defendant Víctor Cruz-Sánchez did not decide to correct his earlier version or to provide another "amplification" of the information contained in his reports on the incident. *Id., page 134, line 21-23.*

3.62  Area Commander Edwin Rivera-Merced was quick to  rely on the facts given to him by Lieut. Cruz-Sánchez to cover up what had really occurred on August 11th in Punta Santiago.  Mr.

Rivera-Merced spoke to a newspaper reporter on either August 11th or August 12th (as reported in a newspaper on the 13th). He told the reporter that there were "two contradictory versions" regarding the events.   He repeated for the press a version which tracked almost word-for-word the account which had been provided by Víctor Cruz-Sánchez in Memo # SAOC-AH-1-20-829.   *Exhibit T, Press account in El Nuevo Día, August 13, 2007 (translation supplied); Exhibit P, Report # SAOC-AH-1-20-829.*

3.63 Colonel Rivera-Merced also told the reporter that there were "several witnesses" other than the police officers who supported the officer's story which included the fabrication that Mr. Cáceres had pushed Zulma Díaz, that he had refused to obey the officer's orders, that he cursed at the female officer, and that he had assaulted Officer Pagán, as well as grabbing the trigger of Officer Pagán's weapon, causing it to fire and injure the officer. *See, Exhibit T, Press account in El Nuevo Día, August 13, 2007.*

3.64 This was not a case of a newspaper misquoting a source.  In his deposition, Edwin Rivera-Merced admitted that he was accurately quoted and had in fact said that there were "several [non-police] witnesses" who supported the officers' versions of the events. *Exh. H, ERM 2009 Depo, page 99, lines 4 to 7.*

3.65  When Col. Rivera-Merced made these statements, he had already heard from Lieut. Luis Rodríguez.  Rather than credit the information provided by Lieutenant Rodríguez, who had spoken to eye-witnesses at the scene, he made the conscious choice to rely on information told to him by Lieutenant Víctor Cruz who said that "there were eye witnesses stating that Mr. Cáceres tried to grab a weapon from one of the agents." *Exh. D, ERM Interrogs Answers, Answer to Question 17, page 7.*

38

3.66 Mr. Rivera-Merced saw the video on Sunday, August 12th.  Although he has now stated that "after watching the video it became clear that the shooting was never justified," his only public statements to the press were that there were "conflicting versions" and that "several witnesses" supported the version of the officers. *Id., Answers to Questions 19 and 20, pages 7-8.  See, also, SofF #'s 3.62 to 3.64 above.*

3.67 During his deposition in February of 2009, Edwin Rivera-Merced was asked about the identity of the "several witnesses" who supposedly supported the officers' version of the events leading to Mr. Cáceres's death.  He could not identify any such persons. *Exh. H, ERM2009 Depo, page 102, lines 12 to 17; page 115, lines 7-15.*

3.68 After being given an opportunity in his deposition to review all of the PRPD reports with respect to this case, defendant Rivera-Merced claimed that the source for this statement was the report by Homicide Agent José Rivera-Rodríguez, who spoke only of Mr. Héctor Huertas. *See, Exh. H, ERM 2009 Depo, page 109, line 24 to page 110, line 24; page 112, lines 1-7.*

3.69 The Rivera-Rodríguez report, however, could not have been the source for Mr. Rivera-Merced's statements as reported in the newspaper on August 13th, since the report was not written until that very day. *See, Exh. Q, Rivera-Rodríguez Report #SAIC-AH0CIC-2-532.*

3.70 Even after reading the reference in the Homicide Agent Rivera-Rodríguez's report to several other unnamed persons whose accounts of the killing were "adverse and against the agents," Mr. Rivera-Merced did nothing to find out who the identity of these other witnesses or what their versions were, or to otherwise correct the patently false information he had provided to the press. *Exh. H ERM2009 Depo, page 113, lines 2 to 13.*

3.71 Unlike the Humacao Area Supervisors, Area Commander Edwin Rivera-Merced,

Lieutenant Víctor Cruz-Sánchez and Juan Colón Báez (and Homicide Agent José Rivera-Rodríguez), Superintendent Pedro Toledo-Dávila did not attempt to disguise the truth.  After seeing the video, Mr. Toledo publicly stated that the event was nothing more or less than an "execution."  He has explained that "the victim was on the floor immobilized and the officer kept shooting." *See, Exh. U, Excerpts from Interrogatories to Pedro Toledo-Dávila, Questions 18 and 21, at pages 13 and Exh. V, PTD Interrogs, Answers to Questions 18 and 21*, *at page 9.*

3.72   After reviewing the video, Superintendent Toledo-Dávila summarily suspended the three officers.  Mr. Toledo was convinced that independently of the reason for the initial intervention and shots, the final shot by Mr. Pagán was clearly unjustified.  He also saw both Carlos Sustache and Zulma Díaz fail in their responsibilities, running from the scene and failing to exercise any control.  Later, he found out that Officer Díaz had egged Officer Pagán on in connection with the incident.  *Exh. L, PTD Depo, page 89, line 13 to page 90, line 4.*

### D. The video-taping of the killing of Miguel Cáceres - the cover-up is exposed

4.1 Plaintiffs are submitting with this Opposition a copy of the CD containing the video recordings made by Ricardo Lebrón on August 11th.   Plaintiffs obtained a copy of that CD from the Institute of Forensic Science of the Commonwealth of Puerto Rico.  *See, Exh.W, Excerpts from the Deposition of Carlos Díaz, ("CR Depo"), page 51, lines 21-24.*  The CD itself is being submitted through a physical filing as Exhibit X to this Statement of Facts.

4.2 The events at Punta Santiago on August 11th were captured on video-tape in Ricardo Lebrón's camera.  Mr. Lebrón decided to film what was happening when he noticed the situation.  He recorded continually for about 5 minut*es.  Exh. N, RLR Depo, page 88, line 8 to line 12; line 20*

*to line 24; page 102, line 22 to page 103, line 9.*

4.3 Although Mr. Lebrón recorded the entire incident in the camera, some of the recording contains only the audio portion.  At some point after Mr. Lebrón witnessed the shooting, he closed the camera and handed it to a friend.  When the camera was closed, it continued to record the audio but not the visual images.  *Id., page 103, line 9 to page 104, line 11*

4.4  Mr. Lebrón was frightened, precisely because of the images he was capturing on the video camera.  He wanted to hide the camera, which was quite small, about the size of a blackberry.  Mr. Lebrón passed the camera over to the other man, who hid it in the pocket of his jeans, but it continued recording.   At all times, the person to whom Mr. Lebrón had briefly handed the camera was right next to him.  *Id., page 103, line 20 to page 104, line 8; lines 12-16, page 105, lines 2-8. page 105, line 20-24; page 107, line 14 to page 108, line 1.*

4.5  After the officers left the scene, Mr. Lebrón attempted to help Mr. Cáceres, who he had observed being shot by an officer for no good reason. With blood on his hands, Mr. Lebrón retrieved the camera from the person to whom he had given it for a short time. *Id., page 105, lines 9-16. page 108, lines 1-7; page 109, line 17 to page 110, line 2.*

4.6 The video recording, however, does not end with Officer Pagán firing at Miguel Cáceres.  Mr. Lebrón continued to record as Mr. Cáceres lay on the ground after having been shot.  The last recording he made that day was of Mr. Cáceres on the ground, bleeding. *Id., page 146, line 3-10; page 155, line 7 - 24.*

4.7. After the incident, Mr. Lebrón closed the camera, put it in a bag and placed it in his car.  He reviewed what he had filmed, in order to make certain that he had captured the entire incident. *Id., page 145, line 1 to page 146, line1; page 147, line 3- 15.*

41

4.8.  Mr. Lebrón made the decision that the recording should be made public.  He consulted with a retired police officer he knew, and the two decided to go to a commercial establishment, "Davidcito,"  in order to make a copy of the recording and give it to the news. *Id., page 144, line 12-14; page 147, lines 21 to 22;  page 148, line 18 to page 149, line 1.*

4.9  Mr. Lebrón took the video to the establishment  at about 8:00 PM on the same day Mr. Cáceres was killed. He gave Davidcito the camera with the SD memory card which had the recordings Mr. Lebrón had taken that day.  Davidcito plugged the camera directly into the computer, using the USB port or plugged the SD card into the computer.  Mr. Lebrón reviewed the images in the computer and indicated which images he wanted produced on a disk. A copy of the video was made on the computer, and Mr. Lebrón was given a disk with the recording. *Id., page 152, lines 1-11; page 160, lines 3-14.*  That night, Mr. Lebrón saw the video on the television news. *Id., page 163, lines 1-15.*

4.10 Although Mr. Lebrón wanted to remain anonymous, being fearful of his security and that of his family, the authorities found him, and he was taken to meet with the Federal Bureau of Investigations (FBI).  Mr. Lebrón turned the camera over to the FBI. *Id.,  page 166, line 21 to page 167, line 3; page 167, line 9 to page 171, line 8.*

4.11 Between August 22, 2007 and September 10, 2007, the Crime Lab of the Institute of Forensic Science of the Commonwealth of Puerto Rico received the following items related to this case from two FBI agents and a PRPD Task Force agent:  two CD-R disks, a laptop computer, a video-tape, a music and video reproducer and an external hard drive, and an Optimus camcorder. The Gateway computer and a Western Digital external hard drive came with a form which one "David" consented to have examined.  These items were provided to the Institute so that it could

perform an expert analysis regarding the events at Punta Santiago on August 11, 2007. *See, Exhibit Y, Excerpts from January 29, 2008 Report by Carlos Díaz of the Institute of Forensic Science; See, also, Exh. W, CD Depo, page 93, lines 8-16.*

4.12  Carlos René Díaz-González ("Carlos Díaz") works in the Digital Evidence Section of the Puerto Rico Institute of Forensic Science.  He has worked in the Institute of Forensic Science for 25 years and in the Digital Evidence Section of the Institute for 10 years. *See, Exh. W, CD Depo, page 8, line 10 to page 9, line 1.*

4.13 Mr. Díaz has received training through several professional organizations, such as the International Association of Computer Investigative Specialists (IACIS).  He is a Certified Forensic Computer Examiner (CFCE).  He is also certified as a Seized Computer Evidence Recovery Scientist (SCERS) and an Electronic Evaluation Collections Specialist (EECS), having taken federal law enforcement trainings to obtain these certifications. *Id., page 11, line 21 to page 12, line 8. Id., page 12, lines 10-18.*

4.14 Mr. Díaz examined several pieces of evidence submitted to the Institute of Forensic Science related to the death of Miguel Cáceres.  He prepared two reports on the evidence based on his forensic analysis of the same. *Id., page 17, lines 14-20; page 18, lines 1-8; line 17 to 24.*

4.15 One of the pieces of evidence examined by Mr. Díaz was a compact disk, which the Institute had received on August 22, 2007 from Miguel Fonseca Hernández, a Task Force law enforcement agent in a joint investigative group comprised of FBI and PRPD agents.  Mr. Fonseca informed the Institute that the disk had been delivered to WAPA television station in Puerto Rico and thereafter obtained by law enforcement. *Id., page 31, lines 17-20.  page 34, line 23 to page 35, line 13; page 35, line 21 to page 36, line 8; page 37, lines 17-22.*

43

4.16 Using forensic software, specifically a tool called ENCASE, Mr. Díaz established that the creation date was August 11, 2007, at 7:34 PM (although he had no independent confirmation that the date and time registered in the camera was itself accurate.) *Id, page 38, line 18 to page 39, line 7; page 40, line 7l; page 42, line 9; page 43, lines 16-20.*

4.17  Mr. Díaz, a seasoned forensic examiner, compared the images on the electronic file, which was the first item he received very soon after the events and the video camera itself, which he received thereafter. This experienced forensic examiner was able to confirm through visual analysis that the content on both items was exactly the same and that nothing leads him to believe that the images he thereafter transferred to yet another electronic file (the CD submitted herewith as Exhibit X) where changed in any way from their point of origin. *Id., page 127, line 3 to page 129, line 17.*

4.18 In order to create the electronic file on the disk submitted herewith, Carlos Díaz copied the items submitted to him by law enforcement.  He prepared an electronic file, slowing down the images by approximately one fourth of actual time, but was not enhanced in any other way.  He prepared another electronic file which includes a running time code which is superimposed on the original video, to establish the duration of the events.  In all other respects the disk produced to the plaintiffs in this case is identical to the recording done by Mr. Lebrón. *Id, page 82, line 5 to 23; page 83, lines 4-23; page 86, lines 2-11.*

4.19  Mr. Díaz also prepared about 15 still pictures from the recording, which were enhanced for color correction, to show a clearer picture.  No other changes were made to the still pictures from the video recording.  *Id., page 84, lines 2 to 21; page 85, lines 12-23.*

4.20 The forensic examiner also took photographs of the evidence which he had examined

in regards to this case and prepared a CD containing these photographic images. *Id., page 60, line 21 to page 61, line 10.*

4.21  Mr. Díaz also created a zip version of the electronic information.  This is a compressed version with certain precautions which prevent tampering.  According to Mr. Díaz, it is "like a secure location that you can store evidence in digital format for the purpose of later analysis." *Id., page 71, lines 4-14.*

4.22   Mr. Díaz's analysis and observation of the recording confirms the testimony offered by Ricardo Lebrón, the man who recorded the incident.  The video shows a period of time when the recording continued, although the camera was in a pocket or some other dark environment, and therefore captured only the audio.  Based on his review of the images in the recordings, Mr. Díaz stated that after the incident, the camera was most likely taken to a car and thereafter to a room, where it was turned off.  *Id., page 138, line 14 to line 20.*

4.23  Based on his examination of the files, the sequence on the file names, the sequence on the dates of the files, and the access dates on the files, Mr. Díaz concluded that the camera and the first disk, created by Davidcito, are "identical in content," with "the same visual content." *Id., Exh. page 149, lines 9-21.*

4.24  Mr. Díaz has no questions about the integrity of the chain of custody with respect to the video which could affect any of the conclusions he reached in his report. Had there been tampering with the images or additions thereto, Mr. Díaz would have been able to detect them. There was no tampering with the video images, and none of the files were changed.  *Id., page 140, lines 3-6; page 140, line 12 to page 141, line5.*

**E. Javier Pagán's history of disciplinary problems in the PRPD**

5.1   PRPD records show that between 1998 and 2008, Officer Javier had eight (8) disciplinary complaints filed against him, the last being the complaint related to the killing of Miguel Cáceres.  The record shows three complaints of assaults against citizens, another complaint filed by a supervisor for insubordination, one related to theft of government property, another for falsifying a police report, another for failing to appear at a court hearing after being receiving a subpoena to appear, and another for refusing to attend to a citizen attempting to file a complaint. *See, generally, Exhibit Z, "Historial" prepared in 2008 ("2008 Historial"); SAIP-OIP-ASJ-10-2,122.*

5.2   A 1998 complaint involving the theft of government property was found to be substantiated, and Officer Pagán received an admonishment from the force for that incident. *Id.*

5.3   During that same time period, Agent Pagán was accused of domestic violence.   María Ivette Cabrera alleged that she and Pagán were in a romantic relationship and that Officer Pagán had attacked her physically and had threatened her. *See, Exhibit AA, Memorandum from Sgt. Rufino Carrión to Juncos Precinct Commander, Rafael Rivera-Carrasquillo, September 29, 1998 ("Rufino Carrión Memo"); Exhibit BB, Memo AH-22-58-829 from Commander Rivera-Carrasquillo  to the then Humacao Area Commander, regarding the Domestic Violence Complaint against Agent Javier Pagán-Cruz, October 1, 1998 ("Rivera-Carrasquillo Memo").*

5.4  The two had met when in mid-1998, Officer Pagán, then assigned to the Juncos District, stopped the young woman for a traffic violation.  Instead of giving Ms. Cabrera a ticket, Mr. Pagán flirted with her ("comenzó a enarmorarla'), and within a week's time, had begun an intimate relationship with her.  *See, Exhibit CC, AA-7-1-249, Proposed Suspension on Sustained Complaint #99-00-34-0051, August 30, 2004, by former PRPD Superintendent Agustín Cartagena ("Cartagena*

46

*Me Propongo"), at pages 1-2.*

5.5 Almost immediately, Mr. Pagán became violent to Ms. Cabrera.  A PRPD investigation found that Officer Pagán assaulted her and upon seeing her with another police officer, threatened to use his service weapon against her if she ever spoke to the agent again.  Officer Pagán was also found to have broken into her residence to commit acts of aggression against her. Although a prosecuting attorney decided that no criminal charges should be filed, his supervisors at the Juncos Precinct made certain that Mr. Pagán was disarmed and sent to the Domestic Violence Unit of the PRPD. *See, Exh. CC, Cartagena "Me Propongo", at pages 1-2; Exh. DD, SAIAAD-2-10-301, Excerpts from Administrative Complaint #99-00-34-0051, Report of Investigation by PRPD Domestic Violence Unit ("Domestic Violence Investigation"), at page 1-3; See, also Exh. AA, Rivera-Carrasquillo Memo.*

5.6   Within a month's time, however, Mr. Pagán was re-armed.  An Interim Commander of the Juncos District requested that this action be taken, using as the fact that no criminal charges were filed as the reason why he should be given the right to carry a weapon again.  *See, Exhibit EE, AH-22-58-961, from Interim Commander of the Juncos Precinct to the Weapons Section of General Headquarters ("Re-arming Memo").*[1]

5.7  Meanwhile, the administrative investigation continued, even though Officer Pagán had gotten his weapon back.  Ms. Cabrera testified that in July of 1998,  Officer Pagán pointed his

---

[1]The Interim Juncos Commander also states that the request for Mr. Pagán to be re-armed was made after he consulted with Lieutenant Vilma Fernández, the Director of the Domestic Violence Unit. *Id.*  However, it was not until a month later, that Lieut. Fernández reviewed the September 29th initial memo by Sgt. Rufino Carrión and determined that "priority"should be given to performing a psychological evaluation of Officer Pagán. *See, SAIAD-2-1-715, Memo from Domestic Violence Unit to Director of Psychology and Social Work, December 17, 1998 ("Psych. Referral).*

service weapon at her and said: "If I see you with another agent, I'm going to kill you".   About two months later, Officer Pagán pushed her against a wall and cursed at her.   Ms. Cabrera also testified that once she filed a first Domestic Violence criminal complaint, she felt threatened by Mr. Pagán, who would frequently pass by the area of her residence and make threatening gestures. *Exh. DD, Domestic Violence Complaint, at pages 1-2*

5.8 Ms. Cabrera also testified that in August of 1999, Officer Pagán had arrested a gangster known as "Charlie" and had confiscated a weapon with a laser from the man.   He kept the weapon in a closet at Ms. Cabrera's residence for several days.    According to Ms. Cabrera, Officer Pagán at one point attached the laser to his service weapon and swore to her that he would use the gun to kill "Charlie." *Id.*

5.9  Evelyn Velázquez, a friend of Ms. Cabrera's, also testified in the investigation.   She stated that Mr. Pagán "kept playing with his service weapon, pointing it a Ms. Cabrera, and saying that he would dare to kill her." *Id, page 2.*

5.10  In August of 2000, the Domestic Violence Unit concluded that Mr. Pagán had committed serious violations of the Police Regulation. *Id, page 11.*

5.11 Four years later, when the Administrative Complaint process finally reached then Superintendent Agustín Cartagena, on August 30, 2004, the Superintendent issued a Resolution of Charges, proposing that Officer Pagán be *expelled* from the police department.   Superintendent Cartagena concluded that Mr. Pagán had committed no less than six serious offenses. *Exh. CC, Cartagena "Me Propongo."*

5.12  At the time of this first proposal that he be expelled from the force, Officer Pagán was working in the Las Piedras District. *Exh. F, LRG Depo, page 11, lines 7-18.*

5.13  In early November of 2004, a little over two months after the then Superintendent had proposed that Javier Pagán be expelled from the force, Officer Pagán was transferred to the Tactical Operations Division of Humacao, to work in a specialized group within the Division, called "SRT," Special Response Team. *See, Exhibit GG, AH-1-20-1,161, November 4, 2004 ("Transfer to T.O.D."); See, also, Rafael Figueroa-Solis Deposition ("RFS Depo"), page 34, lines 9 to 20; page 37, lines 10-20.*

5.14 The Tactical Operations Division is an elite and specialized unit within the PRPD. T.O.D. Agents are trained to deal with sensitive situations.  The SRT, in turn, is a "select" group within the T.O.D, whose members receive additional training and the authority to perform certain tasks not all agents are authorized to do.  *See, Exhibit GG, AH-1-20-1,161, November 4, 2004 ("Transfer to T.O.D."); See, also, Exhibit HH, Deposition of Rafael Figueroa-Solís ("RFS Depo"), page 34, lines 9 to 20; page 37, lines 10-20, page 38, line 23 to page 39, line 7; Exh. K,VCS Depo, page 17, line 24 to page 18, line 2.*

5.15  For that reason, before being sent to T.O.D., the officers should be subject to an appropriate investigation to determine their fitness for the work. *Exh HH, RFS Depo, page 34, line 21 to page 35, line 9; page 36, line 10-18.*

5.16 Among the documents reviewed in such an assessment are the officer's disciplinary complaint files.  *Id., page 34, line 21 to page 35, line 9; page 36, line 10-18.*

5.17 Although there is no magic number of disciplinary complaints which should cause a supervisor in the PRPD to be concerned, they should be on the look-out for complaints alleging verbal abuse or physical abuse.  There are many officers who have no such complaints against them, despite being on the force for many years.  Defendant Edwin Rivera-Merced has testified that two

or three such abuse complaints should be cause for concern and for strict implementation of General Order 87-14 and Special Order 90-5 regarding discipline of agents. *Exh. H, ERM2009 Depo, page 90, line 5 to page 91, line 14.  (For a description of Gen. Order 87-14 and Special Order 90-5, see Section F infra.)*

5.18 The disciplinary complaint files in the PRPD contain histories ("historiales") setting forth the disciplinary complaints the officers have had in the past.  The primary purpose of these 'Historiales' is to allow the department to identify patterns of misconduct and to take appropriate measures, depending on the circumstances. *See, Exhibit II (double "I"), Excerpts from Deposition of Vilma Fernández, at page 53, line 24 to page 54, line 11; See, also,* <u>Gutiérrez v. Cartagena</u>, *888 F.2nd 553 (1ˢᵗ Cir., 1989).*

5.19  Unfortunately, the "histories" included in the officers' disciplinary complaint files are often inaccurate. For example, a "Personal History" in Mr. Pagán's disciplinary file which was certified as correct in August of 2003 as being based on an examination of complaint files at the Superintendency includes only *two* prior disciplinary complaints, although at that time, in reality, Javier Pagán had already been the subject of no less than *five* such complaints (and perhaps *six).* *Compare, for example Exh. Z, 2008 Historial (showing 5 complaints up to 2002 and another in 2003) and Exhibit JJ, SAIP-1-8-898 ("2003 Historial") (showing only two earlier complaints.)*

5.20  Had a supervisor reviewed this 2003 "historial" to examine whether Mr. Pagán was fit to be transferred to Tactical Operations in 2004, he or she would have a drastically incorrect picture of this officer's disciplinary history.  *See, SofF #'s 5.13 to 5.19.*

5.21 Between 2002 and 2004, a period of less than three years immediately preceding Mr. Pagán's transfer to the elite Tactical Operations Division, four administrative complaints were filed

against him and at least one Arrest Order had been issued against him.  Also, during that time frame, the Superintendent of the Police Department had proposed that he be expelled from the force.  *See, SofF # 5.11 above. See, also Exh. Z, 2008 Historial and Exhibit KK, Arrest Order issued on April 29, 2002.*

5.22 Between August of 2004, when Superintendent Cartagena first proposed that Mr. Pagán be expelled from the PRPD and the end of his term at the close of that year, Mr. Pagán was not expelled.  In December of 2005, almost a year into the term of the new Superintendent of Police, Pedro Toledo-Dávila, a second resolution was issued by his Associate Superintendent, recommending once again that Officer Pagán be expelled. *See, Exh. LL,  OS-AA-OAL-1-210, May 18, 2006 ("Toledo Me Propongo")( mentioning the prior expulsion proposal by defendant Toledo-Dávila).*

5.23 In response to this second expulsion proposal, Officer Pagán requested an internal hearing, upon the conclusion of which Superintendent Toledo lowered the proposed sanction from expulsion to a 60-day suspension.  Mr. Pagán, notified of that final determination in May of 2006. *Id.*

5.24 Javier Pagán-Cruz served his suspension from the PRPD between August 23, 2006 to October 22, 2006, returning to work some nine and a half months before he killed Miguel Cáceres. *See, Exh. MM, Memo from Human Resources, August 28, 2006.*

**F. The failure of the defendants at the Area-level and the two high-level supervisor to implement measures to identify Officer Pagán's dangerous tendencies.**

   **1. No one was paying attention to Mr. Pagán's disciplinary files**

   6.1 According to General Order 87-14, every supervisor has the responsibility of examining the personnel file of every officer under his or her supervision.   The supervisor is required to give special emphasis to the nature of the complaints filed against such officers. *Exh. NN, Excerpts from General Order 87-14 ("G.O. 87-14"), page 7.*

   6.2 Special Order 90-5, on "repetitive conduct," also requires "every supervisor, regardless of rank in the chain of command," who observes conduct "from which any type of emotional mal-adjustment or problem requiring re-education and retraining" can be inferred, to bring this to the attention of the Superintendent. *Exhibit OO, Special Order 90-5, page 2.*

   6.3  Every supervisor has the "duty and obligation" to ascertain whether or not agents within the unit have a violent character or fails to respect the civil rights of citizens, independently of whether or not the particular administrative complaints were sustained.  *G.O. 87-14 , page 7.*

   6.4  The General Order provides that prior conduct of the officer or complaints to the effect that he or she abused his or her authority or violated the civil rights of a citizen must be examined in order to determine the facts underlying the result, whether or not the complaint was sustained. *Id., page 8.*

   6.5 Defendant Pedro Toledo-Dávila has testified that he instructed his staff "to closely monitor agents with complaints of excessive force,"and has ordered high-level supervisors to assure compliance with these measures." *Exhibit V, Excerpts from Answers to Interrogatories by Pedro Toledo-Dávila, December 4, 2009 ("PTD Interrogs"), Answer to Question 7, at page 9.*

52

6.6  In each Area, there is a personnel file for each officer which includes pertinent information on the nature of and number of complaints filed against the officer and the resolution thereof.  According to Mr. Toledo-Dávila, supervisors were required to review these files. *Exh. L,PTD Depo, page 53, lines 3-22.*

6.7.  Defendant Edwin Rivera-Merced testified that he has read G.O. 87-14 and knows that it exists. *Exh. H, ERM 2009 Depo, page 30, lines 13-14; and 17.*

6.8  Area Commanders such as Rivera-Merced are presumed to know of the disciplinary history of the agents in the Area.  The Area Commander also should know when there is a recommendation that an officer be expelled.  *Exh. F, LRG Depo, page 76, lines 14-24; page 79, lines 14-19.*

6.9  Lower-level supervisors such as sergeants also have the authority and the responsibility to review the files of the officers under their supervision.  *Exh. K, VCS Depo, page 45, line 24 to page 46, line 15; page 144, line 2-9.* Supervisors within the PRPD know that if officers have problems of domestic violence, they should be sent for counselling and if based on an investigation, should be banned from being officers. *Exh. F, LRG Depo, page 81, lines 8-18.*

6.10  All of the defendants in this case were long-term supervisors at the PRPD by August of 2007, when Miguel Cáceres was killed.  Pedro Toledo had been Superintendent for about 10 years.  Edwin Rivera-Merced had been with the PRPD for three decades and a supervisor for two.  Lieutenant Víctor Cruz-Sánchez had been a supervisor in the PRPD for over ears, having risen to the rank of Sergeant in 2002 and to the rank of Lieutenant in 2004.  Sgt. Rafael Figueroa-Solís had been a PRPD officer for sixteen (16) years and a supervisor for eight (8) years.  During the years between 2001 and 2006, he was a sergeant in the Tactical Operations Unit of Humacao.  In 2006,

53

he moved on to the Command Center and thereafter to the KM unit in Humacao. Sgt. Juan Colón-Báez had been a supervisor in the PRPD for three years, having risen to the rank of Sergeant in 2004. He had held supervisory positions in the CIC Special Arrest Unit in Humacao, in Internal Affairs, in Special Operations, and in the Tactical Operations.  He had headed the Seizure Section of the Humacao Special Operations Division, and he had been the Assistant Director, at different points in time, of the Humacao Tactical Operations Division and of the Special Operations Division. *See, generally, SofF #1.4 above; See, also, Exh. A, VCS Interrogs, Answer to Question #4, at subsections (a) and ©; Exh. C, RFS Interrogs, Answer to Question #3; Exh.B, JCB Interrogs, Answer to Question #3, at subsection (g), (j) and (k).*

6.11 On the day when Mr. Cáceres was killed, Sgt. Figueroa-Solís was the highest-ranking officer assigned to the Humacao Tactical Operations Division.  *See, Exh. H, ERM 2009 Depo, at page 38, lines 18-20; page 39, lines 23-25.*  However, defendant Figueroa-Solís appears to want to hide this fact.  In his sworn answer to an Interrogatory requesting to list his positions during his employment as a police officer, Figueroa-Solís simply *omitted* his 2007 stint as  Acting Director of the Humacao T.O.D..  *Exh. C, RFS Interrogs, Answers to Questions #4 and #4.*In another answer, he makes the false claim that he had been the Acting Director of the Division "for a little more than a month" when Mr. Cáceres was killed.  *Id., Answer to Question #10.*  In yet another misleading statement in his interrogatory answers, defendant Figueroa-Solís stated in his answers to interrogatories that he was "not the interim director of the Humacao Tactical Operations Division" on August 11, 2007, because he "was on vacations [sic] and had passed the command to Sergeant Colón-Báez."  *Id., Answer to Question #9.*

6.12 This last asseveration, however, is contradicted by another of Mr. Figueroa-Solís's

sworn Interrogatory Answers, wherein he states that he was "transferred out of the Humacao T.O.D.

the same date he reported back from vacations [sic]" i.e., *after* Mr. Cáceres had been killed. *Id,*

*Answer to Question #17.*  It is also contradicted by documents setting forth that he identifies himself

as still being the Director of that Division on August 14th, 2007, three days after Mr. Cáceres was

killed. *See, Exhibit SS, SAOC-AH-11-22-837, Memo by Figueroa-Solís, August 14, 2008.*[2]

6.13 In the year and a half leading up to the death of Miguel Cáceres, all three of these lower-

level supervisors ---- defendants Víctor Cruz-Sánchez, Rafael Figueroa-Solís and Juan Colón Báez

--- headed up the Humacao T.O.D. at different periods of time.    Lieut. Cruz-Sánchez was the

Director of the Division from March, 2006 to March, 2007.  Sgt. Figueroa Solís was Acting Director

from March, 2007 to August of that year.  Sgt. Colón-Báez, who had been the Assistant Director of

the Humacao T.O.D. for one year from March, 2006 to February of 2007, assumed the directorship

of the Division on an interim basis in July of 2007.[3]   *Exh. A, VCS Interrogs, Answer to Question #3,*

*at sub-section (e); See, also, Exh.RR, Local Academy Sign-in Sheets ("Academy Sheets), showing*

---

[2] Further seeking to minimize his own responsibility with respect to Officer Pagán, Sgt. Figueroa-Solís also states that he was *not* "the direct supervisor of any agent on [sic] the unit," but rather was the "direct supervisor of the line supervisor of the team or squadron," and that "each team has a direct supervisor." *Exh. C, RFSInterrogs, Answer to Question #9.* Mr. Figueroa-Solís, however, neglects to mention that for some six months during the year 2007, up to the date when Mr. Cáceres was killed, he was the *Acting Director* of the Humacao Tactical Operations Unit and that as Mr. Pagán's supervisor, he filled out his evaluation on *two* of the six month periods in the year and a half before  that Officer killed Mr. Cáceres.  *See, SofF #'s 7.79, 7.82, 7.83; See, Exhibit QQ, Signature Page from Evaluations of January, 2006 and July,2007.*

[3] Defendant Juan Colón-Báez originally transferred to the Humacao Tactical Operations Division upon the request of defendant Víctor Cruz-Sánchez, who had became the Director of the Tactical Operations Unit Lieut. Cruz-Sánchez asked Area Commander Edwin Rivera-Merced to transfer Juan Colón-Báez to the Unit with him, to be the Assistant Director, because he needed a man whom he could trust.  Mr. Colón-Báez joined the Unit as Assistant Director in March of 2006.  *Exhibit J, Deposition of Juan Colón-Baez ("JCB Depo"), page 12, line 17 to page 13, line 4;  Exh. B Excerpts from Interrogatory Answers of Juan Colón-Báez, Interrogatory #3, subsection (j).*

*that Figueroa-Solís headed Tactical Operations in March and May of 2007*; *Exh. TT,*
*SAOC/AH/11/22/837, Memo from Figueroa-Solís, as Director of the T.O.D, to Rivera-Merced,*
*August 14, 2007; See, also, Exh. B, JCB Interrogs, Answer to Question #3, subsections (j) and (l).*

6.14 All three had also been at the Tactical Operations Division in Humacao in the latter half
of 2006, when Officer Pagán served his 60-day suspension. *Id; See, also, Exh. C, RFS Interrogs*,
*Answer to Question #3, subsection (g).*  Nonetheless, these supervisor claim to have been completely
blind as to the underlying facts leading to this imposition of a disciplinary sanction against Mr.
Pagán. *See SofF #'s 6.15; 6.16; 6.17; 6.20; 6.21; 6.22 infra.*

6.15  These experienced PRPD supervisors certainly knew very little about their
responsibilities regarding the men they supervise in general, and Javier Pagán in particular.  Of the
three lower-level supervisors, only Defendant Lieutenant Víctor Cruz-Sánchez admitted that as a
supervisor, he had the responsibility to examine the disciplinary files of the agents under his charge.
He knew that since 1987, in the PRPD, supervisors are required to review the disciplinary records
of officers under their supervision. *Exh. K, VCS Depo, page 152, lines 1-7; page 152, line 23 to page*
*153, line 3.*  He admitted that he knew the term, "conducta repetitiva," as well as the responsibility
of supervisors to evaluate their personnel to see if there was such conduct. *Id., page 153, lines 4-13.*
As head of the Humacao Tactical Operations Division for an extended period between 2006 and
2007, he knew he was authorized to review Javier Pagán's disciplinary files and had full access to
those files. *Id., page 37, line 4-11.*

6.16  Defendant Juan Colón-Báez, on the other hand, claims that he had no access to Pagán's
disciplinary records, because according to him, only the Director of the Unit could see the files. *Exh.*
*J, JCB Depo, page 14, lines 3 to 11.*  He also makes the clearly erroneous statement he "never had

56

the opportunity to review the files of Pagán and Sustache because he was only Acting Director of the T.O.D. for one month before Mr. Cáceres was killed. *Exh. B, JCB Interrogs, Answer to Question #5.*

6.17 Defendant Rafael Figueroa-Solís provided similar testimony, stating that he understood that disciplinary files related to officers he supervised were "confidential" and that "the only ones to have access to them are the directors" of units. According to Mr. Figueroa-Solís, a sergeant would have to request access through a unit director, who could decide whether to grant it or not. *Exh. HH, RFS Depo, at page 19, line 22 to page 20, line 14.*[4] During the five or six months in 2007 when Rafael Figueroa-Solís headed up the T.O.D. in Humacao, he did not examine a single disciplinary file of any of the men and women he supervised. *Id,, page 75, lines 4-10.*

6.18 Sgt. Figueroa-Solís recognizes, however, that even a lowly sergeant can review any such record at the moment an agent is transferred to a new unit. *Exh. C, RFS Interrogs, Answer to Question #5.* Sgt. Figueroa-Solís, himself, was a sergeant in the Humacao T.O.D.. in October of 2004, when Javier Pagán files was transferred to that unit. *Id, Answer to Question #3, subsection (g).* Thus, even according to his own faulty understanding of the applicable rules, he would have had the opportunity to review Javier Pagán's disciplinary file at that time, which was *after* former Superintendent Agustín Cartagena had proposed that this officer be expelled from the force.[5]

---

[4] Despite this purported understanding (which conflicts with General Order 87-14), during the entire five or six month period when Sgt. Figueroa-Solís was the Acting Director of the Humacao T.O.D., Figueroa-Solís could not remember looking up a single disciplinary file of any of the men and women he supervised. *Exh. HH, RFS Depo, page 75, lines 4-10.*

[5] Lieut. Cruz-Sánchez also testified that when a new agent comes into a unit, his or her supervisor is supposed to review his or her personnel file, to ascertain whether the officer is unfit for the position. *Exh. A, VCS Interrogs, Answer to Interrogatory #5; See, also, VCS Depo, page 37, line 4-11.*

6.19 Area Commander Rivera-Merced agrees with Lieut. Cruz-Sánchez that unit directors can access the disciplinary files of the officers they supervise, merely by requesting that information (as specified in General Order 87-14).  They are "responsible for the people under their charge ... and they are supposed to request the information concerning the conduct of the people who work with them."  *Exhibit PP, Excerpts from Edwin Rivera-Merced January, 2010 Deposition in the case of Santiago v. ELA, HSCI2008-00926 ("ERM 2010 Depo"), page 79, lines 9-18 (translation supplied.)*

6.20 Given the failure of these supervisors to know and implement the rules, it is not surprising that they knew virtually nothing about Mr. Pagán's dismal disciplinary record. Defendant Víctor Cruz-Sánchez knew that the Police Superintendent proposed expulsion, but that this was later reduced to a 60-day suspension. *Exh. A, VCS Interrogs, Answer to Question #11.*  Knowing of a proposed expulsion, Lieut. Cruz-Sánchez does not believe that as Director of the unit where an officer subject to an possible expulsion worked at that time, he had any responsibility to "enter into detail" regarding the case. Rather, his responsibility is simply to make certain that the papers are served on Mr. Pagán.  *Exh. K, VCS Depo, page 44, line 14 to page 45, line 18.*  Accordingly, Mr. Cruz-Sánchez never even inquired as to why Officer Pagán was being disciplined. He never asked Officer Pagán anything about the facts which had led to the recommendation for expulsion. *Id., page*

---

However, Juan Colón-Báez disputes this, stating "when [a] transferred agent comes into the division ... and presents the orders to his new supersvisor it is *presumed* that the check has been done and that the agent is fit for work at the division [to which] the agent is being sent."  *Exh. B, JCB Interrogs, Answer to Question #5; emphasis supplied.*

*36, line 25 to page 37, line 3.*[6]   Although he was the Director of the T.O.D. in Humacao during the entire period of Javier Pagán's suspension and for several months thereafter, defendant  Cruz-Sánchez never reviewed this officer's administrative complaint files, as he had done with other officers  under his indirect or direct supervision in the past.  *Id., VCS Depo, page 37, lines 4 to 11, lines 18 to 22.*

6.21 In fact, defendant Cruz-Sánchez never learned why Pagán was subject to the disciplinary sanction.  In his sworn interrogatory answers in late 2009, Lieut. Cruz-Sánchez stated that he understood that  the proposed order for disciplinary action against Officer Pagán was "for some mishandling of an investigation." *See, Exh. A, VCS Interrogs; Answer to Questions #3, at subsection (I); #4.10 and Interrogatory #25.*   In his deposition in March of 2010, Mr. Cruz-Sánchez testified that he understood that the disciplinary sanction was imposed for "mis-managing"a case, claiming that Sgt. Colón-Báez had told him this.  *Exh. K, VCS Depo, page 40, lines 4-13.*  . It was only years later, long after Mr. Cáceres was killed by Officer Pagán, that Lieut. Cruz-Sánchez found out that the suspension had to do with the officer's domestic violence, rather than a "mis-management"of evidence.   Defendant Cruz-Sánchez found this out only in the context of the litigation in the instant case.  *Id., page 41, line 18 to page 42, line 2.*

6.22 Sgt. Juan Colón-Báez was the officer who served the 60-day suspension papers on defendant Javier Pagán in 2006.  He knew that the suspension was a disciplinary sanction, and he believed it was related to an act of domestic violence (Law 54).   Like his boss, Mr. Cruz-Sánchez,

---

[6]This is despite the fact that in his entire time as a supervisor, he had encountered less than five cases of an officer under his supervision being subject to a recommendation of expulsion. *Id., page 38, line 7 to 19.* In fact, when pressed, Lieut. Cruz-Sánchez admitted that he could not remember a single other case where there was an expulsion recommended for an agent under his supervision. *Id.,page 39, line20-24.*

he never stopped to inquire about the incident giving rise to the suspension.  *Exh. J, JCB Depo, page 18, line 14-24;  page 18, lines 14 to page 19, line 3.*  Even though he was Pagán's supervisor, he understood that his only responsibility was to "execute the order ... which is sent by the Superintendent ...." *Id., page 19, line 22 to page 20, line 6 (translation supplied).*

6.23 Sgt. Colón-Báez also claims never to have found out that there had been an initial proposal that Officer Pagán be expelled from the force. *Id., page 23, lines 17 to 22.* Defendant Juan Colón-Báez, who was the Assistant Director of the T.O.D. in Humacao during the entire period when Javier Pagán was serving his suspension for disciplinary matters, swore in his interrogatory answers that he "never heard" that there had previously been an order of expulsion against Officer Pagán. *Exh. B, JCB Interrogs, Answer to Question #11.*

6.24 Sgt. Figueroa-Solís was also blissfully ignorant regarding Officer Pagán's disciplinary problems.  In his 2010 deposition, Figueroa-Solís testified initially that although he remembered serving Officer Pagán with some disciplinary papers, he could not remember if these were for the suspension or the proposed expulsion.  Later on during his deposition, Mr. Figueroa-Solís, admitted that he notified Officer Pagán of the proposed *expulsion. See,* Mr. Figueroa-Solís also emphasized that he had complied with his "duty," which was to notify the officer and that he did so. According to this defendant, neither a supervisor nor a unit director has any responsibilities when he or she receives a proposed disciplinary action, other than to serve the proposal for disciplinary action on the agent.   He explained that since the process is not final and firm, and that the officer has certain appeal rights, all that is required is to notify the officer.  *See, Exh. HH, RFS Depo, page 45, lines 3-22; page 53, line 1 to 9; lines 14-24; page 56, lines 12-15.* Mr. Figueroa-Solís never attempted to find out what facts had motivated two superintendents of the PRPD to propose Mr. Pagán's

expulsion from the force.  *Id., page 56, lines 13-23.*  Mr. Figueroa-Solís did not even know that

underlying complaint which led to Pagán's suspension had to do with domestic violence.  He took

no action to interview any of Pagán's earlier supervisors to ascertain any of the facts upon which the

discipline was based.  *Id., page 60, lines 11-23.*

6.25 Also professing ignorance was Area Commander Edwin Rivera-Merced.   As an Area

Commander with under 500 men under his indirect or direct supervision, Edwin Rivera-Merced

should have known about his officers' disciplinary records.  However, in his deposition in 2009,

defendant Rivera Merced claimed to have no knowledge of the May, 2006 notification lowering the

proposed expulsion of Officer Javier Pagán to a sixty-day suspension, either at the time the

notification was sent or thereafter. He claimed not to have known that Mr. Pagán was found by two

Police Superintendents and by Internal Affairs to have committed domestic violence. *Exh. H, ERM*

*2009 Depo, page 70, line10 to 16; 18-23; page 73, lines 8-9; 11-12.*

6.26 Mr. Rivera-Merced's claim, however, is belied by the documentary evidence, which

shows that on August 24, 2006, defendant Víctor Cruz-Sánchez sent a memorandum to the Area

Commander informing him that Officer Pagán had been notified of the newly proposed reduced 60-

day suspension. *Exhibit TT, SAOC-AH-11-22-668, from Human Resources, notifying Mr. Rivera-*

*Merced of Mr. Pagán's suspension.*

6.27 During his deposition in 2009, Mr. Rivera-Merced was shown the Human Resources

memorandum and given the opportunity to rectify his earlier testimony. Asked to explain, he stated

that "what happens is that we, for example, in this case, I do not have access to the administrative

investigations of the members of the force. ... In fact, when this happened, when these incidents

occurred, I was not even the Commander of the Humacao Area" (referring to the underlying facts

in 1998 and 1999.) *Exh. H, ERM 2009 Depo, page 70, line 24 to page 71, line 5; page 71, line 14.*
He observed that defendant Toledo's May, 2006 "Me Propongo" didn't even mention the facts."
When asked, however, if he, as Area Commander (who clearly had access to Mr. Pagán's files), ever
tried to investigate and find out what were the facts giving rise to the disciplinary sanction against
this officer, he simply stated, "no, no, no, no, I don't investigate; I don't investigate." *Id.,, page 71,
line 25 to page 72, line 6.*[7]

6.28  Actions by Superintendent Toledo also contributed to the ignorance the other
supervisors professed as to Mr. Pagán's disciplinary record.  Defendant Toledo-Dávila modified the
format for the memoranda setting forth the department's proposed disciplinary action against an
officer.  Sgt. Figueroa-Solís testified that at an earlier on, the "me propongo" would include details
of the incident or incidents giving rise to the proposed disciplinary sanction, as well as a brief
statement of the underlying facts. On Mr. Toledo's watch, however, the facts are missing from the
"me propongo" documents, which now only include a statement of the particular proposal and
nothing more. *Exh. C, RFS Depo, page 54, lines 6 to 20; page 54, line 25 to page 55, line 1.*  This
made it more difficult for a supervisor to monitor his officers, since the officer my not have been
assigned to the same unit when the underlying incident occurred. *Id., page 50, line 7 to p.51, line 1.*

6.29 The problem is illustrated when one considers the two different expulsion proposals
with respect to Mr. Pagán.  Whereas the first "Me Propongo,"  issued by former Superintendent
Agustín Cartagena in 2004, lays out in great detail the events giving rise to the expulsion decision,

---

[7]In another deposition, taken in January of 2010 in the case of <u>*Santiago v. ELA,*</u> *Civ. No.
HSCI2008-00926,* Mr. Rivera-Merced offered an entirely different version under oath, stating that as
Area Commander, he *could* access the disciplinary files of a member of the force, simply by requesting
that the files be sent to him. *Exh. PP, ERM2010 Depo, page 78, line 21 to page 79, line 1.*  He testified
that he had, in fact, done so with respect to other officers. *Id., page 79, lines 5-6.*

Mr. Toledo's 2006 "Me Propongo" regarding the 60-day suspension provides no such detail. *Compare, Exh. CC (Cartagena "Me Propongo") with Exh. LL ("Toledo Me Propongo").*

6.30 The August 30, 2004 "Me Propongo" by former Superintendent Cartagena mentions *inter alia* the following:

- That agent Pagán met Ms. Cabrera in the context of a traffic stop.  Rather than giving her the ticket, however, he began a sentimental relationship with her;

- That he had assaulted Ms. Cabrera on two separate occasions, the first occurring only days after he began his intimate relationship with her, and the second in which he broke into her residence and assaulted her;

- That the assaults involved physical attacks on Ms. Cabrera as well as threats with Mr. Pagán's service weapon;

- That he commented to Ms. Cabrera that he had held on to property occupied from a mobster, including a firearm;

- That the mobster had offered Officer Pagán money for the return of the weapon;

- That Agent Pagán carelessly left his weapon unattended to in Ms. Cabrera's residence, leading a friend of Ms. Cabrera's to pick it up and point it at him.

The Cartagena "Me Propongo" also sets forth six serious charges which he understood Mr. Pagán to have committed in connection with this case, as well as five Duties and Responsibilities which were violated. *See, Exh. CC.*

6.31  In contrast, the "Me Propongo" issued by Pedro Toledo, which was delivered to Officer Pagán's supervisors two years later, in 2006, says *absolutely nothing* about the nature of the charges or the violations which Officer Pagán was alleged to have committed and which were substantiated

by the department.  *See, Exh. LL.*

6.32 Rafael Figueroa-Solís believes that if the "me propongo" documents had included a discussion of the facts giving rise to the disciplinary sanction, this would assist the officer's supervisors by providing them with guidance so that they could make a determination one way or the other as to whether to change the officer's assignments within the unit or even remove the officer from a particular unit.  *Exh. HH, RFS Depo, page 45, line 20-25.*

6.33 The importance of supervisors being aware of disciplinary records cannot be over-stated. The unit directors in divisions like Tactical Operations, such as Messrs. Cruz-Sánchez, Figueroa-Solís and Colón-Báez , have the power to recommend that particular agents do only clerical work and to assign different agents of the T.O.D. to different tasks within the unit.  They can refer officers to the psychological for counseling if they deem this appropriate.  *See, Exh. F, LRG Depo, page 80, lines 7-16; Exh. B, JCB Interrogs, Answers to Question #3, at subsection (l); Exh. L, PTD Depo, page 107, lines 12-15.*  Area Commanders such as Edwin Rivera-Merced have that same authority within the entire Area. *Exh. F, LRG Depo, page 79, lines 20-22.*

**2.  No one ever looks at the issue of repetitive conduct**

6.34. Supervisors within individual units at the PRPD often receive personnel with incomplete files.  Often, there will not be any detail about the number or nature of the disciplinary complaints against members of the force or whether or not they have been sent for "repetitive conduct" retraining due to excessive number of complaints. *Exh. F, LRG Depo, page 76, line 14 to 24.*

6.35 General Order 90-5, issued in 1990, established a system for identifying problematic

agents, those with "repetitive conduct." *See, Exh. OO*.  The heads of units are supposed to examine and evaluate the files of agents they supervise in order to see if they have such conduct and take appropriate measures. *Id.*

6.36 The PRPD, however, does little to enforce these policies.  Police supervisors do not even know they exist.  When he answered the Interrogatories in this case in 2010, Lieut. Víctor Cruz-Sánchez did not know what "repetitive behavior" was, despite the existence of General Order 90-5 and the long-standing practice in the PRPD which required supervisors to monitor their officers in order to identify "repetitive conduct"in order to assure that errant officers were re-trained. *Exh. A, VCS Interrogs, Answer to Interrogatory #6.*  In his deposition on March 23, 2010, however, Lieut. Cruz-Sánchez admitted that he had heard of the term "repetitive conduct" in the Spanish language. He admitted that at one point in time this was used to identify agents who had repeated problems, but that the system was eliminated several years  years earlier.  *Exh. K, VCS Depo, page 48, line 17 to page 49, line 5.*

6.37 Defendants Juan Colón-Báez and Figueroa-Solís also both claimed not to know what "repetitive behavior" was, when he answered his interrogatories in early 2010. *Exh. B, JCB Interrogs, Answer to Question #7; Exh. C, RFS Interrogs, Answer to Question #6.*  In his deposition, Juan Colón-Báez claimed not to have received any instruction with respect to "repetitive conduct," even during his training to be a supervisor in the PRPD. *Exh. J, JCB Depo, at page 4, line 24 to page 5, line 6; lines 17-20.*  In Rafael Figueroa-Solís's deposition, the story changed somewhat, with this defendant stating that he did know the term "repetitive conduct," but that he did not know what it meant.  He stated, however, that he never saw the Order regarding "repetitive conduct," nor had he received any training regarding the need to identify officers whose repeated abuses with citizens raise

65

questions regarding their fitness to be police officers. *Exh. HH, RFS Depo, page 82, lines 5 to 25.*

6.38 Lieutenant Cruz-Sánchez's own complaint file includes three complaints for illegal searches, one for illegal arrest and one for verbal abuse.  Three of those cases were in the two years leading up to the killing of Miguel Cáceres. *See, Exh. A, VCS Interrogs, Answer to Question # 24.* Two complaints against Lieut. Cruz-Sánchez in 2007 — one for illegal arrest and the other for verbal abuse ---- were still pending resolution some three years later, when Mr. Cruz-Sánchez answered the interrogatories in this case. *Id., Answer to Question #24, at subsections (5) and (6).*

6.39  Despite Lieut. Cruz-Sánchez's lengthy disciplinary record, Edwin Rivera-Merced thought it was critical for this officer to first command Tactical Operations and then the Humacao Precinct (District) in the years 2006 and 2007.   Rivera-Merced believed him to be an appropriate officer to lead the Humacao District, which was "very important for the area," because it is a large town, with a lot of problems, and he wanted to assign a supervisor who was "more competent" to cover it. *Exh. H, ERM 2009 Depo, page 44, line 3 to 10; page 44, line 14 to page 45, line 1 to 3.*


### 3. Pro-forma evaluations

6. 40  Within the PRPD, evaluations were also given minimal importance. Although the form for evaluating officers in the PRPD has a scale from "1"to "5," with "5"being the highest, supervisors routinely give high marks to *all* of their agents.  Lieutenant Cruz-Sánchez would give "4's" and "5's" to every officer.  He never gave an officer a "1"or a "2" and only rarely would give a "3." *Exh. K VCS Depo, page 47, line 5 to line 25; See, also  Exh. UU, January 2nd, 2007 evaluation of Javier Pagán by defendant Cruz-Sánchez.*  Sgts. Rafael Figueroa-Solís acted in the same way, rarely giving "1's" or "2's" to the agents he supervised. *Exh. HH, RFS Depo, page 19, lines 13 to 16.*

6.41 As Javier Pagán's direct supervisor in the Tactical Operations Division in 2006 and early 2007, Lieutenant Cruz-Sánchez evaluated Officer Pagán.  He evaluated Officer Pagán in January of 2007, covering the period from July 1, 2006 to December 31, 2006, during Mr. Pagán's suspension for two months for disciplinary reasons. Defendant Cruz-Sánchez gave Mr. Pagán a glowing recommendation, including the highest mark - "5" - in the category "self-control," as to which he noted that Mr. Pagán "in difficult situations, he keeps calm and in the proper mood," ("en situaciones difíciles mantiene serena y en buen estado de ánimo.") *See, Exh. UU, January 2nd evaluation; Exh. K, VCS Depo, page 34, line 20 to page 35, line 2.* Defendant Cruz-Sánchez gave Mr. Pagán this glowing evaluation at a time when he knew that both former PRPD Superintendent Cartagena and then Superintendent Pedro Toledo-Dávila had proposed that Javier Pagán be expelled from the force, and that he had just returned from a 60-day suspension. *Id., page 35, line 13 to page 36, line 1; See, generally, Sof F #'s 5.24; 6.29; 6.30 and 6.31.*

### 4. The policies regarding officers who return from suspensions are not followed

6.42  An officer who is serving a lengthy suspension is not considered to be a member of the force. The officer is disarmed, and he or she cannot continue to possess equipment belonging to the PRPD. *Exh. HH, RFS Depo, page 73, line 22 to page 74, line 1.*

6.43  When an officer returns from a suspension for disciplinary reasons, he or she is supposed to report to the "Replacement Center" ("Centro de Reemplazo.") *Exh. H, ERM2009 Depo, page 67, lines 2-7.* The Replacement Center is at police headquarters in Hato Rey.  From there, the officer can be sent to any assignment. *Exh. L, PTD Depo, page 70, lines 3-10.*

6.44  If the officer is sent back to the Area where he or she was originally assigned before the

suspension, the Area Commander  has the authority to decide where to place the officer within the Area. *Exh. K, VCS Depo, page 49, line 15 to 24; Exh. H, ERM2009 Depo, page 81, lines 14 to 20.* Upon the return of such an officer from a lengthy suspension, the Area Commander (in this case, Edwin Rivera-Merced) as well as the Superintendent had the authority to decide whether the agent should be sent for evaluation by a mental health professional.   The Director of the Unit where the officer worked also can request an evaluation. *Exh. J, JCB Depo, page 21, line 14 to page 22, line 15.*

6.45 Before being rearmed, the officer is supposed to go through retraining on the use of weapons.   If the suspension was for violence, Defendant Toledo also says that he would have to go to the psychological unit. *Exh.L, PTD Depo, page 68, line 8 to page 69, line 25.*

6.46 However, none of these rules were followed in the case of Javier Pagán who, after his sixty (60) day suspension, was immediately reincorporated into the Tactical Operations Division of Humacao. *See, Exh. VV, SAOC/AH/11/22/862 (Reincorporation Memo by Defendant Víctor Cruz, October 22, 2006).*  On the day his suspension concluded, then T.O.D. Director Víctor Cruz-Sánchez confirmed to the Director of Disciplinary Measures at police Headquarters that Officer Pagán was back on the job by 9:20 AM. *Id.*

## G. The failure of the high-level supervisors to establish protocols which would have provided for adequate supervision of Javier Pagán

### 1. The two high-level supervisors who are defendants in this case

7.1 The two highest level supervisors who are defendants in this case are Pedro Toledo-Dávila, former Police Superintendent, and Col. Edwin Rivera-Merced, the then Area Commander

for the Humacao Area.

7.2  Defendant Pedro Toledo-Dávila was Superintendent of Police from for eight years in the 1990's and again for four years in the mid-2000's, including when the events giving rise to this case occurred.  As such, he was the highest authority in the Puerto Rico Police Department, with ample authority to establish practices and procedures in the department.  *See, SofF # 1.4 above and 7.3 infra.*

7.3 As Superintendent, Mr. Toledo had the authority to issue General Orders and Special Orders as well as circulars concerning management issues in the PRPD, including discipline of police officers and the conduct of the administrative complaint system and the policies regarding referral of officers for psychological evaluation and treatment. He also had the authority to summarily suspend officers. *See, Exh. L, PTD Depo, at page 104, Line 20 to page 105, line 7; page 106, lines 13-18; page 107, lines 2 to 11.*

7.4 As Superintendent, Pedro Toledo-Dávila could instruct high-level supervisors to closely monitor agents with disciplinary problems or tendency toward violence and to assure that there was compliance with measures intended to identify such agents. *Exh. V, PTD Interrogs, Answer to Question 7, at page 9.*

 7.5  At the time of the events giving rise to this case, defendant Edwin Rivera-Merced had been a police officer for over thirty years.  He reached the rank of Captain in the early 1990's and was the highest ranking officer in different units and districts (precincts) from 1995 to 2000 and from 2001 to 2007 (and up to 2009, when he retired.)  *See, Exh. H,ERM 2009 Depo, at page 15, lines 11-12; page 20, lines 19-20. Exh. D, ERM Interrogs, Answer to Question #1*

7.6  In each of these high-level positions, Mr. Rivera-Merced was "in charge of organizing,

directing, planning and controlling the particular" group or unit. *ERM Interrogs, Answer to Question #1.*

7.7 As Humacao Area Commander, Edwin Rivera had responsibility for the entire Humacao Area comprised of five municipalities, Naguabo, Humacao, Yabucoa, Las Piedras and Maunabo. He was also in charge of specialized divisions such as Tactical Operations and Special Operations as well as other units.  He supervised about 400 to 500 police officers.  *Exh. H, ERM 2009 Depo, page 36, lines 1-8; page 73, lines 4-7.*

7.8 As Area Commander, Mr. Rivera-Merced had the authority to recommend summary suspensions of officers, although he did not have the final authority to suspend officers.  He also had the authority to send officers on vacation leave, to send officers for psychiatric evaluation and to disarm officers. *Exh. D, Excerpts from Interrogatory Answers by Edwin Rivera-Merced, ("ERM Interrogs"), Answer to Question #3, at pages 3-4.*

7.9 While Pedro Toledo-Dávila was Superintendent, he held weekly staff meetings with all of the Commanders.  General orders were discussed in these meetings, and instructions were given to the Commanders to issue directives to all supervisors about such matters.

## 2. No specific record-keeping and analysis of Officer-Involved Shootings

7.10 In the PRPD, there is no specific method of keeping statistics on officer-involved shootings. *See, Exh. A, VCS Interrogs, Answer to Question #15.*

7.11 Nor is there any requirement of reports other than the preparation of a standard "Incident Report Memorandum," which is the same report filled out with respect to a crime alleged to have been committed by any citizen. The only difference from any crime involving citizen suspects is that

because an officer may be involved, if there is a "preliminary finding" that a "criminal violation" has occurred, then the matter is referred to the Special Investigation Bureau ("NIE") of the Justice Department.  If there is no finding of a criminal violation, then the matter is referred for an administrative investigation. *Exh. D, ERM Interrogs, Answer to Question #2.*

7.12 Even if the actions of an officer result in the death of a citizen, the matter is not subject to any special treatment.  The PRPD Homicide Division performs an investigation to make a preliminary determination whether or not a "criminal violation" has occurred, after which the matter is referred to either the NIE or for administrative investigation. *Id.*  If there is doubt about whether the shooting was in self-defense, or the particular circumstances are not known, the Area Command prepares a press release and the standard Incident Report about the death of a person.  No special reports are prepared, nor does the incident appear in the police statistics. *Exh. H, ERM 2009 Depo, page 63, lines 3 to 19.*

7.13 In December of 2009  ---- less than a year after he left the department which he had headed for 12 years — defendant Pedro Toledo-Dávila answered interrogatories in this case.  He did not recall the process in the PRPD for maintaining statistics with respect to officer-involved shootings or the specific office or officers within the PRPD who had the responsibility to do so.  He stated that either the "Legal Division and/or the Statistics Division must have this information and/or documentation, if available, and that "more could be found in Internal Affairs or the Public Integrity Department." *See, Exh. U, Interrogatories to Pedro Toledo-Dávila, Question #3, page 3 to 4; Exh. V, PTD Interrogs, Answer tot Question #3, page 4 to 5.*

7.14   Edwin Rivera-Merced, a long-time PRPD high-level supervisor, does not even know if the Justice Department Special Investigations Bureau (NIE) keeps statistics regarding such uses

of deadly force by police officers or how many investigations of such incidents it carries out. *Exh. H, ERM2009 Depo, page 63, line 25 to page 64, line 2.*

7.15 In December of 2009, when Edwin Rivera-Merced answered interrogatories in this case, he had no specific recollection of the number of officer-involved shootings in the Humacao Area which he had directed from 2006 to 2007.  He did remember three incidents in 2007 — that of Nelson Santiago one week before Mr. Cáceres was killed and one in which a Sergeant killed a Lieutenant. *Exh. D, ERM Interrogs, Answer to Question #4, pages 2 to 3.*

7.16 When Area Commander Edwin Rivera-Merced was asked about in December of 2009 about the rankings of the Humacao Area and of the Tactical Operations Division, as compared to other units, with respect to the frequency of Officer-Involved Shootings or cases of misconduct, he claimed not to "remember."  He stated, however, that it is his "understanding" that "these rankings can be found in the Statistics Division of the Police of Puerto Rico." *Exh. WW, Interrogatories to Edwin Rivera-Merced, Questions 6,7 and 8, at page 3 to 4; Exh. D, ERM Interrogs, Answer to Questions # 6, 7 and 8, at page 5.*

7.17  Mr. Rivera-Merced's "understanding" is incorrect.  In early 2010, plaintiffs issued a deposition subpoena to the PRPD pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, with the purpose *inter alia* of ascertaining where such statistics, if any, were kept. *See, Exh. XX, Rule 30 (b) (6) subpoena and Exhibit YY, addendum thereto.* In response to the Rule 30(b)(6) subpoena, the PRPD designated two individuals, Luis De Jesús-Ramos, the Director of the PRPD Statistics Division and Francisco Morfí-Marrero, the Acting Director of the Division of Psychology and Social Work of the PRPD. *See, Exhibit ZZ, Excerpts from Rule 30(b)(6) Deposition of Luis De Jesús and Fransisco Morfí-Marrero ("Rule 30(b)(6) Depo"), at page 3, lines 3-7; page 7, lines 12-*

*18; page 27, lines 3-6; page 30, line 10 to page 31, line 5; page 42, lines 4-12.*

7.18  Mr. De Jesús-Ramos, Chief of the Statistics Division, testified that the PRPD does not keep any separate records regarding officer involved-shootings.  *Exh. ZZ, Rule 30(b)(6) Depo, page 13, line 17 to page 14, line 2.*  The statistics the Division keeps are those mandated by the Uniform Crime Report System, i.e. statistics regarding serious (Type 1) crimes *Id., page 14, line 3 to 11; page 16, lines 2-9.*

7.19 The crime statistics kept by PRPD Statistics Department do not distinguish between an offender who is a police officer, and an offender who is a civilian.   Thus, for example, the death of Miguel Cáceres, since it was charged as a crime, would simply form part of the crime statistics.  Nothing in the way the Statistics Department maintains or analyzes this crime would be different due to the fact that the accused (and now convicted) was a police officer. *Id., page 16, line 20 to page 17, line 12.*[8]

7.20  The second person designated by the PRPD in response to the Rule 30(b)(6) subpoena, Francisco Morfi-Marrero, had no knowledge of the matters included in the subpoena to the PRPD.  Mr. Morfi is a clinical psychologist absolutely nothing to do with statistic-keeping or monitoring of cases involving police violence or fatal incidents.   His division, the Division of Psychology and Social Work, provides social work and psychological services to the officers employees of the PRPD.  *Id., page 41, line 1-13, page 42, line 4-12; page 44, lines 12 to 21.*  The Division does not provide therapy or counseling — it is an evaluative service which conducts fitness for duty evaluations. *Id., page 45, lines 5-17.*

---

[8]Plaintiffs request this court to take judicial notice that Javier Pagán-Cruz was convicted of the murder of Mr. Cáceres and that defendants Zulma Díaz and Carlos Sustache are still facing criminal charges with respect to this matter.

7.21 In cases of use of unreasonable force by a police officer, a supervisor in the PRPD has the authority to refer the agent for psychological evaluation or a fitness-for-duty determination. *Id., page 44, line 23 to page 45, line 8.*

7.22   Although Superintendent Toledo had the authority to mandate psychological testing of *all* agents, it was not until *November 2007* that the PRPD established a system for regular psychological evaluations of officers.  The requirement was instituted just three months *after* Mr. Cáceres was killed.  *Id., page 49, line 18 to page 50, line 6.*

7.23   At the time when Mr. Cáceres was killed, there was no such requirement.  *Id.*  Even *after* his death, the PRPD did not mandate mandatory counseling for officers alleged to be involved in the use of excessive force. *Id., page 48, line 8 to page 49, line 2; page 50, line 24 to page 51, line 3.*

7.24   Nor was there any requirement that officers involved in shootings be referred to the PRPD Division of Psychology and Social Work. *Id.,, page 60, lines 11 to 20.*

7.25 Despite being designated by the PRPD to respond to the Rule 30(b)(6) subpoena, Mr. Morfi-Marrero, the  head of the PRPD Division of Psychology and Social Work, basically had no information responsive to the subpoena. *Id., page 61, line 15 to page 62, line 10.*  His Department does not track which cases they attend to arise from officer-involved shootings or whether allegations of use of excessive force or unreasonable force played any part in the referral of the officer for services.  *Id, page 62, line 7 to page 63, line 9.*

7.26  In September, 2010, defendant Pedro Toledo-Dávila answered in response to a Request for Admissions that he did not know what plaintiffs meant by the terms "post-traumatic stress" or "post-traumatic shock," because plaintiffs had not defined the terms.  He claimed that "it has not

been shown how the theoretical need to deal with post-traumatic stress or post-traumatic shock has any bearing of [sic] relevance on the facts of this case." *Exh. E, PTD Adm, Request #29, at pages 8 to 9.*

7.27 On the other hand, at his deposition a few months earlier, Mr. Toledo had no difficulty understanding the related concept of "post-shooting trauma" with respect to officers on the scene of an Officer Involved Shooting.   He recognized that first in the FBI and later in the PRPD, he understood that it was important to "deal with police officers involved in the shooting, because definitely it's a trauma."  He understood the necessity of measures to ameliorate the trauma, such as support groups or psychological assistance.   This applies both to those directly involved in the shooting and those who were present at the time of a shooting.   Officers who are involved in such situations should be referred for assistance. *Exh. L, PTD Depo, page 154, line 2 to page 155, line 8.*

7.28  Before becoming PRPD Superintendent, Pedro Toledo-Dávila was an FBI agent for twenty five (25) years. *Id., page 150, lines 13-14.*   He was aware of FBI policies regarding Officer Involved Shootings, at least until his departure from the agency in 1992.  When Mr. Toledo first became Police Superintendent in 1993, he was aware that before his departure, the FBI had mandated complete documentation and analysis of all Officer Involved Shootings by FBI Agents and that the analysis included whether or not each such shooting was justified and whether or not it was consistent with policy, training and/or acceptable field tactics. *Exh. E, PTD Adm, Requests 39 to 42, pages 12 to 13.*

7.29  While Mr. Toledo was still at the FBI, he received training respecting Officer Involved Shootings. *Exh. L, PTD Depo, page 139, lines 1 to 19.*

7.30  Mr. Toledo-Dávila has been a member of the International Association of Chiefs of Police (IACP) for close to two decades.  He has gone to their annual conventions and meetings. During the time he was Police Superintendent and to this day, he receives the monthly publication of the IACP. *Id., page 145, line 13 to page 146, line 3;  page 146, lines 20-25;*

7.31  Mr. Toledo is familiar with the fact that the International Association of Chiefs of Police issues policies based on the information that they gather from different police departments*. Id., page 148, line 18 to page 149, line 3.*

7.32 Despite his active membership in the IACP and his lengthy experience as a trained FBI agent, in his Answers to Interrogatories, Pedro Toledo claimed not to know what the term "1998 Model Policy of the IACP National Law Enforcement Policy Center regarding the Investigation of Officer-Involved shootings" means.  *Exh. E, PTD Adm, Request #34, page 10.*  He also claimed not to know what the "1999 Concepts and Issues Paper of the IACP regarding the Investigation of Officer Involved Shootings" is. *Id., Request #35, page 10 to 11.*  Similarly, he professed ignorance of the IACP Use of Force - Concepts and Issues Paper, originally enacted in 1989 and revised in 1995, 1998, 1999, 2001 and 2005. *Id., Request #36, page 11.*

7.33 In his responses to the admissions, defendant Toledo-Dávila also stated that he could not respond to a request plaintiffs had made regarding the use of "review boards to analyze Officer Involved Shootings," and whether these were "common management and supervisory techniques" used in "major police forces throughout the United States for decades."  He based his failure to respond on the notion that he did not know what *plaintiffs* meant by these terms.  *Id., Request #37, page 11-12.*

7.34 In further response to the admissions, Mr. Toledo-Dávila stated that while he

understands that different departments may or may not use review boards, he "is not clear for what particular purposes for which [sic] they are used by other police forces or whether other mechanisms or entities or structures within an organization can accomplish the same purpose that review boards are used for." *Id.*

7.35  Edwin Rivera-Merced, on the other hand, denied in his answer to the Admissions put to him in 2010 that the model polices adopted by the International Association of Chiefs of Police are "authoritative model policies"or set forth "generally accepted practices and policies in law enforcement." *Exh.AAA, Excerpts from Answers to Request for Admissions by Edwin Rivera-Merced ("ERM Adm"), Request #23.*

7.36  Like Pedro Toledo, Mr. Rivera-Merced also stated that he was "not clear"for what purpose  Review Boards for Officer Involved Shootings are used in other police departments.  *Id.*

7.37  When he answered Interrogatories in this case on December 4, 2009, Edwin Rivera-Merced claimed to not be able to provide any specifics regarding PRPD policies with respect to administrative review of officer involved shootings or mechanisms for dealing with officers exhibiting troublesome conduct, because he was "retired from the Puerto Rico Police Department." *Exh. D, ERM Interrogs, Answers to Questions #1, 11 and 12,at pages 1, 2, 5 and 6.*

7.38  Nor could Mr. Rivera-Merced remember any specifics of any policies which might have required documentation of officer-involved shootings or where such documentation would be maintained and accessed if necessary. On December 4, 2009, defendant Rivera-Merced explained that since he was retired, he did "not have access to this information." *Id., Answer to Question 13, at pages 5 and 6.*

7.39 When defendant Rivera-Merced gave these answers in December of 2009, he had been

out of the police force for only five and a half months, after more than a decade of first-tier supervisory positions within the Department, and just two years after he left the Humacao Area Command. *Exh. PP, ERM 2010 Depo, page 9, line 23 to page 10, line 1; See, also, SoF # 1.4 above.*

7.40 A similar lapse in memory was displayed by this defendant in September of 2010, when he was asked to admit that he "never gave instructions to any of [his] direct or indirect subordinates at the Humacao Area command to conduct any analysis of number or patterns of officer involved shootings. Mr. Rivera-Merced claimed not to have "recollections sufficient to admit or deny" this request for admissions. *Exh. AAA, ERM Adm, Request #13, page 8.*

7.41  Defendant Rivera-Merced also had no specific recollection of any conversation he might have had with the Police Superintendent regarding the need for the Area Commander to provide him with information regarding the number of such officer involved shootings in the Humacao Area, the number of fatalities resulting therefrom or an analysis of whether or not such shootings were justified or consistent with PRPD rules, practices and training. *Id., Request #'s 15 and 16, pages 8-9.*

7.42  In his 34 years in the PRPD, Edwin Rivera-Merced never saw an analysis of the number of disciplinary complaints by Area or by unit.  He testified that in his entire time in the PRPD, there was no practice of providing this kind of information to Area Commanders. *Exh. PP, ERM2010 Depo, page 82, lines 1-9.*

7.42  Defendant Víctor Cruz-Sánchez provided similar testimony regarding the failure of the PRPD to record and analyze Officer Involved Shootings.  By the time he answered his interrogatories in early 2010, Mr. Cruz-Sánchez had been a Lieutenant for several years  and had directed two separate units within the Humacao Area and had been Commander of Humacao District within the

Humacao Area.  He had no idea, however, regarding the number of Officer-Involved Shootings which had occurred in the Area before Mr. Cáceres was killed. *Exh. A, VCS Interrogs, Answer to Questions #4, at subsections ( c) through (g) and  #15.*

7.43  Even though he was the Director of the Tactical Operations Division of Humacao for a year between 2006 and 2007, and a first-tier supervisor in the Humacao Area since 2004, Lieutenant Víctor Cruz-Sánchez had no knowledge of whether any data was collected or analyzed comparing either the Humacao Area or the T.O.D.. with respect to the discharge of weapons by officers or injuries or deaths to citizens due to the use of weapons by officers in the Area or the Division.  *Exh. A, VCS Interrogs, Answer to Question #18; See, also, SofF# 1.04 to 1.09 above.*

7.44 Nor does he have any idea of how the Area or the Division compared with other Areas or Units with respect to the number of administrative complaints against officers, the nature of complaints, and the number of complaints relating to use of excessive force, illegal searches and/or seizures, false arrest or other abuses of authority. *Id., Answer to Question #19.*

7.45 Defendants Juan Colón-Báez and Rafael Figueroa-Solís also had no knowledge of the number of Officer-Involved Shootings during that period or how Tactical Operations or the Humacao Area in general ranked in comparison with other units or Areas, with respect to Officer-Involved Shootings or incidents involving excessive force.  *Exh. B, JCB Interrogs, Answer to Questions #'s 15, 18 and 19; Exh. C, RFS Interrogs, Answer to Questions #'s 14, 15,18 and 19.*

### 3. **Pagán and Sustache witness a police killing one week earlier and no one finds out.**

7.46  On August 5, 2007, barely a week before Mr. Cáceres was killed, both Officer Pagán and Officer Sustache had been present on the scene at a Youth Festival in the town of Las Piedras

immediately after a fellow officer, Abdel Morales, killed Nelson Santiago, a 21 year-old youth who is a son of a police officer in the Area, shooting him several times. *Exhibit BBB, Excerpts from Deposition of Javier Pagán-Cruz in the case of <u>Santiago v. Morales de León,</u> Civil No. 08-1828, ("JP Depo"), page 30, lines 14 to 21; page 47, lines 11-13; page 54, lines 11-14; Exh. CCC, Excerpts from Deposition of Carlos Sustache in the case of <u>Santiago v. Morales de León,</u> Civil No. 08-1828, ("CS Depo"), page 38, line 10-17; page 55, line 24-25.*

7.47  Because there was a Youth Festival, the police presence that night was organized at the level of the Area Command, with the participation of all of the supervisors for the different units and divisions.  There were officers from several different units and districts at the Festival. *Exh. BBB, JP Depo" page 48, lines 15 to 22.*

7.48   Javier Pagán-Cruz, who one week later killed Miguel Cáceres after a "struggle," ("forcejeo"), was present when Officer Abdel Morales shot the young man.  He describes what he saw as follows: "Officer Abdel is there firing off some shots, but before that he was in a struggle ("forcejeo") with the youth and he pushed the kid away from him and fired." *Id., page 54, lines 11-14 (translation provided.)*

7.49 Defendant Pagán was never questioned about the shooting on August 5th at Las Piedras.  No one ever interviewed him about this; nor did he provide a statement about the killing or even offer information on an informal basis.  He was not asked to provide information during an administrative investigation. *Id., JP Depo, page 93, lines 4-13; page 94, line 24 to page 95, line 3.*

7.50  Mr. Pagán never talked with any of his supervisors about the incident.  He did not talk to the T.O.D.. Interim Director, defendant Juan Colón-Báez, or to the T.O.D.. Acting Director, Rafael Figueroa-Solís.  No one at the Area Command level interviewed him. *Id., page 102, lines*

*1-11*.

7.51   Officer Carlos Sustache also was never interviewed about the events he witnessed at the Youth Festival. *Exh. CCC, CS Depo, page 64, lines 13-16.*

7.52 Although the Special Investigations Bureau (NIE) immediately assumed jurisdiction, neither Javier Pagán nor Carlos Sustache were interviewed in the course of that investigation. *See, Exh. DDD, Excerpts from NIE Investigation of the Death of Nelson Santiago, pages 1 and 2.*

7.53 Mr. Pagán did not write up a report on what he had seen that night.  Only the supervisor in charge was required to prepare a report.  Even though he had been an eye-witness to a fatal shooting by a fellow police officer, he was not required to state either in written or oral form what he had seen that night. *Exh. BBB, JP Depo, page 92, lines 18 - 22; See, also SofF #7.48 above.*

7.54   Even though Víctor Cruz-Sánchez knew Officer Morales and knew Officer Abdel Morales, as well as the boy's father and Officers Pagán and Sustache, he did not know that they were on the scene of the killing of a civilian less than one week earlier. *Exh. K, VCS Depo, page 137, lines 14 -25.*

7.55 As Interim Director of the Humacao Tactical Operations Division, defendant Juan Colón-Báez knew that officers from the Humacao T.O.D. would be present at the scene of the Youth Festival in Las Piedras on August 5, 2007. *Exh. J, JCB Depo, page 63, lines 3-11.*

7.56 Juan Colón Báez claims never found out that Officers Pagán and Sustache, had been present at the time Nelson Santiago was killed.  *Id., page 62, line 16 to page 63, line 2.*  Mr. Colón-Báez never even inquired which of his agents had seen the shooting, and thus never found out that Officer Javier Pagán-Cruz, who killed Mr. Cáceres just one week later, had seen Abdel Morales kill Nelson Santiago.  *Id.,, page 64, line 10 - 13.*

81

7.57 There were meetings of supervisors in the Humacao Area every Monday.  Defendant Edwin Rivera-Merced has testified under oath that every officer involved shooting, including the shooting of Nelson Santiago, was discussed at the Monday meetings.  According to Mr. Rivera-Merced, after such a situation, he would specifically "order the supervisors to monitor and pay close attention to officer's [sic] attitudes and those with violent incidents." *Exh. WW, Interrogatories to Edwin Rivera-Merced, Question 23, at page 7; Exh. D, ERM Interrogs, Answers to Question 23, at page 8.*

7.58 This testimony, however, is contradicted by that of defendant Juan Colón-Báez, who has stated that he first learned of the Santiago shooting at a staff meeting.  He states, however, there was no discussion in detail regarding the matter.  The matter was  treated like any other incident, leaving the details to the investigative authorities.  According to Juan Colón-Báez, there was not a great deal of attention paid to the matter because "there were tons of other matters" which had to be addressed. *Exh. J, JCB Depo, page 64, lines 24 to page 65, line 4; page 65, line 6 to line 10; Exh. B, JCB Interrogs, Answer to Question #17.*

7.59 Sgt. Rafael Figueroa-Solís did not learn that defendants Sustache and Pagán had been present at the scene where Nelson Santiago was killed on August 5, 2007, until he later had a conversation with Abdel Morales, the officer who killed Mr. Santiago. *Exh. HH, RFS Depo, page 79, line 21 to page 80, line2; page 80, line 15-25.*

7.60  Even the Area Commander, Edwin Rivera-Merced was unaware of the identities of the agents on the scene where Officer Abdel Morales killed Nelson Santiago one week before Mr. Cáceres was killed. *Exh. H, ERM 2009 Depo, page 54, line 22 to page 55, line 2.*

7.61 Nor was Pedro Toledo-Dávila made aware of the fact that both Carlos Sustache and Javier Pagán were on the scene of a fatal police shooting just one week before the events giving rise to this lawsuit.  Mr. Toledo did not find this out until his deposition nearly three years later. Although he remembered the incident, since the young man who was killed was the son of a police officer, he did not know which officers had observed the shooting.  *Exh. L, PTD Depo, page 156, line 14 to 157, line 11.*

7.62 In Mr. Toledo's opinion, the officers' supervisors would be the ones to assure that officers who are present at an Officer Involved Shooting resulting in the death of a citizen be referred for appropriate counseling.  It is the responsibility of a supervisor to "know where his officers were and what happened."  *Id., page 157, line 23 to page 159, line 12.*

7.63 In the PRPD at that time, however, there was no specific protocol which must be followed when an officer shoots a civilian.  The only protocol which Lieut. Cruz-Sánchez could recall requires that the weapon be seized, for evidentiary purposes.  There is no protocol requiring that officers such as Sustache and Pagán who observe a shooting resulting in the death of a citizen receive any kind of aid or counseling. *Exh. K, VCS Depo, page 138, line 15 to page 139, line 18.*

7.64  Sgt. Rafael Figueroa-Solís has admitted that there "should be" some such protocol, although he knows of no General Order which so provides.  He believes that officers who are present at such scenes in which an officer kills a citizen should be referred for counseling. *Exh. HH, RFS Depo, page 81, line 14 to page 82, line 4.*

7.65 Defendant Juan Colón-Báez recognized that although such situations are difficult for the officers on such a scene, and he has heard about the need to have psychologists offer workshops to the officers, he has never seen that done.  The director of a unit has the authority to call the

Medical Office for assistance.  At the time of the events, however, this was not done.  It was not until some time in approximately late 2008 or 2009 that the PRPD implement measures such as holding a local academy at the unit level to discuss such matters. *Exh. J, JCB Depo, page 65, line 23 to page 66, line 7; line 13 to 16; line 21 to line 23.*

7.66  According to former Police Superintendent, Pedro Toledo-Dávila, when there is a preliminary finding of "negligence" in an Officer Involved shooting, the officer is disarmed, transferred to an administrative post or sent on "vacation."  If he or she is "relieved of his weapon because of negligent conduct" must "complete a series of psychological tests and examinations," and "could also be required to undergo psychological treatment if the incident produced — or could have produced — adverse psychological effects on the agent." *Exh. V, PTD Interrogs, Answer to Question #1, at page 2.*

7.67  In the case of Officer Abdel Morales, however, this was not done.  On August 5, 2007, Officer Morales shot young Nelson Santiago several times and the NIE assumed jurisdiction.   By the very next morning, just hours after the shooting, the PRPD had given Officer Morales a "spare" weapon to replace the one seized for evidentiary purposes. *See, Exh. EEE, Excerpts from Deposition of Abdel Morales in Santiago Reyes v. Morales de León, Civil No. 08-1828, February 2, 2010 ("AM Depo"), at page 186, line 21 to page 187, line 1; page 187, line 4-6.*

7.68  One week before Officer Javier Pagán killed Miguel Cáceres, he had observed Officer Abdel Morales kill a young man in the context of a "forcejeo," only to be re-armed immediately.  Neither he nor defendant Sustache received counseling of any nature with respect to this fatal shooting.   Pagán and Sustache were never interviewed with respect to what they observed.  And, the supervisors in the Humacao Area, defendants Rivera-Merced, Cruz-Sánchez, Figueroa-Solís, and

Colón Báez all claim to have absolutely no knowledge that Officers Pagán and Sustache were on the scene that night. *See, SofF #'s 7.46; 7.48; 7.49; 7.50;7.51; 7.52; 7/54; 7.56; 7.58; 7.49; 7.60; above.*

### 4. Excessive delays in the disciplinary system

7.69  PRPD disciplinary complaints often take years to resolve. *Exh. J, JCB Depo, page 22, line 24 to page 23, line 1.*

7.70 The disciplinary process goes through many steps.

•       First a citizen fills out an Administrative Complaint.

•       The complaint is then endorsed by the Superintendency (of Public Integrity, as it was called at that time).

•       Then it goes to the Office of Public Integrity at the Area level, where it can either be taken up at that office or referred to another nearby Area.

•       All complaints are first investigated at the Area level.  The individual investigator provides a report to the head of the Public Integrity Office at the Area level.

•       The Director of the Area Public Integrity Office then approves a report, which makes findings and points out violations of the Regulation, if applicable, and can make a recommendation as to an administrative sanction ranging from a warning to expulsion.

•       The report, in turn, goes from the Area Public Integrity Office to the island-wide Assistant Superintendency of Public Integrity, which has the authority to accept or reject the recommendation.

- The determination by the Assistant Superintendency is then sent to the Legal Division, which also has the power to modify the recommendation.

- From there, the recommendation goes to the Superintendent, who decides what punishment, if any, to impose.

- The superintendent then drafts a letter, which is commonly referred to as a "Me Propongo."

- The memo from the the Superintendent proposing a disciplinary sanction ("me propongo") is not a final decision, even in the case of an expulsion proposal, but rather a proposed sanction, from which the officer may appeal internally.  After receiving a "Me Propongo," an officer has the right to appeal for an administrative hearing before hearing officers assigned to the Legal Division.

- The hearing officer then renders a report to the Director of the Legal Division, along with a recommendation.

- The matter then goes back to the Legal Division which reviews the evidence and can make additional recommendations.

- The matter then returns to the Police Superintendent or his Associate Superintendent, who can either accept or reject the recommendation of the hearing officer and/or legal division.

- This last decision is a "final" agency decision, which the Officer can then appeal to the CIPA. *See, Exh. FFF, Excerpts from Deposition of Héctor Cintrón ("HC Depo"), page26, lines 17-19; page 26, line 25 to page27, line 2; page 27, lines 14-18; page 51, line s 11-24; page 53, lines 1 to page 54, line 16; page 56, lines 14-16; page 57,*

*lines 3-8; page 71, lines 14-17. See, also, Exh. HH, RFS Depo., page 42, lines 7-14;*

*lines 18-25; page 43, lines 3-12; See, also Exh. L, PT Depo, page 39, line 9 to page*

*40, line1.*

7.71  Edwin Rivera-Merced's own disciplinary record showed that a complaint which had been filed in 1999, alleging an illegal arrest, was still pending final resolution in 2008, as were two complaints which had been filed in 2004 and 2005.  *Exh. GGG , SAIP-DIP-AC-4-1,376, page 2.*

7.72  Former Superintendent Pedro Toledo-Dávila was concerned about the fact that complaints were taking so long to resolve.  He testified that he gave instructions to the Legal Division that because there were so many cases pending, they should be prioritized, which emphasis given to more serious matters such as police brutality and domestic violence.  *Exh. L, PRT Depo, page 42, lines 15-24.*

7.73  The excessive delays in the PRPD disciplinary process are well-known to officers in the PRPD, especially ones like Javier Pagán who have seen the process first-hand, and who has testified that delays of "seven, eight, ten years"are "typical."  *Exh. BBB, JP Depo, page 128, lines 2-7.*

7.74 At the time defendant Pagán was expelled from the force in 2007, two of the complaints against him were still pending resolution.  One of these complaints had been filed a full eight years earlier.  *See, Exh. Z, 2008 Historial.*

7.75 The final sanction on the domestic violence complaint was imposed in late 2006, some seven to eight years after the events giving rise to the complaint. *See, Sof F #'s 5.3 to 5.5; 5.24 above.*

7.76  Remarkably, *three days after* Mr. Pagán killed Miguel Cáceres, the PRPD issued a

Charge Resolution with respect to a complaint filed by one of Javier Pagán's police supervisors in

*March of 1999*, *eight and a half years earlier,* charging him with verbal abuse and insubordination.

The  Department imposed a sanction of a "warning" for yet another proven offense by this errant

office, although the facts dated back to almost a decade earlier. *See, Exh. HHH, #OS-3-OAL-AAi-I-*

*357, Resolution of Charges, August 14, 2007.*

7.77 In Mr. Pagán's case, with at least two complaints pending disciplinary sanction for

almost a decade, his supervisors were not informed about the nature of the complaints against this

T.O.D. agent (unless they sought out the information).  According to defendant Colón-Báez, the

documents imposing punishment just mentioned that a suspension had been proposed, that "an

administrative investigation was done, bla, bla, and that there was a conclusion that the punishment

should be such and such." *Exh. J, JCB Depo, page 23, lines 2 to 11.*

7.78 While the disciplinary process is wending its way through its multiple levels,

supervisors do not generally try to ascertain the nature of the charges, even if the recommendation

is for expulsion.  This is because, as Mr. Colón-Báez understands it, "the agent has the right to

appeal to CIPA (the Commission for Investigation, Processing and Appeal)" and the supervisors

believe that that is up to the agent and his attorney.  *Id., JCB Depo, page 18, line 14-24.*

**5. The lack of supervisory staff at the Humacao Tactical Operations Division**

7.79 In the Tactical Operations Division of Humacao in August of 2007, there were no

lieutenants.  The Division was being headed up on an interim basis by a sergeant, defendant Rafael

Figueroa-Solís, who was Acting Director.  When Mr. Figueroa-Solís went on vacation in July of that

year, a vacation which was to last about a month and a half, Sgt. Juan Colón-Báez, who was the only Sergeant in the Division when Lieutenant Cruz left the T.O.D., took over the supervision of the approximately 30 officers in the division.   *Exh. K, VCS Depo, page 53, line 11 to line 16; page 61, line 19-24; page 62, line 13-17. See, also Exh.III (Triple "I"), Service List for Tactical Operations, August 6 to 12, 2007.*

7.80   Former Superintendent Pedro Toledo has testified that the head of the Tactical Operations Unit in each of the Areas should have a rank above that of a sergeant.  *Exh. L, PTD Depo, page 75, line 19 to page 76, line 3.*  Although both Rafael Figueroa-Solís and Juan Colón Báez served as Acting or Interim Director of that Unit, and the former sent out correspondence identifying himself as "Director," these Sergeants acted as Director, but lacked the rank to do so. *Exh. HH, RFS Depo, page 75, lines 11 to 19.*

7.81  As a general rule, there should be approximately eight or ten agents per sergeant. *Id., page 75, line 19 to page 76, line 3.*

7.82  At the same time that Sgt. Figueroa-Solís was directing the Humacao Tactical Operations Division, with some 30 agents and no other sergeants or lieutenants in the division,  Mr. Figueroa-Solís was also in charge of the Humacao Motorcycle Unit*, as well as the Area Command Center, the Criminal Records Office, and the Housing Project Security Corps.  He was supervising approximately 120 agents in all. *Exh. HH, RFS Depo, page 85, lines 10-13; lines 20-25; page 86, line 1-5; lines 18-21; page 87, lines 5-16.*

7.83 The lack of supervisory personnel in the Tactical Operations Division — with only one sergeant temporarily on loan and substituting for the one supervisor in the Division, also a sergeant ---- is in sharp contrast to other units, such as the Humacao District, which had 6 supervisors for a

total of 42 agents. *Exh. A, Excerpts from Interrogatory Answers of Víctor Cruz-Sánchez, Interrogatory #4, sub-section(e).*

7.84 It is important to have supervisors on each shift, in order to supervise the personnel and to maintain control over them. *Exh. K, VCS Depo, page 61, line 8 to line 18.*

7.85 Rafael Figueroa-Solís was on vacation from July 5th to August 20th, 2007, and Juan Colón-Báez was placed in charge of the Humacao T.O.D. on an interim basis. *See, Exhibit III, Service list for Tactical Operations, August 6 to 12,2007, at page 2; Exh. J, JCB Depo, page 29, line 24 to page 30, line 10.*

7.86 Since he was the only police sergeants at T.O.D. in August of 2007, he would typically assign T.O.D. officers such as Officers Pagán and Sustache to be supervised by other officers with the same rank as these defendants, but who had no special training in supervision. *Id, page 63, lines 3-11; page 63, line 14 to page 64, line7.*

7.87 Víctor Cruz-Sánchez was concerned about the lack of supervisors in the Humacao T.O.D..  The unit usually worked two shifts, meaning that one shift would always be without a supervisor on duty.  Lieut. Cruz-Sánchez understood that it would be proper to have a supervisor on duty.  He brought this concern to the Staff meetings and the Area level, requesting more supervisors for the T.O.D..  Area Commander Edwin Rivera-Merced had the authority to deal with the situation, but did not. *Exh. K, VCS Depo, page 54, line 12 to page 55, line 7.*

7.88. In the Humacao Area in 2007, it was up to the Area Commander, Edwin Rivera-Merced, to determine where supervisory personnel were assigned and to assure an adequate ratio of supervisors to agents in each unit. *Exh. L, PTD Depo, page 203, lines 4-18.*

**G. Lou Reiter's expert opinion confirms the supervisory failings in this case**

8.1 Plaintiff's police expert, Lou Reiter, has been actively involved in police practices and law enforcement for forty years.  He was an active police officer for 20 years, having served as a patrol and traffic officer, supervisor, manager, command officer and executive staff officer. *See, Exhibit JJJ, Lou Reiter Report under penalty of perjury ("LR Rep" ),  pages 1 and 3.*

8.2 A former Deputy Chief of Police of the Los Angeles Police Department, Mr. Reiter retired in 1981.  Thereafter, he has stayed in the field of police and law enforcement practices as a private police consultant. *Id., pages 1, 2 and 3.*

8.3 While he still with the Los Angeles Police Department, Mr. Reiter was involved in the investigation and adjudication of police officers' use of force, including officer involved shootings. He was a member of that city's Use of Force Review Board and for two years, he was the Chairman of that Board. *Id., page 5 - 6.*

8.4  The Los Angeles Use of Force Review Board evaluated all officer firearms discharges and any in-custody death from some other means, as well as evaluated any firearm discharge by a police officer and made specific recommendations on policy, tactics, equipment, training and supervisory control.  *Id., page 6.*

8.5 For close to two decades, Mr.  Reiter has been providing law enforcement consultation in police training and management in a number of matters involving police practices and administration.  These include investigation of critical incidents (officer involved shootings, use of force, and pursuits), management of the internal affairs function, police discipline, use of force and deadly force issues, police pursuit issues, investigative procedures and supervision, jail intake

procedures, personnel practices, supervisory techniques, crowd control procedures, liability management, policy and procedure development, and management effectiveness. *Id., page 1.*

8.6  Mr. Reiter does approximately 15 to 20 trainings per year, with approximately 1,000 participants.  He has provided trainings in 39 of the 50 states, as well as the District of Columbia and the United Kingdom.  *Lou Reiter Resumé, appended to Exh. JJJ, LR Rep, at page 1.*  One of the areas in which Mr. Reiter works in training police practitioners concerns administrative investigations and review of use of force by officers. *Exh. JJJ ,LR Rep., page 6.*

8.7  In his trainings of police practitioners, Mr. Reiter uses model policies developed by professional organizations such as the International Association of Chiefs of Police, as well as his own manual entitled *Law Enforcement Administrative Investigations,* initially published in 1993, with the most recent edition coming out in 2008. *Id., page 6.*

8.8  Mr. Reiter performs consulting work for both very small and very large police departments, including a department with close to 40,000 employees.  He performs internal audits for police organizations, with his primary focus on the following areas: citizen complaint procedures, discipline (internal affairs and early warning systems), personnel practices (selection, hiring, EEOC/AA, promotion, assignment and retention), specialized operations (traffic, investigations, narcotics, vice, intelligence, emergency response teams and unusual occurrence units), organizational structure and command responsibilities, police department governance, policy and procedures development, use of force policy and procedures, and investigation of critical incidents. *Id.,, page 2.*

8.9  In 2001, Mr. Reiter was appointed as the Federal Court Monitor for a consent decree in California.  For the last 15 years, he has acted as a consultant to the U.S. Department of Justice, Civil

Rights Division, with respect to major police department in which there were federal pattern and practice investigations.  He also worked with two cities which were being investigated by the Civil Rights Division of the Justice Department. *See, Lou Reiter Resume, appended to Exh. JJJ, LR Rep, at page 2.*

8.10  Mr. Reiter also serves as an expert witness in police matters.  Since 1983, he has been retained in over 1000 police related cases.  He has worked on behalf of plaintiffs as well as defendants. *Exh. JJJ, LR Rep, page 2.*  He has worked on cases in 46 of the 50 states, and in Puerto Rico.  *Id., at page 3.*

8.11 He has been qualified as an expert in state and Federal Courts, including the District of Columbia and Puerto Rico.  He has provided trial testimony in multiple areas including the following: field procedures including tactics, arrest techniques and pursuits; standards of police misconduct investigations; use of force and deadly force; supervision; investigative procedures; jail intake procedures; police management and personnel practices; investigation of citizen complaints and discipline; police policy and procedures development and police training. *Exh. JJJ, LR Rep, page 2.*

8.12 His testimony has been cited by the Court of Appeals for the First Circuit, for example, in the leading case of *Gutiérrez-Rodríguez v. Cartagena, op.cit.*  It has also been cited extensively in this court. *See, eg., González-Pérez v. Gómez-Águila, 312 F.Supp. 2d 161, 167 (D.P.R. 2004).*

8.13  Mr. Reiter has been involved with police practices litigation in Puerto Rico since the *Gutiérrez* case in the late 1980's.  Since that time, he has served as a police practices expert in approximately 40 civil cases in Puerto Rico, about two thirds of which involve officers from the PRPD. *Exh. JJJ, LR Rep,  pages 6-7.*

8.14 In the context of earlier cases in Puerto Rico, Mr. Reiter has been able to obtain a historical view of the PRPD's administrative investigations protocol.  In addition to the depositions and documents reviewed specifically for the instant case, Mr. Reiter has reviewed many other depositions of other police supervisors, and of at least four Police Superintendents.  He has also reviewed several hundred administrative investigations in the PRPD, dating back to the 1970's, as well as the General Orders of the PRPD.  Two of the General Orders are of particular relevance to the case at hand — General Order 87-14 (regarding disciplinary investigations and the responsibilities of line supervisors regarding the agents under their supervision) and 90-5 (requiring identification and training of officers who engage in repetitive misconduct.)  *Id., page 22.*

8.15  After reviewing extensive materials in this case, including depositions in this case, as well as interrogatory answers, admissions and productions of documents, Lou Reiter analyzed the conduct of each of the supervisory defendants with respect to this case.  He concluded that "**the supervisors .... were deliberately indifferent in their supervision, control and monitoring of field officers' uses of force, including use of deadly force.**"  Based on his review of the applicable standards and the facts of this case, Mr. Reiter concluded that each of the supervisory defendants failed in their responsibilities as police supervisors.[9]  *Id. page 12-13.*

---

[9]Mr. Reiter also concluded that the police intervention by Carlos Sustache, Zulma Díaz and Javier Pagán was unjustified, "objectively unreasonable and contrary to generally accepted police practices" and contrary to the Model Policy on Police-Citizen Contacts.  He concluded that there was an unjustified use of force by defendant Pagán and a failure on the part of Díaz and Sustache to "prevent this use of police deadly force," and of all three to fail to provide medical care to the dying man.  *Exh. II, LR Rep , page 7-11.*  Since these defendants have not filed for summary judgment, there will be no further discussion herein of Mr. Reiter's opinions with respect to defendants other than the five supervisory defendants.

94

8.16   In police administration, there is a generally accepted practice requiring all police departments to have formal written policies on the handling of officer involved shootings. According to Mr. Reiter, it is a matter of certain complexity, which requires consistency.  Puerto Rico, the third largest police force under the United States Constitution, is, in fact, that only major police force which does not have such a policy. *Exhibit LLL, Excerpts from the Deposition of Lou Reiter ("LR Depo"),page 74, line 20 to page 78, line 1; page 218, line 16 to page 220, line 1.*

8.17   The Puerto Rico Police Department **"has historically chosen to create a system and agency environment which is designed to not hold officers accountable for misconduct and abuse of citizens"** and one which **"can result in unreasonable uses of force and deadly force."** *Exh. JJJ, LR Rep, page 13.*

8.18   Given these historical deficiencies, seasoned officers would be aware of the general impunity for unreasonable uses of force and deadly force, "**and the failure to hold officers accountable for misconduct or improper, unreasonable and excessive uses of force."** *Id.*

8.19   One area in which the system deficiencies are clear is in the practices of the PRPD with respect to administrative investigations.  If reasonable practices are followed, such systems are key elements in establishing "the environment within the ... agency for field officers to know that **they will be held accountable for their actions in the field."** *Id., page 14.*

8.20   Acceptable police practices with respect to administrative investigations have been delineated and studied for some eighty (80) years.  Federal Studies were conducted in the 60's and 70's.  Model policies have been in existence for decades.  The accepted police practices in this area are continuously referenced in authoritative texts in the field and in training materials by major law enforcement professional organizations. *Id., pages 14-15*.

95

8.21  Since 1997, "specific recommendations for this aspect of policing are embodied into the various agreements between police agencies and the Civil Rights Division, U.S. Department of Justice and the 'best practices' developed by the U.S. Department of Justice from these investigations." *Id., page 15.*

8.22  The dismal failures of the disciplinary system in Puerto Rico are well-known to field officers such as Javier Pagán.  This defendant had personal knowledge of the lengthy delays and ineffective discipline in the PRPD system.  In 1998, he was accused of domestic violence. The criminal case against him was not pursued.  The Department, however, found the complaint to be sustained.  Pagán's ultimate punishment, however, was not meted out for eight years after the initial allegation.  He apparently was never sent to see a police psychologist as required.  Nor was he sent to the Replacement Center upon his return to the PRPD after serving his 60-day suspension.  No one analyzed whether or not he needed remediation.  Edwin Rivera-Merced, who had the authority to take such steps, simply sent Officer Pagán back to the Tactical Operations Division, a division requiring "elite" officers.  *Id., page 23*; *See, also, SofF #6.46 above.*

8.23  Although General Order 87-14 mandates that all supervisors research and know the disciplinary history of the agents under their charge, the practice is not implemented.  This is apparent through the testimony of Sgt. Figueroa-Solís, Sgt. Colón-Báez and Lieut. Víctor Cruz-Sánchez.  All of these officers had either seen papers related to the expulsion order against Officer Pagán or the later reduced punishment of a 60-day suspension, but they failed to inquire as to the nature of the charges.  *Id, page 23; See, also SofF #6.14 to 6.24 above.*

8.24  Defendant Rafael Figueroa-Solís failed in his responsibilities with respect to Officer Pagán.  He was a supervisor in the Division at the time of Mr. Pagán's suspension in 2006, and he

even served Officer Pagán with papers imposing a disciplinary sanction.  Yet, Figueroa-Solís did absolutely nothing to find out what the underlying facts were.  He made a conscious choice not to consider the suspension documents or request information related thereto.  Moreover, in violation of General Order 87-14, Sgt. Figueroa-Solís never reviewed Mr. Pagán's disciplinary files.  *Exh. LLL, LR Depo, page 132, line 8 to page 133, line 17; page 134, line 16 to page 135, line 1; page 135, line 25 to page 136, line 20; page 138, line 2 to page 139, line 25.*

8.25 Defendants Juan Colón-Báez and Víctor Cruz also demonstrated complete ignorance of the requirements of General Order 87-14.  They never reviewed Mr. Pagán's disciplinary files, despite having the obligation to do so. They also directly involved in the handling of Officers Pagán, Díaz and Sustache after the events took place and acted in such a manner which was designed to forestall and cover up the actions of these three errant officers. *Id., page 140, line 6 to page 141, line 9; See, also LR Rep , Exh. JJJ, page 8.*

8.26  Defendant Victor Cruz-Sánchez headed up the Tactical Operations Division for critical periods in the year prior to Mr. Cáceres's death.  On the night of the shooting, he was the highest level official on duty. He evaluated officer Pagan and gave him the highest ranking in his evaluation despite the fact that some of those evaluations were done for the period of time while he was in his 60 day suspension, failing to even mention the disciplinary suspension in the evaluation. Victor Cruz never reviewed Javier Pagan's disciplinary file, and even asserted that general order 87-14 was replaced and no longer in effect, an asseveration which is refuted by the evidence and also by the testimony of Superintendent Toledo.  *Exh. LLL, LR Depo,  page 162, line 13 to page 163 line 20; p. 173 line 4 to p.174 line 7.*

8.27 During the year leading up to the killing of Mr. Cáceres, the Tactical Operations Division was headed at different times by Víctor Cruz-Sánchez, Rafael Figueroa-Solís and Juan Colón Báez.  None of these officers reviewed Mr. Pagán's disciplinary record.  Had any of these three defendants reviewed these files and acted as a reasonable supervisor, they would have been on alert to look at the underlying factors and make a determination on whether someone with this propensity for violence is appropriate for a tactical operations assignment. *See, SofF #'s 6.14 to 6.24 above.*

8.28 The failings are particularly evident when one considers what happened after Mr. Pagán returned from his 60-day suspension.  Defendant Rivera-Merced, who had the authority to reassign Officer Pagán within the Area, did not do so.  Defendant Cruz-Sánchez took no special precautions within his discretion as to assignments within the division, including assignments which would not bring him into contact with citizens. *See, SofF #6.46 above.*  Instead, Officer Pagan was immediately reassigned to Tactical Operations coming off of a 60-day suspension with no retraining whatsoever and without assuring that the officer had no residual effects from this lengthy suspension. *Exh. LLL, LR Depo, page 175, lines 8 to 15; page 176 line 17 to page 178 line 11; page 179 line 12 to page 180 line 3.*

8.29 In his actions with respect to Officer Javier Pagán-Cruz, Area Commander Edwin Rivera-Merced violated reasonable norms of police administration.  As Area Commander with the ultimate responsibility over several hundred agent in the Humacao Area, he is the person who must ensure that the supervisors "directly over an officer who has a significant suspension like 60 days has evaluated it properly and taken reasonable supervisory steps to ensure that when the person

comes back, there would be no furtherance of misconduct." *Id., page 189, line 20 to page 190, line 2; page 190, line 14 to page 191, line 18.*

8.30 Edwin Rivera-Merced received and transmitted documents related to Pagán's suspension, but never inquired about the matter, understanding that it was the job of the Internal Affairs (SAIP) to examine the employee's complaint history and inform the field about any concerns. *See, SofF # 6.25-6.27.*  Despite Mr. Rivera-Merced's knowledge of the failings in the disciplinary system and the abject failure of the department to have reasonable policies regarding officer involved shootings, he failed to exercise any of his authority to assure accountability of the officers under his charge. *Id.; See, also LR Rep , Exh. JJJ, page 24.*

8.31 According to Lou Reiter, "any reasonable supervisor, manager has to be aware of and make an independent determination of whether [hostility, bitterness about the supension, stress] might be a factor, but ...  nobody ever evaluated [Officer Pagán] looking at those kinds of facts. They simply put him right back in tactical operations." *Exh. LLL, LR Dep, page 191, lines 19 to page 193, line 12.*

8.32 Another failure to employ reasonable police practices is seen in the PRPD's treatment of officer involved shootings. The International Association of Police Chiefs has long emphasized "the seriousness of officer-involved shootings"and "the critical nature of these investigations." "An accurate and complete investigation of these deadly force incidents" requires adequate planning and the "establishment of protocols that must be followed..."  Although there is not a single model for an appropriate investigation, "superficial or cursory investigations of officer-involved shootings in general and particularly in instances where citizens are sounded or killed can have a devastating

impact on the professional integrity and credibility of an entire law enforcement agency." *Exh. JJJ, LR Rep, page 16-17.*

8.33  As early as August of 1999, the International Association of Chiefs of Police issued a "Concepts and Issues Paper" on the issue of "Investigation of Officer Involved Shootings."  The paper of this important professional organization stated that there should be independent investigations by a Force Review Committee, Shooting Review Committee or similar entity.  "The scope and intent of these forums is to assess such incidents to determine whether they have any implications for the department's training function, policies and procedures."  Such a committee examines such shootings "in a risk management context to improve the agency's response to these critical incidents and **to make any corrections in agency practice or procedure that will help avoid identified problems in the future."** *Id., page 21.*

8.34 In a department with over 15,000 officers, officer involved shootings are an inevitability. To ensure that both officers and citizens are protected in these situations, there must be a written protocol on how to handle such officer involved shootings, so as to ensure that there is no exacerbation with respect to the potential ramifications for the officers, for the citizens present, and for the department.  The fact that there is no such policy in the PRPD is a deficiency attributable to defendants Pedro Toledo-Dávila and Edwin Rivera-Merced. *Exh. LLL, LR Depo, page 146, line 18 to page 147, line 16.*

8.35 In Mr. Reiter's opinion, the "lack of any .... protocol or administrative review" of officer-involved shootings "is most disturbing." As a former FBI agent, Pedro Toledo-Dávila is well aware of acceptable police practices and has been a member of the International Association of Chiefs of Police for some two decades.  Although he "has attended its national conference, receives

its magazine and is aware that it has drafted model policies for its members," Mr. Toledo showed

a remarkable ignorance about the policies and directives concerning the handling of officer involved

shootings and the concept of a Force or Shooting Review committee.  Under his leadership, the

PRPD maintained no separate statistics for analyzing officer-involved shootings. *Exh. JJJ, LR Rep,*

*page 25.*

      8.36  High-level supervisor such a Col. Edwin Rivera-Merced did not even know whether,

in fact, statistics on officer involved shootings were kept and if so, where.  In fact, in the PRPD,

headed by defendant Toledo for 12 years of the last 17, there is no system of maintaining separate

statistics regarding officer-involved shootings. *Id., page 25; See, also SofF #'s 7.10 to 7.25 above.*

      8.37  Mr. Toledo, a former FBI Agent, never instituted a policy or a directive specifically

addressing PRPD handling of officer involved shootings.  He was not aware of any specific statistics

regarding that matter.  Nor did he institute any specific measures for reviewing the same.  *Exh. LLL,*

*LR Depo, page 208, line 13 to page 209, line 16.*

      8.38  Although Mr. Toledo knew about the FBI protocol for officer involved shootings,  he

did nothing to implement any such protocol in Puerto Rico.  He was "not even concerned with his

own agency whether they have one or not and has no knowledge of statistics or who might have that

knowledge...." *Id., page 214, lines 4-13.* Mr. Toledo, as Police Superintendent, had to "ensure that

there was a consistency in how the agency handles [officer-involved shootings], what kind of

administrative investigation was going to be conducted, and a critical analysis of what caused the

shooting to occur." *Id., page 219, lines 8-23.*

      8.39  According to police expert Lou Reiter, Mr. Toledo "has to have his head stuck in the

sand not to realize that this is a vital issue for any police department and to control officers' uses of

102

deadly force.  These are essential agency protocols which have to be in place." *Id, page 209, line 16-21.*  Mr. Toledo's failure to act "is, as one judge said in definition of deliberate indifferent, doesn't give a damn." *Id., page 214, line 13-18.*

8.40 The handling of the officer involved shooting in this particular case is reflective of the lack of adequate protocols.  In the initial hours after an officer involved shooting, strong supervisory controls are required.  Although standard protocol requires separating the officers present at the scene and interviewing them separately, this was not done in the hours following the shooting of Miguel Cáceres.   Rather than exercising "strong supervisory control" after the fatal shooting, assuring that the scene is preserved and managing the officers, as well as protecting potential evidence, defendants Juan Colón-Báez and Víctor Cruz-Sánchez were more concerned with protecting their subordinates from possible accountability.   These defendants remained at the hospital dealing with the officers directly involved in the shooting, rather than going to the scene. There is not even a recording of their close to four hours of  interaction with these officers. According to Mr. Reiter, they made conscious choices to protect these officers from criminal and administrative scrutiny, demonstrating the manner in which they approached the issue of monitoring errant officers.  *Exh. JJJ, LR Rep, pages 11-12.*

8.41 These defendants violated generally accepted police practices by allowing Officers Díaz and Sustache to remain together at Ryder Hospital for some four (4) hours after the incident, and then ordering them to return to the station, without even requiring them to be separated.  *Id., page 12.*

8.42 Also, despite having already heard from his subordinate that night, Lieut. Luis Rodríguez, that the officer's version "smelled," Lieut. Víctor Cruz-Sánchez assumed that Officer

Pagán had to be telling the truth.  However, he never asked agent Pagán just why it was that he shot an unarmed civilian four times. *Id, page 12.*

8.43 . The absence of protocols and systems for monitoring officers involved in shootings is demonstrated by the fact that both Officers Pagán and Sustache were present at the scene of another fatal shooting of a citizen just one week before Mr. Cáceres was killed.  Mr. Reiter found it "very concerting" that none of the supervisors in this case were even aware of that fact.  Neither Pagán nor Sustache were interviewed about this matter; nor were any steps taken to assure that they received counseling if needed.  *Id.,, page 26.*

8.44 There is no protocol or General Order in the PRPD regarding the administrative investigation of officer involved shootings.  Nor does the Police Department have any statistics or engage in any analysis of such shootings.  According to Mr. Reiter, "the Department **has elected to overlook any ability to learn from these tragic critical incidents and analyze its policies, training, tactics, equipment and supervision."** *Id.*

8.45  This is not an innocent oversight, but rather a "**conscious choice to ignore this vital and necessary control accountability."**  This failure is attributable not only to Superintendent Toledo, but also to his "top command officers," such as Edwin Rivera-Merced.  "Their **collective failures have continued to place the public at serious risk."** *Id, page 26.*

8.46 The environment within the agency is critical to the behavior of officers in the field, who independently make the decision to arrest a citizen or to use force against a person.  "This grave responsibility is controlled through proper selection, training and supervision.  **Supervision of the field officer is the most essential element to ensure that he/she exercises this authority in a reasonable manner."**  This is so because "the ultimate aim of reasonable discipline is to correct

104

individual and agency misuse of this authority and the improper use of discretions .... **Without effective discipline the exercise of this authority and discretion to use force and deprive a person of his/her liberty is compromised and the public good is placed in serious jeopardy."** *Id., page 19.*

8.47 In addition to the above, Mr. Reiter also raised the possibility that the abuse of anabolic steroids may have been involved in this incident.  Several indicators — such as Mr. Pagán's physical appearance and his rash response to Mr. Cáceres, typical of "road rage," are suggestive of this issue. It is, moreover, "well known and commonly accepted in law enforcement that 5-10 percent of sworn officers are abusing anabolic steroids."  Because of this, major departments, such as New York, Boston, Miami-Dade and Los Angeles, now perform random drug screening and sampling following an officer's involvement in a fatal incident. *Id, page 27.*

8.48  In Puerto Rico, however, there is no such testing.  Superintendent Toledo indicated that despite the possibility that officers may be abusing steroids, has indicated that there is no basis for testing, because the rumors of such use have never been "proven."   In Mr. Reiter's opinion, "in today's policing, any top administrator who dismisses the use of anabolic steroids by his/her subordinates is simply avoiding the issue and making a conscious choice to not address it within the police agency." *Id, page 27.*

8.49   The conclusions reached by Mr. Reiter have their foundation in his 49 years of experience in the field of law enforcement, and *inter alia* his personal and professional experiences, including his continuing work as a trainer, auditor and litigation consultant in the field.  *Id., page 4.*

8.50   Mr. Reiter based his opinions on "generally accepted police practices [which] have developed over time to encourage and assist police agencies to deliver police services to

communities serviced which are professional, reasonable, effective, and legal." He formed his opinions based on the practices and standards generally applicable to police departments in the United States, based on a "continuous review of case law which should guide a reasonable police agency in supervising its employees." *Id., at page 4 and page 5.*

8.51 His opinions are provided with a reasonable degree of certainty, based on standards which are generally recognized in the field of law enforcement, particularly in the areas of police administration and supervision. They are based on the same standards which this expert uses in his training of police supervisors, managers and command officers with respect to administration investigations and civil liability. *Id., page 5.*

## H. CONCLUSION

The supervisory defendants in this case acted in a manner which was objectively unreasonable and in violation of their duties as police officials. They acted in abject violation of reasonable norms of police practice and administration. The Puerto Rico Police Department, through its Superintendent Pedro Toledo-Dávila, its Humacao Area Commander Edwin Rivera-Merced, and the line supervisors at the district and unit level, Lieut. Víctor Cruz-Sánchez, Sgt. Rafael Figueroa-Solís and Sgt. Juan Colón-Báez, made conscious choices to ignore the risk officers such as Javier Pagán-Cruz represented to the citizenry. They failed to establish, implement and apply reasonable police practices to assure accountability for police violence. It took a tragedy such as the death of Miguel Cáceres to get the department to even begin to analyze the failings which allowed such an incident to occur. By then, it was too late to protect Mr. Cáceres and his family, the plaintiffs herein.

In his deposition testimony a year ago, defendant Edwin Rivera-Merced demonstrated remarkable clarity (if not complacency) when asked about the problems of the PRPD under his leadership and that of Mr. Toledo. This 34 year veteran of the PRPD put his finger on why the police department has had this long history of police violence and has never addressed seriously the long-recognized problems with the disciplinary system.  In a final word from the horse's mouth, Mr. Rivera-Merced described the environment in the PRPD and the practices therein as follows:

"In the [PRPD] there are a lot of problems and they are discussed to the degree that they come up.  And there are times which they are discussed before the problem arises.  But normally, the Police Department, well, it reacts after the problem occurs.  You see?  Almost .... Almost ... More often than not, that's the way it is." *Exh. PP, ERM2010 Depo, page 80, lines 3-11 (translation provided)*

All of the defendants in this case failed to comply with their duties and respond to the plaintiffs for the injuries caused thereby.


### SECTION II
### PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF FACTS

As explained above, in this section, plaintiffs will respond to each of the factual asseverations made by the defendants in support of their request for summary judgment, complying with their obligation under the Local Rules of this court to admit or deny the facts and to make clarifications when necessary.

107

However, one additional explanation is in order with respect to the "admissions" of facts made by the plaintiffs herein.  There are literally dozens, if not hundreds, of factual assertions which the defendants make which are "admitted," but which are not material to the controversies in this case.

For example, while it is true that Pedro Toledo-Dávila was not directly involved in the development of the plans for the Impact Service in Humacao on August 11, 2007, this is irrelevant to plaintiffs' theory of liability against this defendant.  Similarly, the fact that he may have expelled a thousand officers during his 12-year tenure as Police Superintendent, as he states (without any evidentiary support), this does not serve to absolve him for the failings which plaintiff point out with respect to the PRPD disciplinary system in general, officer Pagán in particular, and the entire issue of PRPD treatment of officer involved shootings.

Similar issues arise with respect to the other defendants. It is irrelevant, for example, that neither Mr. Toledo or other defendants, before August 11, 2007, did not know of specific complaints against any officers for actions they took as members of the impact unit, since that has nothing to do with plaintiffs' theory of liability, which rests not on the prior misconduct of Impact Unit agents in the Humacao Area in early August of 2007, but rather the "latitudinarian approach" demonstrated by the supervisory failings in this case, leading to Mr. Cáceres's death. *See, Camilo-Robles v. Hoyos, 151 F.3d 1, 145 (1ˢᵗ Cir., 1998).*

 Accordingly, it is respectfully submitted that this court should understand that by admitting to certain facts, since they are uncontested in the evidentiary record, plaintiffs are *not* admitting that they are material to the questions concerning the liability of the defendants for the injuries suffered by the plaintiffs and their decedent, Miguel A. Cáceres.

With that clarification, plaintiffs present the following response to defendants' Statement of Facts.

Fact #1: Admitted.

Fact #1: This statement is Denied. While it is certainly true that the May 18, 2006 letter suspending Javier Pagán for sixty days was signed by Mr. Toledo's Associate Superintendent, Ramón A. Ortega, it went out *under Superintendent Toledo's name*. The signature is as follows:

> Cordially,
>
>
> Attorney Pedro A. Toledo Dávila
> Superintendent
>
> *Ramón A. Ortega Rodríguez*
>
> Ramón A. Ortega Rodríguez, C.P.A.
> Associate Superintendent
> *Exh.LL; (Translation and actual signature provided)*

Defendant Toledo, moreover, has stated under oath that he has "the ultimate authority" with respect to the imposition of disciplinary sanctions in the PRPD, such as the 60-day suspension imposed on Officer Pagán in 2006. *See, See, Exhibit 2 to defendants' Statement of Facts ("D's SofF"), Docket #250-2, Excerpts from Toledo-Dávila Deposition, page 17, line 15 to page 18, line 14.* Although Mr. Toledo has delegated such matters to the Associate Superintendent, he has not curtailed his own decision-making with respect to the same. *Id. Cf., Camilo-Robles, 151 F.3d ast 15 (*rejecting a Qualified Immunity argument made by Mr. Toledo in another case of police violence in the 1990's, noting that he had the "sole *de jure* responsibility to authorize rearming" of an errant agent.

109

Accordingly, it is simply incorrect to state that Mr. Toledo had "nothing to do with the issuance" of the 60-day suspension.

Fact #3: Admitted, subject to the clarification set forth with respect to Fact #2, regarding the "ultimate authority" which Mr. Toledo-Dávila retained over this matter. Also, it should be noted that Mr. Toledo, himself, has stated that the recommendation of the Legal Division may go to *either* the Superintendent or the Associate Superintendent. *See, Exhibit 2 to D's SofF*, *Docket #250-2, at page 39, lines 23-25; page 40, lines 7-12*. Finally, it should be noted that defendants' own Statement of Facts demonstrates that Mr. Toledo always retained the power and authority to suspend officers. *See, D's SofF #31 and #32, regarding the suspension and subsequent expulsion of Officers Pagán, Sustache and Díaz after the killing of Miguel Cáceres on August 11, 2007.*

Fact #4: Admitted, subject to the clarifications set forth above in response to Facts #2 and #3. Mr. Ortega did *not* have the ultimate "authority" to suspend Javier Pagán-Cruz. Rather, he was "delegated" that work by Superintendent Toledo.

Fact #5: Admitted, subject to the clarifications set forth in response to Facts #2,#3 and #4.

Fact #6: Admitted.

Fact #7: Admitted.

Fact #8: Admitted.

Fact #9: Admitted.

Fact #10: It is admitted that Mr. Toledo did not know of Officers Sustache and Díaz. With respect to Officer Pagán-Cruz, however, this "facts" is denied. In 2005, Mr. Toledo ordered the *expulsion* of this officer, and in 2006, had his name on the signature page of the letter ordering his

110

*60-day suspension. See, generally, plaintiffs' response to Facts 2 to 5 above.*  Accordingly, the asseveration as to whether he "knew who Javier Pagán-Cruz was" is <u>denied</u>

Fact #11 Admitted.

Fact #12: Admitted.

Fact #13: Admitted.

Fact #14: Admitted.

Fact #15: Admitted.

Fact #16: Admitted.

Fact #17: Admitted.

Fact #18: Admitted.

Fact #19: This asseveration is <u>denied</u>.  Mr. Toledo clearly knew of the domestic violence complaint as to which former Superintendent Agustín Cartagena issued an order of expulsion in August of 2004 and as to which he, Superintendent Toledo-Dávila issued a second order of expulsion in December of 2005. *See, generally, Plaintiffs' Statement of Facts, SofF #'s 5.1, 5.10, 5.11, 5.18, 5.21, 5.22 and 5.23, and evidentiary references cited therein.*

Fact #20: Admitted.

Fact #21 Admitted.

Fact #22: Admitted.

Fact #23: Admitted.

Fact #24: Admitted.

Fact #25: Admitted.

Fact #26: Admitted.

Fact #27: Admitted.

Fact #28: Admitted.

Fact #29: Admitted.

Fact #30: Admitted.

Fact #31 Admitted.  Pedro Toledo-Dávila had the power to suspend police officers and he took that action in August of 2007 with respect to Officers Pagán, Sustache and Díaz.

Fact #32: Admitted.   *See, Answer to Fact #31,* regarding Mr. Toledo's authority to take disciplinary action against PRPD officers.

Fact #33: This statement is partially admitted and partially denied.   It is admitted that the statement is consistent with Mr. Toledo's testimony.  It should be noted, however, that the defendants have neither sought nor produced any records which would substantiate the complain that under Mr. Toledo's administration, "over a thousand police officers were expelled and he worked to stop acts of police brutality, root out corruption among the police force and to stop officers from using excessive force."  Moreover, as noted above, his actions and inactions, in violation of the basic norms related to police governance and management, failed to prevent officers such as Javier Pagán from engaging in violence against citizens and in fact created an environment in which officers understood that they would not be held accountable for incidents in which they used excessive force and those involving other misconduct. *See, generally, Plaintiffs' Statement of Facts, SofF #'s 8.16-8.22; 8.32 -8.46; 8.50-8.51.*

Fact #34: Admitted.

Fact #35: Admitted.

Fact #36: Admitted.

112

Fact #37: With respect to this statement, it is admitted that Mr. Toledo has stated in his declaration, *Exhibit 1 to D's SofF, at ¶38,* that he arranged for INSPIRA services.  It is clarified, however, that this statement does *not* mention *when* this was done, so it is unclear whether it was before or after Mr. Cáceres was killed.  It is further clarified that the other two supporting references, both of which refer to Mr. Toledo's *deposition* testimony, were apparently mentioned in error, since they do not address the matters in this paragraph.

Fact #38: Admitted.

Fact #39: Although this statement is admitted, it must be clarified that this is thoroughly *irrelevant* to the questions in this case.  One would not expect individual citizens like Fermín Torres-López, an eye-witness to the killing of Miguel Cáceres, who are untrained in the law and are not in law enforcement themselves, to have any knowledge as to "any act or failure to act on the part of Toledo-Dávila that caused the death of Mr. Cáceres."

The supervisory defendants, in any number of depositions, asked eye-witnesses like Mr. Torres-López, emergency medical personnel, and even Mr. Cáceres's widow and young children (including the boy who was ten years old at the time his father was killed), to state whether they had personal knowledge of acts or omissions of the supervisory defendants leading to the death of Miguel Cáceres.  These questions were a colossal waste of time when these government-contracted attorneys took up valuable time in depositions to ask them; the inclusion of the answers to this question in the summary judgment papers is patently absurd and in fact, calls into question the seriousness of the arguments raised by these defendants in their quest for summary disposition.

Fact #40: It is admitted that Jackeline Aponte does not know who Pedro Toledo is.

Fact #41: This is also admitted.  However, it must be clarified who Jackeline Aponte is. On August 11, 2007, Ms. Aponte was working at the Humacao Civil Defense when she responded to the call for medical personnel at Punta Santiago, and she was on her way there when the patrol car in which Officers Pagán, Sustache and Díaz were invaded the lane where the ambulance was riding, signaling the ambulance to stop, and arranging for Mr. Pagán (and not Mr. Cáceres) to get treatment in the ambulance.  *See, Exh. KKK, Excerpts from Deposition of Jackeline Aponte, at page 13, line 7 to 11; page 29, line 12-18; page 32, lines 2-4; page 33, lines 7-10; page 35, lines 8-12.*

The fact that this particular witness did not know of acts or omissions by Pedro Toledo causing the death of Miguel Cáceres.  The defendants, themselves, note that Ms. Aponte does not even know who Mr. Toledo is.  Also, as noted above, the question put to this witness was absurd, and the inclusion of her answer in the summary judgment papers is equally absurd.

Fact #42: This is denied.  The asseveration that Mr. Toledo-Dávila "acted according to the laws of the Commonwealth and the Rules and Regulations of the Police Department" cannot be accepted merely because Mr. Toledo makes that conclusory statement in his declaration.  A statement of facts submitted on summary judgment "must concern *facts* as opposed to *conclusions, assumptions or surmise.*" *Pérez v. Volvo Car Corp,* 247 F.3d 303, 315 (1st Cir., 2001) Such a conclusory statement is inadmissible on summary judgment, *inter alia,* because it is "totally lacking in specificity." *Pérez,* 247 F.3d at 316.

Moreover, even if Mr. Toledo's statement *were* properly considered on summary judgment, it is denied as contradicted in the record.  Puerto Rico law requires officials such as Mr. Toledo to comply with constitutional requirements.  As can be seen in plaintiffs' Statement of Facts, Mr.

Toledo failed to comply with these legal requirements. *See, generally, plaintiffs' Statement of Facts, in particular, Statement of Facts #'s 8.16-8.22; 8.32 -8.46; 8.49-8.51.*

Fact #43: Admitted.

Fact #44: Admitted.

Fact #45: Admitted.

Fact #46: Admitted.

Fact #47: Admitted.

Fact #48: Admitted.

Fact #49: Admitted.

Fact #50: Admitted.

Fact #51: Admitted.

Fact #52: Admitted.

Fact #53: Admitted.

Fact #54: This statement is partially admitted, partially denied, and it is clarified.  It is admitted that Mr. Rivera-Merced did not give precise instructions that night with respect to the Impact Unit.   However, he was the officer who created the unit and gave instructions to supervisors to select personnel for the unit. *See, generally, SofF#'s 2.1 to 2.13.*  Accordingly, to the degree that the overall planning and instructions to supervisors are considered part of the "instructions"to the officers on duty that night, this statement must be denied.

Fact #55: Admitted.

Fact #56: Denied.  Mr. Rivera-Merced clearly knew of the administrative complaint for which Mr. Pagán served a 60-day suspension in 2006.  In August 24, 2006, defendant Víctor Cruz-

115

Sánchez sent a memorandum to the Area Commander informing him that Officer Pagán had been notified of the newly proposed reduced 60-day suspension. *Exhibit TT, SAOC-AH-11-22-668, from Human Resources, notifying Mr. Rivera-Merced of Mr. Pagán's suspension.*

> <u>Fact #57</u>: Admitted.
>
> <u>Fact #58</u>: Admitted.
>
> <u>Fact #59</u>: Admitted.
>
> <u>Fact #60</u>: Admitted.
>
> <u>Fact #61</u> Admitted.
>
> <u>Fact #62</u>: Admitted.
>
> <u>Fact #63</u>: Admitted.
>
> <u>Fact #64</u>: Admitted.
>
> <u>Fact #65</u>: Admitted.
>
> <u>Fact #66</u>: Admitted.
>
> <u>Fact #67</u>: Admitted.

<u>Fact #68</u>: This fact is admitted, but it is clarified.  It is admitted that Mr. Rivera-Merced obtained his information from other PRPD officers, since he was not on the scene.  It is also admitted that he received information from Lieut. Luis Rodríguez, Inspector Juan Torres and agent José Rivera Rodríguez.  It is of note, however, that Mr. Rivera-Merced leaves out the name of defendant Víctor Cruz-Sánchez, from whom he unquestionably received information regarding the incident.

Moreover, the only officer Rivera-Merced lists as being persons from whom he obtained information who was actually on the scene,  was Lieut. Luis Rodríguez, who told him that several

trustworthy witnesses had given versions contrary to that of the officers. Lieut. Rodríguez told this defendants that the incident "smelled bad" and that he believed the officers had engaged in excessive force.  In any event, neither Lieut. Rodríguez nor any of the other officers Mr. Rivera-Merced lists as being his informants that night, provided *any* basis for Mr. Rivera-Merced's public statements to the effect that "several" non-officer witnesses supported the versions of the three officers involved in the shooting of Mr. Cáceres.  *See, generally, SofF #'s 3.09 to 3.12; 3.14; 3.28; 3.30 - 3.32; 3.39-3.53 and 3.62-3.66, and the supporting references therein.*

Fact #69: This is denied.  Mr. Rivera-Merced was certainly told that there were different versions.  However, he clearly intended to give false and misleading statements when he repeated the patently false version given by police officers Díaz and Sustache, and when he stated publicly that there were "several" witnesses whose versions supported those of the officers.  *See, references in preceding paragraph.*

Fact #70: Although this statement is admitted, it must be again clarified that this is thoroughly *irrelevant* to the questions in this case, as one would not expect individual citizens like Fermín Torres-López, an eye-witness to the killing of Miguel Cáceres, who are untrained in the law and are not in law enforcement themselves, to have any knowledge as to "any act or failure to act on the part of Rivera-Merced that caused the death of Mr. Cáceres." *See, response to Fact #39 above.*

Fact #71 Again, it is admitted that the emergency medical technician, Jackeline Aponte, did not know of any such facts.  Once again, this asseveration is thoroughly immaterial and so absurd as to not merit this court's attention.  *See, discussion above with respect to Fact #41..*

117

Fact #72: This "fact" is denied.  The asseveration that Mr. Rivera-Merced "acted according to the laws of the Commonwealth and the Rules and Regulations of the Police Department" cannot be accepted merely because Mr. Rivera makes that conclusory statement in his declaration.  A statement of facts submitted on summary judgment "must concern *facts* as opposed to *conclusions*, *assumptions or surmise*." *Pérez v. Volvo Car Corp, op.cit.* Such a conclusory statement is inadmissible on summary judgment, *inter alia* because it is "totally lacking in specificity." *Pérez, 247 F.3d at 316.*

Moreover, even if Mr. Rivera-Merced's statement *were* properly considered on summary judgment, it is denied as contradicted in the record.  Puerto Rico law requires officials such as Mr. Rivera-Merced to comply with constitutional requirements.  As can be seen in plaintiffs' Statement of Facts, Mr. Rivera-Merced failed to comply with these legal requirements. *See, generally, plaintiffs' Statement of Facts, in particular, Statement of Facts #'s 8.16-8.22; 8.28-8.31; 8.32-8.46; 8.49-8.51.*

Fact #73: Admitted.

Fact #74: Admitted.

Fact #75: This denied as contradicted by the evidentiary record, in particular Mr. Cruz-Sánchez's evaluation of Mr. Pagán, as his "supervisor" on the final page of his January, 2007 evaluation, Exhibit UU.

Fact #76: This statement is denied. The notion that Mr. Cruz-Sánchez, as the head of Tactical Operations in Humacao could not "discipline" his subordinates is so absurd as to be laughable.  While Mr. Cruz-Sánchez makes this outlandish statement in his sworn declaration, it runs counter to the entire history of police management and any number of reported cases which

118

have found supervisors whose positions are analogous to that of Víctor Cruz to be liable for their "disciplinary" failures. *See, eg., Gutiérrez v. Cartagena, op.cit; Camilo-Robles v. Hoyos, op.cit.; See, also, SofF #'s 8.25-8.28; 8.40-8.43.* The only explanation which plaintiffs can imagine for this patently incorrect statement is that Mr. Cruz-Sánchez is confusing the concept of "discipline" with the imposition of a "disciplinary sanction."

     Fact #77: Admitted.

     Fact #78: Admitted.

     Fact #79: Admitted.

     Fact #80: This is denied. When one examines the underlying reference supporting the notion that the officers designated for the Impact Unit "belonged to the Humacao Area for supervision and not to the Humacao District," one sees that this is not what Mr. Cruz-Sánchez really said. Mr. Cruz-Sánchez's testimony arises in the context of a discussion with respect to *vacations and days off. See, Excerpts from Deposition of Cruz-Sánchez submitted by defendants as Exhibit 14 to Docket #250, at page 75, lines 8-23.* His testimony was that the Impact Unit officers as a group "belonged to the Area," and that he had nothing to do with the assignment of their days off. *Id., page 75, lines 21-23.* Nothing in this underlying testimony changes the reality that these officers — assigned for a few days to an Impact Service ---- are removed from the "supervision" of their regular supervisors.

     Fact #81 Admitted.

     Fact #82: This is denied as contradicted by the evidence. Mr. Cruz-Sánchez was the Officer in Charge of the entire Area that night and thus "had supervisory responsibility [and]

authority over the Impact Unit." He wrote the plan for the Impact Service and was the designated highest-level officer on duty at that time *See, Table at SofF#1.9; See, also, SofF #'s 2.3 and 2.13.*

Fact #83: This is <u>denied</u> as an outright falsehood. The Impact Service Plans bear Mr. Cruz-Sánchez's signature. The cited pages of his deposition, moreover, do *not* support the asseveration in this "fact." *See, Excerpts from Deposition of Víctor Cruz-Sánchez submitted by defendants, at page 66, lines 13-22* (which do not support the notion set forth in this "fact") and *Exhibit I hereto, Excerpt from Impact Service Plan, submitted by Víctor Cruz-Sánchez to Edwin Rivera-Merced.*

Fact #84: Admitted.

Fact #85: Admitted, although the unit is correctly named the "Superintendency of Public Integrity," and was previously known as the "Auxiliary (Assistant) Superintendency for Inspections and Disciplinary Matters" ("SAIAD"). *See, <u>Díaz v. Martínez</u>, 112 F.3d 1, 2 (1st Cir., 1997).*

Fact #86: Admitted.

Fact #87: This is <u>denied</u> as completely false. This statement is contradicted by the investigative files themselves (obtained in discovery not only from Police Headquarters but also from the Humacao Area) and by the personal histories (historiales) contained therein. The statement is also contradicted by the documents from Mr. Pagán's personnel file (as opposed to the administrative complaints), which include several documents which specify facts relating to his history of disciplinary problems. It is also contradicted by General Order 87-14 itself. *See, generally, inter alia, SofF #'s 5.1 to 5.9; 5.18; 5.21; 6.1-6.6; 6.9; 6.18; footnote 5; and Exhibits AA; BB; CC; DD; EE; and JJ.*

Fact #88: This fact is <u>denied</u>.  First, when in his depositions,  Mr. Cruz-Sánchez stated that when he receives a transferred agent "se verifica" the file, it is not clear to which "file" he is referring.  Secondly, and more importantly, it is clear that Mr. Cruz-Sánchez did not "comply with his administrative duties regarding the personnel files of his subordinates," because he failed to even recognize what "repetitive behavior" was, thought that the requirement to review files in order to identify such misconduct was eliminated long ago (which it was not), and failed to even look at Mr. Pagán's files to see why he was subject to two orders of expulsion and eventually a final order imposing a 60-day suspension as a disciplinary sanction. *See, generally, SofF #'s 6.15; 6.20-6.21; 6.36.*

Fact #89: This fact is <u>denied</u>.  Mr. Cruz-Sánchez did *not* comply with his duties.  He failed miserably in enforcing General Order 87-14 and protecting the citizenry from dangerous officers such as Javier Pagán-Cruz. *See, generally, SofF #'s 6.15; 6.20-6.21; 6.36; 8.26-8.28.*

Fact #90: Admitted.  Since Mr. Cruz-Sánchez failed to comply with his duties, he did not even know the seriousness of the offenses with which Mr. Pagán had been charged. *See, response to Fact #'s 88-89 above.*

Fact #91 <u>Denied</u>.  Mr. Cruz-Sánchez had specific knowledge of Javier Pagán's violent tendencies, even if he refuses to admit it.  *See, generally, response to Fact #'s 87-90 above.*

Fact #92: Admitted.

Fact #93: Admitted.

Fact #94: Admitted.

Fact #95: Admitted.

Fact #96: <u>Denied</u>. *See, response to Fact #83 above.*

121

Fact #97: This fact is partially admitted and partially denied.  It is true that Capt. Luis Aponte's name appears on the "Service List" for the Impact Service The plan, however, bears Victor Cruz's signature and was transmitted by Víctor Cruz to Edwin Rivera-Merced.  *See, Exhibits G and I hereto.*  It is also denied that Mr. Aponte "made the list of agents"to take part in the Impact Service.  It was Víctor Cruz who selected Zulma Díaz for that service and Juan Colón-Báez who selected Officers Javier Pagán and Carlos Sustache for the Impact Service.  *See, generally, SofF #;s 2.3 to 2.9.*

Moreover, the work plans for the Impact Unit that week were discussed at a regular staff meeting at which Cruz-Sánchez, as the Director of a Precinct, would have been in attendance. He would have participated in the discussion which resulted in a decision that the focus of the work of the Impact Unit was to be on the Municipality of Naguabo, a town selected for the Impact Service, since it was the area where drug-trafficking was most problematic.  *See, SofF #2.12 above.*

Fact #98: Admitted.

Fact #99: Admitted.

Fact #100: This is denied as false.  Defendant Cruz-Sánchez knew of the expulsion proposal and the 60-day suspension.  The fact that he never bothered to read the file or to inquire as to the nature of the underlying facts leading to this discipline, far from relieving him of responsibility only demonstrates his liability for the damage done to the plaintiffs herein.  *See, generally, plaintiffs' responses to SofF #'s 87-91 above.*

Fact #101 Admitted.

Fact #102: Admitted.

Fact #103: Admitted.

Fact #104: Admitted.

Fact #105: Admitted.

Fact #106: Admitted.

Fact #107: Admitted.

Fact #108: Admitted.

Fact #109: Admitted.

Fact #110: Admitted

Fact #111 Admitted.

Fact #112: This fact is denied, except for the portion thereof which states that Víctor Cruz was not at the scene.  The rest of the statement is false.  While Mr. Cruz may have received information from Lieutenant Luis Rodríguez, who *was* on the scene, the information this defendant then transmitted to "third parties" was directly contrary to that which he had been given by Luis Rodríguez (as well as that which he was hearing from the eye-witnesses he chose not to listen to). Also, Víctor Cruz-Sánchez based the information he provided on the statement given by one Héctor Huertas, the only witness whose testimony contradicts that of dozens of bystanders (and the video itself.)  Mr. Cruz-Sánchez, moreover, was the official who put Mr. Huertas in touch with Homicide Investigator José Rivera-Rodríguez (not the other way around.)  Finally, it should be noted that, contrary to reasonable police practices, Mr. Cruz-Sánchez interviewed all three of the officers ---- Pagán, Sustache and Díaz — to get their version, which he then transmitted to "third parties." *See, generally, Sof F* #'s *3.18 - 3.25; 3.28 - 3.31; 3.33; 3.39 -3.40; 3.42 - 3.3.53.*

123

Fact #113: Admitted that Mr. Cruz-Sánchez heard that there were different versions of the events.  The officers, who were lying, were backed up by only one witness, Héctor Huertas, to whom Mr. Cruz-Sánchez gave a great deal of credence, rejecting the versions of the trusted eye-witnesses he knew that Lieut. Rodríguez had interviewed on the scene.  He clearly *was* trying to "discredit" the "eyewitness accounts regarding the circumstances surrounding the intervention and death of Miguel Cáceres-Cruz."  Accordingly, the remainder of this paragraph is <u>denied.</u>  *See, generally, references cited in response to Fact #113, in addition to SofF #'s 3.9 to 3.12 (regarding the information Mr. Cruz-Sánchez was receiving from Lieut. Rodríguez.)*

Fact #114: Although this statement is admitted, it is clarified yet again that this is thoroughly *irrelevant* to the questions in this case, as one would not expect individual citizens like Fermín Torres-López, an eye-witness to the killing of Miguel Cáceres, who are untrained in the law and are not in law enforcement themselves, to have any knowledge as to "any act or failure to act on the part of Rivera-Merced that caused the death of Mr. Cáceres." *See, response to Fact #39 above.*

Fact #115 Again, it is also admitted that the emergency medical technician, Jackeline Aponte, did not know of any such facts.  Once again, this asseveration is thoroughly immaterial and so absurd as to not merit this court's attention.  *See, discussion above with respect to Fact #41..*

Fact #116: This "fact" is <u>denied.</u>   The asseveration that Mr. Cruz-Sánchez "acted according to the laws of the Commonwealth and the Rules and Regulations of the Police Department" cannot be accepted merely because Mr. Cruz makes that conclusory statement in his declaration. A statement of facts submitted on summary judgment "must concern *facts* as opposed

to *conclusions*, *assumptions or surmise*." *Pérez v. Volvo Car Corp, op.cit.* Such a conclusory statement is inadmissible on summary judgment, *inter alia* because it is "totally lacking in specificity." *Pérez, 247 F.3d at 316.*

Moreover, even if Mr. Cruz-Sánchez's statement *were* properly considered on summary judgment, it is <u>denied</u> as contradicted in the record. Puerto Rico law requires officials such as defendant Cruz-Sánchez to comply with constitutional requirements. As can be seen in plaintiffs' Statement of Facts, Mr. Cruz-Sánchez failed to comply with these legal requirements. *See, generally, plaintiffs' Statement of Facts, in particular, Statement of Facts #'s 8.25 - 8.28; 8.31; 8.40-8.43.*

<u>Fact #117</u>: Admitted in part and denied in part. It is admitted that Mr. Figueroa-Solís was Acting Director of the Humacao Tactical Operations Division at different periods of time from 2001 to 2006. This statement, however, is incomplete, since Mr. Figueroa was also Acting Director from March, 2007 to August of 2007 (although he was on vacation from early July to mid-August.) *See, SofF #'s 2.10; 6.11-6.13; 7.85 and footnote 2.*

<u>Fact #118</u>: Admitted.

<u>Fact #119</u>: This is <u>denied</u> with respect to Officers Pagán and Sustache. Mr. Figueroa-Solís was one of only two sergeants in the Tactical Operations Division for a good period of time, and he was the Acting Director on many occasions. He completed at least two evaluations of Javier Pagán, in January, 2006 and again in July of 2007 (when he was unquestionably Acting Director of the Humacao T.O.D.) *See, SofF #'s 2.10; 6.11-6.13; 7.85 and footnote 2; See, also, Exhibit QQ, Signature Page from Evaluations of January, 2006 and July,2007.*

<u>Fact #120</u>: Admitted.

125

Fact #121: This is admitted, but it is clarified that Mr. Pagán was *first* assigned to the SRT in 2004, but that this was not his assignment afterwards. The supervisor to which the defendants refer, Miguel Sánchez-Delgado, was *not* a member of the Tactical Operations Division in 2007, as demonstrated by the duty rosters and attendance sheets submitted by plaintiff in this Statement of Facts. *See, Exhibit RR, attendance sheet for local academies in March and May of 2007; Exhibit III, Service List for Tactical Operations, August 6-12, 2007.* Additionally, plaintiffs must point out to this court just how the defense is attempting to play fast and fancy with the truth. In the two deposition references provided by defendants in support of this Fact #121, they imply that the witnesses are talking about the entire time Mr.Pagán was in the Tactical Operations Division. When one goes to the underlying reference, however, it is clear that both Mr. Figueroa-Solís and Mr. Colón-Báez are talking about events in the distant past, not in 2006 or 2007. *See, deposition references in defendants' Fact #121.* In fact, as has been shown, it was defendant Figueroa-Solís, and on one occasion, defendant Cruz-Sánchez who evaluated Mr. Pagán during that time frame (and certainly not Miguel Sánchez-Delgado, who was not at Tactical Operations.) *See, Exhibits QQ and UU.*

Fact #122: It is admitted that Officer Miguel Sánchez-Delgado has not been sued. It is nothing short of outrageous for the defendants ----knowing that Mr. Sánchez-Delgado was *not* Mr. Pagán's supervisor in 2006 and 2007 (and that they *were*) ---- to fault the plaintiffs for not suing Mr. Sánchez-Delgado.

It is beyond serious question that the misrepresentation made by defendants regarding the role of Mr. Sánchez-Delgado was *purposeful* and done with the intent to confuse and obfuscate the truth. Defendants unquestionably *know* that Mr. Sánchez-Delgado was out of the Tactical

126

Operations Division *years* before Mr. Cáceres was killed.  This is evident from the testimony of Rafael Figueroa-Solís, himself, who states that Miguel Sánchez-Delgado directed the division for a time.  This defendant also states that Mr. Sánchez-Delgado was "removed" from that position because he had a "personal problem," and that Figueroa-Solís took on the role of director for a short interval thereafter.  *After* that, Miguel *Vázquez San Antonio* became the Director, to be followed by defendant Víctor Cruz-Sánchez, who left in March or April of 2007. *Exh.HH, RFS Depo, page 32, line 14 to page  33, line 3; page 33, line 15-18; page 33, line 23-24.*

Finally, one last point must be made regarding this factual asseveration, which involves conduct on the part of the attorneys for defendants which would be laughable if it did not provoke such time-consuming work as much of their litigation efforts produce.  Defendants (and this court) are aware of the fact that plaintiffs mistakenly believed that one "Miguel Vázquez San Antonio" (not Miguel Sánchez-Delgado) was the head of the Tactical Operations Division of Humacao at the time of Mr. Cáceres's death.  Accordingly, they included him as a defendant in the original complaint.  By the time the amended complaint was filed, however, plaintiffs had ascertained that each of the three line supervisors ---- Víctor Cruz; Rafael Figueroa-Solís and Juan Colón-Báez — had been the Division's director at different points in time between 2006 and 2007.

Attorneys for the defendants, however, have evidently done a *word search* for the word "Miguel," and they have provided certain paragraphs in the two complaints filed by plaintiffs, as supporting references for the "fact" that a different "Miguel" (Miguel Sánchez-Delgado) was Pagán's supervisor.  The comedy of errors, however, reaches new heights when one examines the

127

references defendants make to plaintiff's complaint ---- they are, almost without exception, references to *Miguel Cáceres*, the man who was killed by defendant Pagán.[10]

   Fact #123: Admitted.

   Fact #124: Admitted.

   Fact #125: Admitted.

   Fact #126: This is admitted, but clarified.  While it may well be true that Mr. Figueroa-Solís, after he returned from his vacation in August of 2007, was not sent back to the Tactical Operations Division, he *still* was heading that division on August 14th, 2007, three days after Mr. Cáceres was killed. *See, Exhibit SS, SAOC-AH-11-22-837, Memo by Figueroa-Solís, August 14, 2008.*

   Fact #127: Admitted.

   Fact #128: Admitted.

   Fact #129: Admitted.

   Fact #130: Admitted.

   Fact #131 Admitted.

   Fact #132: Admitted, although the unit is correctly named the "Superintendency of Public Integrity," and was previously known as the "Auxiliary (Assistant) Superintendency for

---

[10]*See, for example, paragraphs 3.1- 3.5 of the Amended Complaint, cited by defendants as "support" for the notion that *Miguel Sánchez-Delgado* was Pagán's supervisor.  These paragraphs, however, deal not with Miguel *Sánchez,* but rather with *Miguel Cáceres.* (*"Plaintiff Evelyn Ramírez-Lluveras is ........the widow of  the decedent Miguel Cáceres-Cruz; plaintiffs Jenitza Cáceres and the minor children identified as MC and MAC are the only children of Miguel Cáceres-Cruz; The plaintiffs are the sole heirs of the deceased Miguel Cáceres Cruz;   The aforementioned defendants directly caused the injuries to and death of plaintiffs' decedent, and the damages suffered by his wife and children, when on August 11, 2007, they intervened with Miguel Cáceres-Cruz in an event which culminated in his death when he was shot and killed by defendant Pagán)*

Inspections and Disciplinary Matters" ("SAIAD"). *See, Díaz v. Martínez, 112 F.3d 1, 2 (1st Cir., 1997).*

Fact #133: Admitted.

Fact #134: This fact is partially admitted and partially denied. It is admitted that Mr. Figueroa-Solís claims to have performed some of the investigations of new personnel assigned to him by his supervisors in the Tactical Operations Division. It is denied, however, that he did so with respect to Officer Javier Pagán. Mr. Figueroa-Solís was a sergeant in Tactical Operations in 2004, when Mr. Pagán was transferred to Tactical Operations. He has testified, however, that he knew nothing about Mr. Pagán's disciplinary record, even though at the time of the transfer, there was an outstanding order of *expulsion* against this officer. *See, D's SofF #117*; *plaintiffs' SofF #'s 3.6; 6.11-6.14; and 6.24.*

Fact #135: It is admitted that sergeants do not have access to "statistics about investigations." The remainder of Fact 135, however, is denied as utterly false and contradicted in the record. While it may be true that Mr. Figueroa-Solís failed to examine Mr. Pagán's Disciplinary files, this was not because he did "not have access to the records of investigations such as these." This is contradicted by General Order 87-14 itself, which *requires* supervisors to examine their subordinates' disciplinary files. *See, generally, Sof F #6.15 and 6.16.* Both Lieut. Cruz-Sánchez and Col. Edwin Rivera-Merced agree that unit supervisors can access disciplinary files. Mr. Rivera-Merced has indicated that they can do so, merely by requesting that information (as specified in General Order 87-14). They are "responsible for the people under their charge ... and they are supposed to request the information concerning the conduct of the people who work with them." *See, SofF # 6.19.*

129

Fact #136: This fact is denied as contradicted in the record.  Mr. Pagán's personnel record included any number of documents pertinent to his disciplinary problems, including but not limited to documents setting forth some specifics of the facts giving rise to the domestic violence complaint.  *See,*eg., *Exhibits AA; BB; CC and EE.*

Fact #137: The assertions in this paragraph are admitted, with one clarification.  While sergeants may generally have to ask their unit directors for authorization to view a particular file (although Mr. Rivera-Merced does not believe this to be the case,) the fact is that for much of the time leading up to the death of Mr. Cáceres, the Acting Director of Tactical Operations was, in fact, a *sergeant*, at some points Mr. Figueroa-Solís and at other points in time, Mr. Colón-Báez. *See, SofF #'s 7.79 and 7.82*.

Fact #138: This factual asseveration is denied.  Sgt. Figueroa-Solís directed the unit for extended periods of time, including the last period of some six months before Mr. Cáceres was killed. *See, SofF #6.13; See, also, Exh.HH, RFS Depo, page 32, line 14 to page  33, line 3; page 33, line 15-18; page 33, line 23-24*.

Fact #139: Admitted.  It is clarified, however, that Mr. Figueroa-Solís performed two of the most recent evaluations of Officer Pagán in the time leading up to Mr. Cáceres's death. *See, also,  Exhibit QQ, Signature Page from Evaluations of January, 2006 and July,2007.*

Fact #140: Admitted.  It is clarified, however, that Mr. Figueroa-Solís's lack of knowledge about this issue is indicative and probative of his failure to comply with reasonable standards for his conduct as a police supervisor.

Fact #141 Admitted, although his failure to know about Javier Pagán's violent tendencies, if true, is further evidence of his failure to comply with reasonable standards for his conduct as a police supervisor.

Fact #142: Admitted.

Fact #143: Admitted.

Fact #144: Admitted.

Fact #145: Admitted.

Fact #146: Admitted.

Fact #147: Admitted.

Fact #148: Denied.  Mr. Figueroa-Solís knew of the domestic violence complaint which had resulted in two superintendents making a proposal that he be expelled from the force and which finally resulted in the 60-day suspension in 2006. *See, SofF #6.24 and 8.24 above.*

Fact #149: Admitted.

Fact #150: Admitted.

Fact #151 Admitted.

Fact #152: Admitted.

Fact #153: Admitted.

Fact #154: Admitted.

Fact #155: Admitted.

Fact #156: Admitted.

Fact #157: Admitted.

Fact #158: Admitted.

Fact #159: Admitted.

Fact #160:   Although this statement is admitted, it is clarified yet again that this is thoroughly *irrelevant* to the questions in this case, as one would not expect individual citizens like Fermín Torres-López, an eye-witness to the killing of Miguel Cáceres, who are untrained in the law and are not in law enforcement themselves, to have any knowledge as to "any act or failure to act on the part of Rivera-Merced that caused the death of Mr. Cáceres." *See, response to Fact #39 above.*

Fact #161: Admitted.

Fact #162:   Again, it is also admitted that the emergency medical technician, Jackeline Aponte, did not know of any such facts.  Once again, this asseveration is thoroughly immaterial and so absurd as to not merit this court's attention.  *See, discussion above with respect to Fact #41.* Also, as defendants note, Ms. Aponte does not even know who Mr. Figueroa-Solís is. *See, D's SofF #161.*  Why defendants believe that her testimony that she knows of no acts or omissions by Mr. Figueroa-Solís which caused Mr. Cáceres's death is somehow relevant to the issues at stake in this case is, quite simply, baffling.

Fact #163: This "fact" is denied.    The asseveration that Mr. Figueroa-Solís "acted according to the laws of the Commonwealth and the Rules and Regulations of the Police Department" cannot be accepted merely because Mr. Figueroa-Solís makes that conclusory statement in his declaration.  A statement of facts submitted on summary judgment "must concern *facts* as opposed to *conclusions*, *assumptions or surmise*." Pérez v. Volvo Car Corp, *op.cit.* Such a conclusory statement is inadmissible on summary judgment, *inter alia* because it is "totally lacking in specificity." Pérez, *247 F.3d at 316.*

132

Moreover, even if Mr. Figueroa's statement *were* properly considered on summary judgment, it is <u>denied</u> as contradicted in the record.  Puerto Rico law requires officials such as Mr. Rivera-Merced to comply with constitutional requirements.  As can be seen in plaintiffs' Statement of Facts, Mr. Figueroa-Solís failed to comply with these legal requirements.  *See, generally, plaintiffs' Statement of Facts, in particular, Statement of Facts #'s 8.23; 8.24 and 8.27.*

Fact #164: Admitted.

Fact #165: This is <u>denied</u> for the reasons set forth in plaintiffs' response to Fact #135 above. As a long-term sergeant in the Division, and as Assistant Director for a lengthy period of time, followed by a stint as Interim Director, Mr. Colón-Báez clearly had access to the disciplinary files of his subordinates and the opportunity to evaluate them. *See, SofF #'s 1.5; 6.10; 6.15, 6.16 and 6.19.*

Fact #166: This fact is <u>denied</u>.  The defendants clearly know this statement to be false.  One need only examine the Service List for Tactical Operations in Humacao for the week of August 6th to 12th to see that Mr. Colón-Báez not only was assigned to the T.O.D., he was the *only* supervisor in the unit at that time, during Mr. Figueroa's vacations.  *See, Exhibit III.*

Even more telling, however, is the sworn declaration of Mr. Colón-Báez, himself, in his interrogatory answer, in which he states that between March of 2006 and February of 2007, he was the *"Assistant Director* of the Tactic [sic] Operations Division - Humacao" and that he was "Acting *Director*" of the Division in July and August of 2007.  *Exh. B, JCB Interrogs, Answer to Question #3, subsections (j) and (l).*

However, the proof of Mr. Colón-Báez's prevarications does not end there.  Yet another piece of evidence demonstrates that even the Interrogatory Answers ---- which would have Mr.

Colón out of the T.O.D. from March of 2007 to June of 2007 ---- were also incorrect.  Exhibit RR consists of two sign-up sheets for Local Academies at the Tactical Operations Division — in March of 2007 and in May of that year.  While Mr. Colón is listed as "reconcentrado" (temporarily assigned to another division) in the May list, the sign-up sheet for the March Academy has him listed as a regular member of the division, on vacation at that time. *See, Exh. RR.*

   Fact #167: Admitted.

   Fact #168: Denied.  As Acting Director, Mr. Colón clearly had the opportunity to "directly supervise" agents Pagán and Sustache (albeit not Zulma Díaz, who was assigned to the Humacao Precinct.)  He even was the person who selected Pagán and Sustache for the Impact Service. *See, SofF #2.8 above.*

   Fact #169: Admitted.

   Fact #170: It is admitted that Mr. Colón-Báez, as a "sergeant under a Tactical Operations Director" did not directly supervise Officer Zulma Díaz.  This is, however, a *non-sequitor*, since Officer Díaz did not belong to Tactical Operations.

   The remainder of this factual asseveration is <u>denied</u> as defying all logic, despite Mr. Colón's sworn declaration to the contrary.  For a long time, Mr. Colón-Báez was the Assistant Director of the Division.  He was a sergeant in the division for an extended period of time.  It is mind-boggling that this officer, who for a lengthy period of time was one of only two sergeants in the Humacao T.O.D. and for a short period was its *only* sergeant, can sign a declaration stating that he "did not directly supervise the performance in the field of agent [Carlos] Sustache." *See, generally, plaintiffs' response to D's SofF #'s 165 and 166 above.*

Fact #171.  This statement really cannot be either admitted or denied.   Clarification is in order, so that the court can understand the quandary.

In his sworn declaration supporting the previous Fact (#172), Mr. Colón-Báez affirmed that he did *not* directly supervise Officer Sustache, a Tactical Operations Division officer. Now, this defendant would have us believe that he *did* supervise Officer Pagán in the field, and that he did not observe any misconduct.   His testimony is so completely devoid of any logic as to make it very difficult to afford it any credibility, and it is therefore denied.  If one credits this illogical rendition, then one would have to believe that Mr. Colón was lucky enough to have the opportunity to observe Mr. Pagán (but not Mr. Sustache) and that all was fine and dandy.  Since plaintiffs cannot prove the opposite, if this court credits Mr. Colón-Báez's statement, then plaintiffs would have no choice but to admit this statement.

Fact #172: Admitted.

Fact #173: Denied.  This statement is contradicted by the testimony of defendants Edwin Rivera-Merced and Víctor Cruz-Sánchez. *See, plaintiffs' response to D's SofF # 135 and 160 above.*  General Order 87-14 also contradicts this statement. *See, generally, SofF #6.9; 6.10; 6.16, 6.18-6.19.*

Fact #174: Denied.  At the outset, it should be noted that the defendants failed to include page 19 of Sgt. Colón-Báez's deposition as an exhibit to their filing. *See, Exhibit 16 to Docket #250, which does not include page 19.*   The second reference — to page 23, line 5-11 of the Colón-Báez deposition ---- does *not* support the asseveration made.  The portion of the deposition which is cited has only to do with the "me propongo" documents, not with the *administrative*

*investigation* files themselves. *See, Exhibit 16 to Docket #250, at page 23, lines 5-11; See, also, SofF #7.7 above.*

Fact #175: Denied. *See, response to Fact #173 above.*

Fact #176: Admitted.

Fact #177: Denied. Mr. Colón-Báez knew of the domestic violence complaint which had resulted in two superintendents making a proposal that he be expelled from the force and which finally resulted in the 60-day suspension in 2006. Sgt. Juan Colón-Báez was the officer who served the 60-day suspension papers on defendant Javier Pagán in 2006. He knew that the suspension was a disciplinary sanction, and he believed it was related to an act of domestic violence *Exh. J, JCB Depo, page 18, line 14-24; page 18, lines 14 to page 19, line 3.*

Moreover, Sgt. Colón-Báez's claim that he never to have found out that there had been an initial proposal that Officer Pagán be expelled from the force, *Id., page 23, lines 17 to 22,* is simply not worthy of credence, given that Juan Colón-Báez was the Assistant Director of the T.O.D. in Humacao during the entire period when Javier Pagán was serving his suspension for disciplinary matters and presumably would have heard at some point that two different PRPD Superintendents had proposed his expulsion from the force. *See, SofF #6.22 - 6.23.*

Fact #177: Admitted.

Fact #178: Admitted.

Fact #179: This fact is denied in its entirety as thoroughly unsupported by any proper record reference. First of all, the supporting reference at page 27 of the Colón-Báez transcript only says that Officers Sustache and Pagán were selected by Mr. Colón-Báez for the Impact Unit. It does not say *anything* about this meaning that they "were not under the supervision of any superior

in Tactical Operations," as defendants assert.  This is a *non-sequitor* which is contradicted in the record.  Nothing in this underlying testimony means in any way, shape or form that these officers — assigned for a few days to an Impact Service ---- were removed from the "supervision" of their regular supervisors.

Fact #180: Admitted.

Fact #181 Admitted.

Fact #182: This fact is partially admitted at partially denied.  It is admitted that Lieutenant Rodríguez and Sgt. Betancourt supervised the team that formed the Impact Unit that evening.  The supporting reference, however, do not support the notion that "Colón-Báez was not in any supervisory position over Agents Pagán and Sustache" that day.  Not only are the *references* insufficient, they are contradicted by the facts.  As Interim Director of the Tactical Operations Division that day (and for several weeks before that day), Juan Colón-Báez clearly *was* in a "supervisory position" with respect to these Officers.  *See, eg., Exhibit III, Tactical Operations Division Service List for week of August 6 to 12, 2007.*  The mere fact that on that *day* these two officers were assigned to a particular task does not mean that all previous supervisory failings on the part of the line supervisors magically disappeared.

Fact #183: Admitted.

Fact #184: Admitted,  although the unit is correctly named the "Superintendency of Public Integrity," and was previously known as the "Auxiliary (Assistant) Superintendency for Inspections and Disciplinary Matters" ("SAIAD").  *See, Díaz v. Martínez, 112 F.3d 1, 2 (1ˢᵗ Cir., 1997).*

Fact #185: Admitted.

137

Fact #186: This statement is denied.  Mr. Colón-Báez may indeed state that administrative investigations are conducted only at the central office, but this is clearly incorrect. This sworn declaration by Juan Colón-Báez is directly contrary to that of Captain Héctor Cintrón, the head of the Public Integrity division for the *Humacao Area,* who notes that *all complaints are first investigated at the Area level*.  The individual investigator provides a report to the head of the Public Integrity Office at the Area level, who then approves a report, which makes findings and points out violations of the Regulation, if applicable, and can make a recommendation as to an administrative sanction ranging from a warning to expulsion. As Mr. Cintrón explained, the report, in turn, goes from the Area Public Integrity Office to the island-wide Assistant Superintendency of Public Integrity, which has the authority to accept or reject the recommendation. *See, SofF #7.70 and supporting citations therein. See, also, Exhibit MMM, SAIP-OIP-AH-1-792, August 14, 2007, from Capt. Héctor Cintrón Abreu, Director of the Public Integrity Division in the Humacao Area.*  The very fact that after so many years in the PRPD, Sgt. Colón-Báez does not even *know* that there is a Public Integrity Office at the Area level is further evidence of his total lack of knowledge of, and interest in, his fundamental responsibilities as a police supervisor.

Fact #187: Admitted.

Fact #188: Denied as contradicted in the record.  Mr. Pagán's personnel record included any number of documents pertinent to his disciplinary problems, including but not limited to documents setting forth some specifics facts involved in the incidents giving rise to the domestic violence complaint.  *See,eg., Exhibits AA; BB; CC and EE.*

Fact #189: This fact is denied as utterly false and contradicted in the record.  Although Mr. Colón-Báez apparently never reviewed the information which was available to him, it most certainly

138

is *not* becaucse the information "regarding open investigations of Agent Pagán [had not] yet [been] completed."    General Order 87-14 itself requires supervisors to examine their subordinates' disciplinary files. *See, generally, Sof F #6.15 and #6.16.*  Both Lieut. Cruz-Sánchez and Col. Edwin Rivera-Merced agree that unit supervisors can access disciplinary files.  Mr. Rivera-Merced has indicated that they can do so, merely by requesting that information (as specified in General Order 87-14).  They are "responsible for the people under their charge ... and they are supposed to request the information concerning the conduct of the people who work with them."  See, SofF # 6.19.  The disciplinary records, moreover, contain personal histories of each agent ("historiales") which provide information on prior investigations, even when the results of the same are still "pending," and therefore are "open." *See, eg. Exh. A, VCS Interrogs, Answer to Question #24; Exhibit Z; Exhibit JJ.*

Fact #190: This statement is denied.  Once again, Mr. Colón-Báez has resorted to contradicting his own previous sworn testimony with new sworn declarations.  In his deposition in early 2010, Sgt. Colón-Báez stated that he believed that the suspension was for *domestic violence (Law 54). Exh. J, JCB Depo, page 18, line 14-24.*  At this juncture, however, he has presented a new sworn declaration stating that "at all times" before this lawsuit was brought, he believed that it was related to "mishandling of evidence," echoing Víctor Cruz-Sánchez's sworn deposition testimony.  Remarkably, in his deposition a year ago, Mr. Colón-Báez simply neglected to mention the "mishandling of evidence" belief he evidently held for so many years.  The notion that he testified at his deposition that the complaint was based on "domestic violence, Law 54," only because he found that out in the course of this lawsuit, is simply too absurd to merit any credence.

Fact #191 Admitted that Mr. Colón-Báez claims that he never heard that there had been a proposed order of expulsion for agent Javier (not "José) Pagán.

Fact #192: Admitted.

Fact #193: Denied for the reasons set forth in plaintiffs' response to SofF #177 above.

Fact #194: Admitted.

Fact #195: Admitted.

Fact #196: Admitted.

Fact #197: This statement is almost exactly the same as D's Sof F #179. It is partially admitted and partially denied. It is admitted that Zulma Díaz, a Humacao precinct officer, was not under Colón-Báez's supervision. As to the other two officers, the statement is denied for many of the same reasons as Fact #179. The statement is a *non-sequitor* which is contradicted in the record. Nothing in the record changes the reality that these officers — assigned for a few days to an Impact Service ---- were not, in fact, removed from the "supervision" of their regular supervisors. The mere fact that on that *day* the two officers from the T.O.D., Sustache and Pagán, were assigned to a particular task does not mean their Unit Director is now free to wash his hands of all responsibility for their conduct.

Fact #198: This is denied. The work plans for the Impact Unit were discussed at a regular staff meeting at which Colón-Báez, as the Director of a Unit, would have been in attendance. He would have participated in the discussion which resulted in a decision that the focus of the work of the Impact Unit was to be on the Municipality of Naguabo, a town selected for the Impact Service, since it was the area where drug-trafficking was most problematic. *See, SofF #2.12 above.*

Fact #199: Admitted.

140

Fact #200: <u>Denied</u>.  Mr. Colón-Báez knew about the domestic violence complaint. *See, plaintiffs' response to Fact #190 above.*

Fact #201 Admitted.

Fact #202: Admitted.

Fact #203: Admitted.

Fact #204: Admitted.

Fact #205: Admitted.

Fact #206: Admitted.

Fact #207: Admitted.

Fact #208: Admitted.

Fact #209: Admitted.

Fact #210: Admitted.

Fact #211 Admitted.

Fact #212: This is another irrelevant fact regarding what eyewitness Fermín Torres-López knew or did not know about Colón-Báez's responsibility for Miguel Cáceres's death.  It is clarified yet again that this is thoroughly *irrelevant* to the questions in this case, as one would not expect individual citizens like Fermín Torres-López, who are untrained in the law and are not in law enforcement themselves, to have any knowledge as to "any act or failure to act on the part of Rivera-Merced that caused the death of Mr. Cáceres." *See, response to Fact #39 above.*

Fact #213 Again, it is also admitted that the emergency medical technician, Jackeline Aponte, did not know why Colón-Báez is responsible for Mr. Cáceres's death.  Again, it is

clarified that this fact adds absolutely *nothing* to the pertinent inquiries in this case.  *See, discussion above with respect to Fact #41.*

Fact #214: This "fact" is <u>denied</u>.   The asseveration that Mr. Colón-Báez "acted according to the laws of the Commonwealth and the Rules and Regulations of the Police Department" cannot be accepted merely because the defendant makes that conclusory statement in his declaration.  A statement of facts submitted on summary judgment "must concern *facts* as opposed to *conclusions, assumptions or surmise*." <u>Pérez v. Volvo Car Corp</u>, *op.cit.* Such a conclusory statement is inadmissible on summary judgment, *inter alia* because it is "totally lacking in specificity." <u>Pérez</u>, *247 F.3d at 316.*

Moreover, even if Mr. Colón-Báez's statement *were* properly considered on summary judgment, it is <u>denied</u> as contradicted in the record.  Puerto Rico law requires officials such as defendant Colón-Báez to comply with constitutional requirements.  As can be seen in plaintiffs' Statement of Facts, this defendant utterly failed to comply with these legal requirements. *See, generally, plaintiffs' Statement of Facts, in particular, Statement of Facts #'s 8.15; 8.23; 8.25; 8.40-8.43.*

Fact #215: Defendants propose this fact concerning Evelyn Ramírez-Lluveras, the *widow* of Miguel Cáceres, stating that she has no "personal knowledge of any acts on the part of the supervisory defendants that led to the death" of her husband.  Again, they defendants are relying on questions put to witnesses who were not in a position to know.

As will be seen below, the defendants took up an extraordinary amount of time taking depositions of witnesses whose testimony they did *not use at all* on summary judgment.  Not a single one of the depositions of eye-witnesses or of investigators or forensic scientists was used

in any substantive way.  The *only* mention of such testimony was to affirm that these witnesses lacked personal knowledge regarding the supervisory failings of the defendants, a matter which is clearly *outside* the purview of their knowledge by *any* stretch of the imagination.) The answers to such questions are plainly *irrelevant* to any factual issue in controversy in this case.

With respect to Ms. Ramírez, however, there is another *wrinkle* to this litigation conduct by the defendants.  The supervisory defendants, of course, wasted valuable time asking Mr. Cáceres's widow if she knew of acts or omissions by the supervisors which caused the death of her husband.  *See, Exhibit NNN, Excerpts from Deposition of Evelyn Ramírez-Lluveras, page 82, line 13 to page 86, line 17.*   The defendants, however, failed to include those pages as references in support of their asseveration that Ms. Ramírez had no personal knowledge as to how the supervisory defendants caused the death of her husband. Rather, they cited the clearly *incorrect* reference — that of the deposition of her daughter, Michelle Cáceres-Ramírez. *See, D's Sof F #215 and 216.*

This does *not* appear to be an inadvertent error.  One need only review the actual testimony by Ms. Ramírez to see why the correct page references were omitted.  While plaintiffs' counsel tried to move the deposition along, by *stipulating* that her client, of course, would not have such personal knowledge, counsel for the supervisory defendants insisted on asking the same questions he or his co-counsel had asked of *all* of the supervisory defendants — whether the witness had "personal knowledge" of the "acts or omissions" of *each* defendant which lead to Mr. Cáceres's death.

Ms. Ramírez, however, was not willing to give Mr. Cardona the answer he was looking for. She stated that she did not know Mr. Rivera-Merced or Mr. Figueroa-Solís, but she *did* know who

143

Pedro Toledo-Dávila was and she *did* have an *opinion* about his responsibility for her husband's death.  The following colloquy ensued:

Q:   The same question as to Mr. Pedro Toledo Dávila.  Do you know of any actions on his part or failure to act that led to the death of your husband or that could have avoided the death of your husband?

A:   I don't know of any failure, *but if he would have been a better chief of agency*, perhaps the death of my husband *would have been avoided* and not only his death, *but also the death of many other persons.*

Q:   But I'm aksing you about personal knowledge.

A:   No.

Q:   No means that you don't have any personal knowledge?

A:   Not that I know.  No.   *That's my personal opinion in terms of his performance as the head of an agency.*

Q:   But you don't know, personally know about things he did or that he did not do?

A:   To avoid the death of my husband?  No.

*See, Exh. MMM, Excerpts from deposition of Evelyn Ramírez-Lluveras, page 85, line 15 to page 86, line 12 (emphasis supplied.)*

144

Fact #216: Defendants set forth a *separate* "fact" about the Evelyn Ramírez's lack of knowledge of "omissions" causing the death of her husband.   Again, no proper reference is provided, although *plaintiffs* are submitting the applicable pages herewith. The questions defendants put to plaitniffs are superfluous and ridiculous and the answers thereto have no place in a *serious* discussion of the issues in this case.

Fact #217: The next four factual statements are based on the same questions as those which gave rise to Facts #215 and 216.   The only difference is that now the defendants are asking the questions of Mr. Cáceres's two daughters, respectively 21 years old and 17 at the time of their father's murder.   The answers they gave to these absurd questions in their depositions, whether they had personal knowledge of acts or omissions by the defendants causing their father's death, have no importance whatsoever to the facts in controversy in this case.

Fact #218: *See, plaintiffs' response to Fact #217 above.*

Fact #219: *See, plaintiffs' response to Fact #217 above.*

Fact #220: *See, plaintiffs' response to Fact #217 above.*

Fact #221: In their endless and unnecessary consumption of time during depositions which plaintiff had long before warned were useless to defendants on summary judgment,[11] the defendants actually asked a young boy, Mr. Cáceres's son, who was just *10 years old* at the time of his father's death, whether he had any personal knowledge of omissions on the part of the supervisory defendants which led to the death of his father.   This question was not only

---

[11]Plaintiffs' consistent argument on this point has been borne out completely by the fact that the extensive summary judgment submitted by the supervisory defendants contains absolutely no substantive facts about the underlying event, just as plaintiffs anticipated in their multiple efforts to forestall further delays in this case.

*unnecessary*, it was *cruel* to put to the boy.  Of course, plaintiffs must *admit* that the young boy knows of no such omissions.  It is no less certain, however, that this is *irrelevant* to the issues on summary judgment, and that the supervisory defendants have wasted everybody's time by insisting on asking questions of this nature.

Fact #222: *See, plaintiffs' response to Fact #221* (regarding the fact that this young boy did not know what actions or omissions of the supervisory defendants caused his father's death.)

Fact #223: Through months of litigation, the supervisory defendants took regarding the underlying constitutional violation.  As plaintiffs stated in any number of motions and during court hearings, there was *no need* for the supervisory defendants to push back the discovery.  Defendants *already* had access to the complete transcripts from the Pagán criminal trial and knew the complete versions of these witness's testimony.  Moreover, it was clear that their defense would not depend on the facts concerning Mr. Pagán's murder of Mr. Cáceres, but rather on the nature of the actions of the *supervisors*.

At the current juncture, there is absolutely *no doubt* as to the accuracy of plaintiffs' predictions.  The summary judgment papers submitted by the defendants contain not a single reference to the underlying facts of the incident in Punta Santiago in which Officer Pagán killed mr. Cáceres (facts which are included in *plaintiffs'* opposition factual statement).  Rather, the sum total of the use which the supervisory defendants gave to the hours upon hours they spent on depositions (and the corresponding time spent by plaintiffs' counsel) are the statements in the defense's summary judgment that witnesses such as Anibal Mojica-Cruz, Ferdinand Rosa-Ortiz, Ricardo Lebrón and Jackeline Aponte made to the effect that they have no "personal knowledge" of the supervisory failings which led to Mr. Cáceres's death.  These witnesses are, respectively, two

146

men who were at Punta Santiago and witnessed the killing, the factory worker who happened to capture the murder on video, and the emergency medical technician whose drive to reach the dying man was interrupted by the patrol car which invaded her land and managed to ge the ambulance to take *Javier Pagán* instead of *Miguel Cáceres* to Ryder Hospital.

It is certainly admitted that these witnesses do not have "personal knowledge" of the acts or omissions of the supervisory defendants leading to the death of Miguel Cáceres.  Nor do his widow and young children.  These facts, however, are patently *immaterial* to any *serious* or *logical* consideration of the issues of supervisory responsibility in this case.

Fact #224: Admitted, subject to the clarification made in response to SofF #223.

Fact #225: Admitted, subject to the clarification made in response to SofF #223.

Fact #226: Admitted, subject to the clarification made in response to SofF #223.

In San Juan Puerto Rico, this 15th day of March, 2011.

**Respectfully Submitted**

Berkan/Mendez
Calle O'Neill G-11
San Juan, Puerto Rico 00918-2301
Tel.: (787) 764-0814
Fax.: (787)250-0986
bermen@prtc.net

/s/ Judith Berkan                                    Mary Jo Méndez
Judith Berkan                                        Mary Jo Méndez
US DC No. 200803                                     USDC No. 209407
berkanj@microjuris.com                               mendezmaryjo@microjuris.com

147

This is to certify that this document is being filed pursuant to the ECF filing system, which will automatically notify all counsel of record.

/s/ Judith Berkan
Judith Berkan