IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

EVELYN RAMIREZ-LLUVERAS, *et al.*,

    **Plaintiffs,**

        **v.**                    **CIVIL NO.** 08-1486 (FAB)

JAVIER PAGAN-CRUZ, *et al.*,

    **Defendants.**

## OPINION AND ORDER

BESOSA, District Judge.

    This is a civil rights action brought pursuant to 42 U.S.C. § 1984 ("section 1983") and Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 5141 ("article 1802") arising from the highly publicized death of Miguel A. Caceres-Cruz ("Caceres"). Before the Court is Juan Colon-Baez ("Colon"), Rafael Figueroa-Solis ("Figueroa"), Victor Cruz-Sanchez ("Cruz"), Edwin Rivera-Merced ("Rivera") and Pedro Toledo-Davila's ("Toledo") (collectively, the "supervisory defendants") motion for summary judgment pursuant to Fed.R.Civ.P. 56 ("Rule 56"). (Docket No. 249.) For the reasons set forth below, the Court **GRANTS** the supervisory defendants' motion for summary judgment of the plaintiffs' claims against them brought pursuant to section 1983 and article 1802.

**I.   FACTUAL BACKGROUND**

   **A.   Procedural Background**

         Caceres' wife, Evelyn Ramirez-Lluveras, and their three
children, Jenitza Caceres, MC and MAC (collectively, the
"plaintiffs") filed an amended complaint on behalf of themselves
and Caceres against several field officers in the Puerto Rico
Police Department ("PRPD"), Javier Pagan-Cruz ("Pagan"), Carlos
Sustache-Sustache ("Sustache"), Zulma Diaz ("Diaz") (collectively,
the "field officers")[1] and the supervisory defendants.  (Docket
No. 64.)  Plaintiffs allege that their rights under the Fourth,
Fifth, Eighth, and Fourteenth Amendments of the Constitution were
violated when Caceres was forced to the ground by the field
officers and was eventually shot and killed by then Officer Pagan
in the Punta Santiago sector of Humacao, Puerto Rico.  Id.  They
also seek damages pursuant to article 1802.

         In an opinion and order dated October 3, 2011, the Court
dismissed all claims against the supervisory defendants except for
plaintiffs' Fourth Amendment claim in their representative
capacities, pursuant to section 1983 and article 1802.  (Docket
No. 332.)  On February 18, 2011, the supervisory defendants filed
their motion for summary judgment pursuant to Rule 56.  (Docket
No. 249.)  Plaintiffs opposed on March 15, 2011.  (Docket No. 262.)

---

         [1] Pagan has been convicted of killing Mr. Caceres.  Diaz and
Sustache were found not guilty by a jury.

On March 25, 2011, plaintiffs filed a motion to supplement their opposition to add a reference to a case decided by the Ninth Circuit Court of Appeals. (Docket No. 274.) The supervisory defendants replied to plaintiffs' opposition on May 17, 2011. (Docket No. 297.) On May 25, 2011, plaintiffs submitted a sur-reply. (Docket No. 311.)

   B.   **Factual Background**

      1.   **Preliminary Evidentiary Issues**

         The supervisory defendants argue that plaintiffs' Statement of Material Facts (Docket No. 262) is defective because many of the documents on which they relied are not authenticated by and attached to an authenticating affidavit, and that plaintiffs' exhibits Z, AA, BB, CC, DD, EE, which detail Pagan's disciplinary history, constitute inadmissible hearsay. (Docket No. 296 at ¶¶ 5.3-5.13; Docket No. 297 at 4-5.)

         Documents must be authenticated by and attached to an affidavit to be admissible to be considered to decide a motion for summary judgment. Fed.R.Civ.P. 56(e); Carmona v. Toledo, 215 F.3d 124, 131 (1st Cir. 2000) (quoting Orsi v. Kirkwood, 999 F.2d 86, 92 (4th Cir. 1993). Plaintiffs did not provide an authenticating affidavit for many of the exhibits they rely upon in their Statement of Material Facts. (See, e.g., Docket No. 262 at ¶¶ 5.1-5.4.) "The Court has discretion to allow a party to cure deficiencies in supporting documentation." Goguen ex rel. Estate

of Goguen v. Textron, Inc., 234 F.R.D. 13, 17 (D.Mass 2006) (citing McMahon v. Digital Equipment Corp., 162 F.3d 28, 34 (1st Cir. 1998)).  Plaintiffs attempted to cure this defect by submitting a sworn statement by Judith Berkan, one of plaintiffs' attorneys, declaring that the documents in question were produced during discovery.  (Docket No. 311 at ¶¶ 9-10, Ex. D.)  Documents produced in discovery are deemed authenticated.[2]  See Catala v. Dep't. of Veterans Affairs, No. 08-1822, 2010 WL 1664884, at *2 (D.P.R. Apr. 21, 2010); Vachon v. R.M. Davis, Inc., No. 03-245, 2004 WL 1146630, at *1-3 (D.Me. Apr. 13, 2004) (internal citations omitted); Estes Exp. Lines, Inc. v. Macy's Corp. Serv., No. 08-3582, 2010 WL 398740 at *5 (D.N.J. 2010).  Accordingly, plaintiffs cured the defect and the court will consider the exhibits.

The supervisory defendants' argument that plaintiffs' exhibits Z, AA, BB, CC, DD, and EE, which detail Pagan's disciplinary history, constitute inadmissible hearsay is

---

[2] The supervisory defendants argue in their motion to strike the plaintiffs' sur-reply that Diaz-Román v. Denis, No. 08-1420, 2010 WL 3069942, at *2 (D.P.R. Aug 2, 2010) stands for the proposition that documents are not authenticated merely because they were obtained during discovery.  (Docket No. 314 at 6.) Diaz-Román, however, does not stand for that proposition.  Id. Rather, the court held there that citing to pages of discovery materials does not make those materials automatically part of the record.  Id.  To be part of the record, the proponent must take "appropriate steps" to include them.  Id.  Accordingly, the supervisory defendants' argument fails and the documents are admissible.

also unavailing.  (Docket No. 296 at 5.3-5.13.)  Under Federal Rule
of Evidence 801(c), hearsay is defined as "a statement other than
one made by the declarant while testifying at the trial or hearing,
offered in evidence to prove the truth of the matter asserted."
Here, the statements contained in the exhibits are not hearsay
because they are not being used to prove that Pagan actually
behaved in the manner described in the exhibits.  <u>See</u>
<u>Gutierrez-Rodriguez v. Cartagena</u>, 882 F.2d 553, 575 (1st Cir.
1989).  Rather, the exhibits are offered to establish whether or
not the supervisory defendants acted with deliberate indifference
in light of Pagan's disciplinary records.  <u>Id</u>. (holding that an
officers' disciplinary files were not hearsay because they were
used to show the supervisors' responses to complaints against an
officer.) Accordingly, the Court will consider plaintiffs' exhibits
Z, AA, BB, CC, DD, and EE for that limited purpose.

### 2.  **Miguel Caceres' Death**

On August 11, 2007 the field officers were in the
Punta Santiago sector of Humacao, Puerto Rico as part of the Impact
Unit.  (Docket No. 262 at 1.8, 2.38.)  Defendant Rivera, the
Humacao Area Commander from 2006 to 2007, had made the decision to
create an Impact Unit to help fight crime in the area.  <u>Id</u>. at
¶ 2.13; Docket No. 250 at ¶ 9.  Defendant Cruz, the Director of the
Humacao Tactical Operations Division (the "T.O.D."), selected Diaz
to be a part of the Impact Service.  (<u>Id</u>. at ¶ 2.5.)  Defendant

Colon, the Assistant Director of the Humacao T.O.D. from March 2006 to February 2007 and again from July 2007 to August 2007, selected Pagan and Sustache for the Impact Unit.  Id. at ¶¶ 1.4, 2.5.

The Punta Santiago Scooter Club (the "Club") was also present at Punta Santiago on August 11, 2007.  The Club was there to provide an escort for a girl celebrating her fifteenth birthday (her "quinceañero").  Id. at ¶¶ 2.24-2.25.  Roughly eleven club members, dressed in yellow T-shirts, parked their scooters in front of the girl's grandmother's house.  Id. at ¶¶ 2.25, 2.33. The scooters blocked a quarter of a road's lane closest to the grandmother's house.  Id. at ¶ 2.34.  Caceres, a member of the Club, assisted in directing traffic, letting one side of the traffic pass through at a time.  Id. at ¶¶ 2.35-2.36, 2.37.

The field officers arrived in a PRPD Ford Explorer to the spot where Caceres was directing traffic.  Id. at ¶ 2.38. After the Explorer was stopped for "a while," Caceres instructed it to move forward.  Id. at ¶ 2.39.  Pagan told Caceres that they alone have the authority to tell someone to "move on" and informed Caceres that the club members must move their scooters off the road within five minutes.  Id. at ¶¶ 2.40-2.42.  After Caceres responded, Pagan said the scooters must be moved immediately.  Id. at ¶ 2.42.  The parties dispute what happened next.  Id. at ¶ 2.46; Docket No. 296 at ¶ 2.46.  According to Fermin Torres-Lopez, the President of the Club, the club members moved their scooters to the

sidewalk.  _Id_. at ¶ 2.46.  But according to Hector M. Huertas-Marrero, the club members did not comply with the order.  (Docket No. 296 at ¶ 2.46.)

In any event, after the exchange between Caceres and Pagan, the field officers then left their vehicle and moved towards Caceres.  (Docket No. 262 at ¶ 2.47; Docket No. 250 at ¶ 93.) Pagan pointed at Caceres and said, "[y]ou are a charlatan." (_Id_. at ¶ 2.49.)  Caceres retorted that "[i]f I am a charlatan, you are too."  _Id_.  Officer Diaz then informed Caceres that he was under arrest.  _Id_. at ¶ 2.51.  Caceres moved backwards and said that he did not do anything to justify his arrest.  _Id_. at ¶ 2.52. According to Hector M. Huertas-Mercado, Caceres attempted to evade Officer Diaz and hit her, causing her to fall into a puddle. (Docket No. 295 at ¶ 2.52; Docket No. 322 at Ex. 26.)

After Pagan tried to grab Caceres' shirt, Caceres pushed him.  (Docket No. 262 at ¶ 2.54.)  Officers Pagan and Diaz enclosed Caceres between a chain and the road.  Caceres fell down. _Id_. at ¶ 2.55.  While Caceres was on the ground, Pagan punched Caceres in the face.  _Id_. at ¶ 2.56.  Then, Caceres grabbed onto Pagan's leg, touching his gun holster as he was trying to get up. _Id_. at ¶ 2.61.  Pagan placed his hand on top of Caceres' hand and a struggle ensued.  _Id_. at ¶¶ 2.61, 2.63.  While Pagan's gun was still in its holster, he shot himself in the leg.  _Id_. at ¶ 2.67. Pagan then pulled the gun out of the holster and shot Caceres

several times in the back and head.  Id. at ¶¶ 2.73-2.75.  Caceres

died.  See Id. at ¶¶ 2.22, 3.6.

        Following the shooting, the field officers retreated

to the Explorer and left the scene.  Id. at ¶ 2.78.  Lieutenant

Rodriguez communicated with Officer Diaz twice through the PRPD

radio.  Id. at ¶ 3.2.  Officer Diaz informed Lieutenant Rodriguez

that Pagan was bleeding profusely but did not mention Caceres

having been shot.  Id. at ¶¶ 3.2-3.4.

### 3.   Pagan's Disciplinary History

        Pagan's "Personal History" record shows that, prior

to Caceres' death, he had been subject to seven complaints.  Id. at

¶ 5.1.  He was accused of (1) theft of government property that he

left in the trunk of his personal vehicle; (2) domestic violence;

(3) insubordination; (4) failing to appear after being subpoenaed;

(5) reporting a "loss" in a stolen and recovered vehicle report;

(6) failing to take action on a complaint filed by a citizen; and

(7) assaulting a motorcyclist.  (Docket No. 281 at Ex. Z.)  Pagan

received a warning for the theft of government property.  (Docket

No. 262 at ¶ 5.2.)  The insubordination complaint was "filed for

future reference."  Id.  The complaint for the stolen and recovered

vehicle report is pending in the PRPD's legal affairs office.  Id.

The complaint for assault of a motorcyclist was "filed in the

record."  Id.  There is no indication that any action was taken by

the PRPD for the complaint that Pagan failed to appear after being

subpoenaed.  (Docket No. 281 at Ex. Z.)  The accusation that he engaged in domestic violence was deemed substantiated.  Id. at Ex. DD; Docket No. 262 at ¶ 5.3.

Maria Cabrera-Santiago ("Cabrera") had accused Pagan of domestic violence, stemming from three incidences.  In the middle of 1998, Cabrera and Pagan entered into a consensual, intimate relationship.  (Docket No. 262 at ¶ 5.4.)  Cabrera alleged that in August 1998, Pagan saw her speaking with another police officer.  Id. at ¶ 5.5.  Subsequently, Pagan slapped her in the face and pointed his police-issued firearm at her.  Pagan purportedly said, "[i]f I catch you with another man, I'm going to kill you."  Id. at ¶¶ 5.2-5.3, 5.5, 5.7; Docket No. 281 at Ex. AA, CC.  In the second incident, Cabrera alleged that Pagan stored an arrestee's firearm and laser in Cabrera's home for three days.  Id. at ¶ 5.8; Docket No. 281 at Ex. CC.  Pagan attached the laser to his police-issued firearm, pointed to the wall and swore that he was going to kill the arrestee.  (Id.; Docket No. 281 at Ex. DD.)  In the final incident, Cabrera alleged that after their relationship deteriorated, Cabrera sent Pagan a bill for a beeper she previously had given to Pagan as a gift.  Id. at ¶ 5.5; Docket No. 281 at Ex. CC.  That purportedly caused Pagan to "burst" into Cabrera's home, question her about what she had done and assault her.  Id. at ¶ 5.5; Docket No. 281 at Ex. CC.

The District Attorney decided not to file charges
against Pagan because he didn't think Puerto Rico Law 54, which
addresses domestic violence, applied and/or because of Cabrera's
"lack of interest." (Id. at ¶ 5.5; Docket No. 281 at Ex. AA, CC.)
Pagan's police-issued firearm was seized and he was referred to the
Domestic Violence Division. (Docket No. 281 at Ex. BB.)   On
August 23, 2000, the Domestic Violence Division concluded that
Pagan committed four violations of PRPD Personnel Regulations.
(Id. at Ex. DD; Docket No. 262 at ¶ 5.10.)   On August 30, 2004,
then PRPD Superintendent Augustin Cartagena found that Pagan
committed six violations of PRPD Personnel Regulations.   (Id. at
Ex. CC; Docket No. 262 at ¶ 5.11.)   Cartagena wrote Pagan that he
intended to expel him from the police force.   (Id. at Ex. CC;
Docket No. 262 at ¶ 5.11.)   In November 2004, however, Pagan was
transferred to the "T.O.D," to work as in a Special Response Team
(the "S.R.T.").[3]  Docket No. 262 at ¶ 5.13.

        According to a letter signed by Ramon A. Ortega-
Rodriguez ("Ortega") and with Toledo's name appearing below the
valediction, Pagan was once again notified of the intent to expel
him from the PRPD.  Id. at ¶ 5.22; Docket No. 281 at Ex. LL.  An

_____

        [3] The T.O.D. is an elite unit within the PRPD composed of
agents trained to deal with sensitive situations. (Docket No. 262
at ¶ 5.14.)  The S.R.T. is a "select group" within the T.O.D.  Id.
Members of the S.R.T. receive additional training and are
authorized to perform tasks not all T.O.D. agents are permitted to
perform.  Id.

administrative hearing was held on October 8, 2005.  Id.  After the hearing, Pagan's expulsion was modified.  Id.  Instead, he was suspended from employment without pay for sixty (60) days.  (Id. at ¶ 5.23; Docket No. 281 at Ex. LL.  Pagan served the suspension from August 23, 2006 to October 22, 2006.  (Id. at ¶ 5.24.)

## II.  SUMMARY JUDGMENT STANDARD

The Court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure.  Rule 56 states, in pertinent part, that the court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  See also Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000).

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  See Rule 56(c).  The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once a properly supported motion has been presented, the opposing party has the burden of demonstrating that a trial-worthy issue exists that would warrant the court's denial of the motion

for summary judgment.  For issues where the opposing party bears the ultimate burden of proof, that party cannot merely rely on the absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute.  See Suarez v. Pueblo Int'l., Inc., 229 F.3d 49 (1st Cir. 2000).

In order for a factual controversy to prevent summary judgment, the contested facts must be "material" and the dispute must be "genuine."  "Material" means that a contested fact has the potential to change the outcome of the suit under governing law. The issue is "genuine" when a reasonable jury could return a verdict for the nonmoving party based on the evidence.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  It is well settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment."  Id. at 252.  It is therefore necessary that "a party opposing summary judgment must present definite, competent evidence to rebut the motion."  Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994).

In making this assessment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor."  Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). The court may safely ignore, however, "conclusory allegations,

improbable inferences, and unsupported speculation." Medina-Muñoz

v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

## III. DISCUSSION

Section 1983 permits a plaintiff to recover money damages from

government officials who violate the plaintiff's constitutional

rights.  Camreta v. Greene, 131 S.Ct. 2020, 2024 (2011).[4]  A

section 1983 claim has two elements:  (1) the defendant must have

acted under color of state law; and (2) the defendant's conduct

must have deprived the plaintiff of rights secured by the United

States Constitution or by federal law.  Gagliardi v. Sullivan, 513

F.3d 301, 306 (1st Cir. 2008) (citing Rodriguez-Cirilo v. Garcia,

115 F.3d 50, 52 (1st Cir. 1997); Lipsett v. Univ. of P.R., 864 F.2d

881, 901-02 (1st Cir. 1998) (citing Voutour v. Vitale, 761 F.2d 812

(1st Cir. 1985).  The supervisory defendants do not dispute that

they were acting under color of state law.

Under the supervisory liability doctrine, a supervisor who

does not directly engage in the unconstitutional behavior may be

liable under section 1983.  Camilo-Robles v. Hoyos, 151 F.3d 1, 6-7

---

[4] Section 1983 provides in relevant part:

"Every person who, under color of any statute, ordinance,
regulation, custom, or usage, of any State . . .
subjects, or causes to be subjected, any citizen of the
United States or other person within the jurisdiction
thereof to the deprivation of any rights, privileges, or
immunities secured by the Constitution and laws, shall be
liable to the party injured in an action at law, suit in
equity, or other proper proceeding for redress . . . ."

(1st Cir. 1998) (citing <u>City of Okla. City v. Tuttle</u>, 471 U.S. 808
(1985)).  But, a supervisor is not liable for their subordinates'
unconstitutional conduct under the theory of *respondeat superior*.[5]
<u>Id.</u>; <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1948 (2009); <u>Whitfield v.
Melendez-Rivera</u>, 431 F.3d 1, 14 (1st Cir. 2005) (citing
<u>Barreto-Rivera v. Medina-Vargas</u>, 168 F.3d 42, 48 (1st Cir. 1999).
Rather, "[s]upervisors may only be held liable under § 1983 on the
basis of their own acts or omissions."  <u>Whitfield</u>, 431 F.3d at 1.
Accordingly, to establish the second element of section 1983
liability, two prongs must be satisfied:  (a) the supervisor's
subordinate must have violated the plaintiff's constitutional
rights; and (b) the supervisor's "action or inaction" must be
'affirmative[ly] link[ed]. . .' to that behavior in the sense that
it could be characterized as 'supervisory encouragement,
condonation, or acquiescence' or 'gross negligence amounting to
deliberate indifference.'"  <u>Pineda v. Toomey</u>, 533 F.3d 50, 54 (1st
Cir. 2008); <u>Sanchez v. Alvarado</u>, 101 F.3d 223, 227; <u>Lipsett</u>, 864
F.2d at 902 (citing <u>Bohen</u>, 799 F.2d at 1189; <u>Maldonado-Denis</u>, 23
F.4d at 582 (1st Cir. 1994) (internal citations omitted).  The
supervisory defendants concede, for purposes of their motion, the
first prong – that the field officers violated Caceres'

---

[5] The Restatement (Third) of Agency § 2.04 cmt. b (2010)
defines *respondeat superior* as "a basis upon which the legal
consequences of one person's acts may be attributed to another
person."

constitutional rights.  (Docket No. 249 at 13.)  At issue is the
second prong – whether the supervisory defendants deprived
plaintiffs of their Fourth Amendment rights by acting with
deliberate indifference.

To establish that the supervisory defendants acted with
deliberate indifference, plaintiffs must show (1) a grave risk of
harm, (2) the supervisory defendants' actual or constructive
knowledge of that risk, (3) that the supervisory defendants failed
to take easily available measures to address the risk, and (4) an
"affirmative link" between the supervisory defendants' deliberate
indifference and the resulting violation committed by their
subordinates. Figueroa-Torres v. Toledo-Davila, 232 F.3d 270, 279
(1st Cir. 2000); Camilo-Robles, 151 F.3d at 7 (citing Manarite v.
City of Springfield, 957 F.2d 953, 956 (1st Cir. 1992); Maldonado
v. Fontanes, 568 F.3d 262, 275 (2009) (internal citations omitted);
Sanchez v. Figueroa, 996 F.Supp. 143, 149 n. 7 (D.P.R. 1998);
Cruz-Acevedo v. Toledo-Davila, 660 F.Supp.2d 205, 216 (D.P.R. 2009)
(citing Maldonado-Denis, 23 F.3d at 582).

The case law reveals two overarching theories sufficient to
impose liability:  where the supervisor knows of but disregards a
subordinate's risk of constitutional violations, and where a
supervisor "formulat[es] a policy or engage[s] in a custom . . .
that leads to the challenged occurrence. See McIntyre v. United
States, 336 F.Supp.2d 87, 127 (D.Mass. 2004) (describing many of

the scenarios in which the First Circuit Court of Appeals found that supervisors acted with deliberate indifference); Barreto-Rivera, 168 F.3d at 49; Maldonado-Denis, 23 F.3d at 582. The gravamen of plaintiffs' claim is that the supervisory defendants were deliberately indifferent because they: (a) had actual or constructive knowledge that Pagan posed a risk and failed to dismiss him from the PRPD; and (b) failed to establish adequate supervision policies when there was no specific record keeping and analysis of officer-involved shootings, had excessive delays in the disciplinary system, lacked supervisory staff at the Humacao

T.O.D., and failed to hold officers accountable for misconduct.[6]
(Docket No. 262 at 34; <u>See</u> Docket No. 262 at ¶¶ 6.1-8.51; Docket
No. 64 ¶¶ 4.13-4.34.)   The supervisory defendants argue that they
are entitled to summary judgment because their conduct did not

---

[6] Plaintiffs' opposition to the supervisory defendants' motion
states "there is evidence of the overall failings in the
disciplinary system and the failure to comply with recognized norms
inpolice [sic] administration . . ."   (Docket No. 262 at 34.)
Plaintiffs leave the court to speculate, however, what those
failings were and how they caused Caceres' death.   The First
Circuit Court of Appeals has recently reiterated that "Judges are
not mind-readers, so parties must spell out their issues clearly,
highlighting the relevant facts and analyzing on-point authority."
<u>Rodriguez v. Municipality of San Juan</u>, 659 F.3d 168, 175 (1st Cir.
2011).   The Court has attempted to tease out plaintiffs' arguments.
Nevertheless, additional evidence of the PRPD's failings may be
found buried within plaintiff's 107-page Statement of Facts.
Plaintiff's opposition alludes to the PRPD's failings in a cursory
fashion, however, without any case law or factual development and
with the hope that the court will connect the dots.   Plaintiffs
have, in effect, shifted their lawyering duties onto the court.
This they cannot do and the remainder of their arguments are
waived.   <u>Id.</u>; <u>United States v. Zannino</u>, 895 F.2d 1, 17 (1st Cir.
1990) ("it is not enough merely to mention a possible argument in
the most skeletal way, leaving the court to do counsel's work,
create the ossature for the argument, and put flesh on its bones.")
Although this is an admittedly harsh result, this court has
previously stated "[i]t is not solely substantive an often
prohibitively high bar for showing of supervisory liability; it is
procedural law and the standards of the legal profession.   The law,
alone, can do little to remedy injustice-proper lawyering is an
essential component."   <u>Cruz-Acevedo</u>, 660 F.Supp.2d at 219 (D.P.R.
2009).   <u>See also</u> Local Civil Rule 56.

inexorably lead to Caceres' death.[7]   (Docket No. 249 at 2-3.)
Specifically, the supervisory defendants contend that there is no
issue of material fact (1) that the field officers posed a grave
risk of harm; (2) that the supervisory defendants had actual or
constructive know of the risk; and (3) that the supervisory
defendants failed to take measures to address the risk.   (Id.
at 13.)   The Court agrees.

**A.   Risk of Harm**

It is axiomatic that prior to characterizing behavior as
being "deliberately indifferent," there must first be a problem.
Lipsett, 864 F.2d at 902 ("One cannot make a 'deliberate' or
'conscious' choice to act or not to act unless confronted with a
problem that requires the taking of affirmative steps.").   Thus,
the test for deliberate indifference is whether "it would be
manifest to any reasonable official that his . . . [a subordinate
officer's] conduct was very likely to violate an individual's
constitutional rights."   Hegarty v. Somerset County, 53 F.3d 1367,

---

[7] The supervisory defendants also argue that plaintiffs do not
have standing to bring a section 1983 claim, that they are entitled
to qualified immunity, and that plaintiffs' Fourteenth and Fifth
Amendment claims fail as a matter of law because the Supreme
Court's decision in Ashcroft v. Iqbal, 129 S.Ct. 1937 rejected
supervisory liability predicated on "deliberate indifference."
(Docket No. 249, 6-12, 20-38.)   In an opinion and order dated
October 3, 2011, the Court rejected these contentions.   (Docket
No. 332.)   Accordingly, the court need not address these arguments
because the plaintiffs have not put forth any new argument or
evidence, the Court grants the supervisory defendants' motion for
summary judgment on other grounds.

1380 (1st Cir. 1995) (quoting <u>Febus-Rodriguez v. Betancourt-Lebron</u>,
14 F.3d 87, 92).  In conducting this inquiry, the court's duty is
to determine whether the field officers' "reasonably observable
characteristics, behavior or conduct indicated an abnormally high
likelihood that [they] posed a threat to violate the constitutional
rights of citizens in the manner alleged . . . ."  <u>Figueroa</u>, 966
F.Supp. at 148-49 (D.P.R. 1998) (citing <u>Gutierez-Rodriguez</u>, 882
F.2d at 564-66); <u>Camilo-Robles</u>, 151 F.3d at 7.

     Plaintiffs allege that the field officers violated
Caceres' constitutional rights when Pagan wrongfully shot and
killed him during an arrest, failed to prevent the use of force and
did not assure that Caceres received medical attention.  (Docket
No. 64 at ¶¶ 3.6-3.8.)  Nevertheless, plaintiffs have not raised an
issue of material fact that the field officers presented a grave
risk to violate citizens' constitutional rights.

     Plaintiffs have not provided the court with evidence
indicating that Sustache and Diaz were subject to any complaints or
discipline prior to Caceres' death on August 11, 2007.  Plaintiffs
have not even offered Diaz and Sustache's disciplinary records.
Accordingly, the court is unable to find that the supervisory
defendants ignored any grave risk that Sustache's and Diaz's
continued employment with the PRPD may have presented.
<u>Camilo-Robles</u>, 151 F.3d at 7; <u>See</u> <u>Cummings v. McIntire</u>,
No. 00-211-P-H, 2001 WL 30529, at *10-11 (D.Me. Jan. 11, 2011)

(granting summary judgment because the plaintiffs did not produce evidence that police officer was subject to a complaint, discipline or negative performance review which would evidence a propensity to violence).

Moreover, the complaints filed against Pagan do not indicate that Pagan had a propensity to assault, shoot or kill a citizen during an arrest. Maldonado-Denis, 23 F.3d at 582; See Gonzalez-Perez v. Toledo-Davila, 709 F.Supp.2d 125, 132 (D.P.R. 2010). According to Pagan's "Personal History," Pagan had seven complaints prior to Caceres' death. (Docket No. 262 at ¶ 5.1.) Of those seven, only two related to crimes against a person:  a domestic violence claim and an assault against a motorcyclist. Id. Of those two, only the domestic violence complaint was substantiated. (Id. at ¶ 5.3; Docket No. 281 at Ex. DD.) Cabrera alleged that Pagan slapped her in the face, threatened her with his police-issued firearm, stored an arrestee's firearm in Cabrera's home, told Cabrera that he was going to kill the arrestee, and burst into her home and assaulted her. There is no indication that Cabrera ever had a propensity to abuse citizens' rights while on duty and acting under color of law. Thus, plaintiffs have not proffered evidence that, prior to Caceres' death, the field officers were subject to discipline concerning unlawfully discharging firearms in the line of duty, much less complaints alleging violation of constitutional rights.

This case is on all fours with Burgos-Yantin v. Municipality of Juana Diaz, 669 F.Supp.2d 191, 198-199 (D.P.R. 2009). In Burgos-Yantin, the plaintiffs filed a section 1983 suit against various PRPD officers and supervisors alleging that the PRPD officers used excessive force when they shot at the plaintiffs, fatally hitting one in the back of the head and the other in the knee. Id. at 194. The previous complaints against the officers revealed the use of a firearm in self-defense, an assault against another officer, a dispute with a supervisor and a domestic dispute. The Burgos-Yantin court held that the PRPD officers did not show a pattern of behavior evincing a likelihood of constitutional violations. Id. at 198. Here, like a defendant in Burgos-Yantin, Pagan was accused of domestic violence. Moreover, like the officers in Burgos-Yantin, Pagan did not have any substantiated prior incident displaying violent tendencies while acting under color of law as a member of the PRPD. Accordingly, plaintiffs have not proffered sufficient evidence to raise a question of material fact that Pagan possessed a propensity towards violence under color of state law.

Barreto-Rivera, 168 F.3d 42 is inapposite. There, the decedent's relatives brought a section 1983 suit against a PRPD police officer and his supervisor. The First Circuit Court of Appeals vacated the district court's grant of summary judgment. The court of appeals held that there was sufficient evidence to

show the police officer's propensity toward violent conduct,
reasoning that the officer's disciplinary history in the PRPD was
"troubled" at best when he was disciplined 30 times for an abuse of
power, and/or unlawful use of physical force.  Id.  There, the
police officer's supervisor recommended his dismissal because of
the assaults and continued misbehavior despite imposing sanctions.
Id.  Here, unlike in Barreto-Rivera, of the seven complaints
against Pagan, only two related to physical violence.  The
complaint against Pagan for allegedly assaulting of a motorcyclist
was merely "filed in the record."  (Docket No. 281 at Ex. Z.)
There is no indication that the complaint was substantiated.
Although Cabrera's domestic violence complaint was substantiated,
Pagan's disciplinary history, unlike the officer in Barreto-Rivera,
does not evince a propensity to abuse citizens' rights while on
duty and acting under the color of law.

        The fact that the police department disciplined Pagan is
irrelevant.  On two separate occasions, Pagan was informed of the
"intent" to expel him from the PRPD.  (Docket No. 262 at ¶ 5.11;
Docket No. 281 at Ex. CC; Docket No. 262 at ¶ 5.22; Docket No. 281
at Ex. LL.)  After an administrative hearing, however, he was
suspended from employment and pay for sixty (60) days.  (Id. at
¶ 5.23; Docket No. 281 at Ex. LL.)  While more could have been
done, supervisors are not given the gift of perfect foresight.  The
court declines to charge supervisors with deliberate indifference

whenever an officer is suspended and later commits an act of
unforeseeable violence.  Thus, the fact that Pagan was disciplined
does not necessarily reflect that he had dangerous propensities or
that he represented a grave risk of harm.

        The Court cautions that the result it reached neither
follows nor establishes a rule mandating that an officer is
entitled to "one free bite."  (Id. at 34.)  Rather, to impose
supervisory liability it must be foreseeable that the field
officers' would violate Caceres' constitutional rights "in the
manner alleged." Figueroa, 996 F.Supp. at 148-49.  Mere isolated
instances of unconstitutional conduct are insufficient, as a matter
of law, for supervisory liability to attach.  Maldonado-Denis, 23
F.3d at 582.  There is no genuine issue of material fact that the
field officers presented such a risk.  Accordingly, the supervisory
defendants are entitled to summary judgment.

    **B.   Actual or Constructive Knowledge of Risk**

        Even assuming, *arguendo*, that plaintiffs are able to show
that the field officers represented a grave risk of harm,
defendants Colon, Figueroa, Cruz and Rivera are also entitled to
summary judgment because there is no issue of material fact as to
whether they had knowledge of the field officers' disciplinary

history.[8]  (Docket No. 250 at ¶¶ 56-67; Docket No. 250 at ¶¶ 55-67, 100-111, 148-159, 199-211).

Pursuant to section 1983, "[a]ctual or constructive knowledge of a rights violation is a prerequisite . . ." to finding liability.  <u>Feliciano-Hernandez v. Pereira-Castillo</u>, No. 11-1052, 2011 WL 6118537, at *7 (1st Cir. Dec. 9, 2011).  The supervisory defendants argue that they are also entitled to summary judgment because they did not have knowledge of the field officers' dangerous tendencies, any problem with citizen interventions, or with any use of excessive force on citizens by agents operating with the Impact Unit prior to the incident.  (Docket No. 248 at 13.)

Defendant Cruz did not know of administrative complaints filed against the field officers.  (Docket No. 250 at ¶¶ 100-11.) Plaintiffs contend that the fact that defendant Rivera signed a letter stating that "P.O. Javier Pagan-Cruz 19664 was notified on

_____

[8] Plaintiffs raise an issue of material fact regarding the extent of Superintendent Toledo's knowledge of Pagan's disciplinary history.  According to Toledo, he does not know of any complaints levied against Pagan prior to Caceres' death.  (Docket No. 250 at ¶ 19.)  But, Toledo's name appears below the valediction of a letter signed by Ortega indicating the intent to expel Pagan from the PRPD.  (Docket No. 262 at ¶ 5.22; Docket No. 281 at Ex. LL). Moreover, the letter indicates that Toledo and Ortega "evaluated the record."  (<u>Id</u>. at Ex. LL.)  Nevertheless, this issue is not dispositive because the Court has previously concluded that the supervisory defendants are entitled to summary judgment because, based on the evidence presented, the field officers did not present a risk of violating citizens' constitutional rights or that the supervisory defendants conduct was "affirmatively linked" to Caceres' death.

August 23, 2006 of the 60-day employment and salary suspension" is
sufficient to establish that defendant Rivera had knowledge of
Pagan's disciplinary history (Docket No. 262 at ¶ 56; Ex. TT.)
This letter, however, does not indicate that Rivera had knowledge
of the reasons underlying the suspension.  A police officer may be
subject to disciplinary actions for a myriad of reasons.  Thus, the
letter merely reflects defendant Rivera's knowledge that Pagan was
notified about his suspension, nothing more.

        Similarly, defendant Figueroa stated in his deposition
that he remembered serving Pagan with disciplinary papers regarding
either the suspension or proposed expulsion.  (<u>Id</u>. at ¶ 6.24.)
Nevertheless, defendant Figueroa stated that his duty was merely to
deliver the disciplinary papers; he did not investigate the reasons
for the disciplinary action taken against Pagan.  (<u>Id</u>. at ¶¶ 6.24,
8.24.)  Likewise, there is also no evidence that defendant Colon
had knowledge of the field officers' dangerousness.  Defendant
Colon previously stated that he served Pagan with sanctions.
(Docket No. 281 at Ex. J.)  Defendant Colon believed that Pagan was
suspended for 60 days for domestic violence.  (Docket No. 281 at
¶ 190.)  It is not established, however, that defendant Colon knew
of this information prior to Caceres' death.  Rather, defendant
Colon stated that the sanctions he served did not indicate that it
was for domestic violence; only the intent to suspend was
indicated.  (Docket No. 291 at Ex. J.)  The inferential step

required to impute knowledge of an officer's dangerousness upon supervisors merely by virtue of them having notice of a suspension is too tenuous, at best, to make at the summary judgment stage.

Moreover, there is no issue of a material fact that defendants Colon, Figueroa, Cruz and Rivera had constructive knowledge of a risk. A supervisor is liable even if he or she does not have actual knowledge of the unconstitutional behavior. See, Colon-Andino, 634 F.Supp.2d at 232 (citing Maldonado-Denis, 23 F.3d at 582.) "Constructive knowledge 'may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of [their] official responsibility the [municipal policy makers] should have known of them.'" Bordanaro v. Mcleod, 871 F.2d 1151, 1157 (1st Cir. 1989) (internal citations omitted). Nevertheless, plaintiffs have not established that the supervisory defendants had constructive knowledge, precisely because they have not established that the field officers' conduct was either widespread or flagrant. As the Court previously concluded, Pagan's disciplinary history did not evince a risk of constitutional violations.

Plaintiffs point to the supervisory defendants' lack of knowledge of Pagan's disciplinary record and failure to look at agents with "repetitive conduct" as demonstrative of the supervisory defendants' deliberate indifference. This contention, however, without more, is insufficient to attach liability. See

Calderón v. P.R. Police Dep't., No. 05-1722, 2008 WL 2960694 at *4
(D.P.R. Jul. 30, 2008) (holding that an allegation that defendants
lacked knowledge of disciplinary record does not demonstrate
"reckless disregard" by the defendants when the officers in
question did not demonstrate a dangerous propensity to violate the
Constitution).

   C.   **Affirmative Link**

        Even assuming, *arguendo*, that the field officers were a
grave risk and that the supervisory defendants had knowledge of
that risk, "not every official who is aware of a problem exhibits
deliberate    indifference    by    failing    to    resolve    it."
Feliciano-Hernandez,    2011    WL    6118537,    at    *8    (quoting
Feliciano-Hernandez, No. 09-1569, 2010 WL 3372527, at *11 (D.P.R.
Aug 24, 2010).  Plaintiffs have not established that the PRPD's
failure to expel Pagan from the force or a deficient policy was
"affirmatively linked" to Caceres' death.  See Figueroa, 966 F.Supp
at 184.

        "Deliberate   indifference   is   not   the   be-all   and   the
end-all of a section 1983 claim premised on supervisory liability
. . . there is a causation element as well."  (Id. at 149 (D.P.R.
1998) (quoting Maldonado-Denis v. Castillo-Rodriquez, 23 F.3d 576,
582 (1st Cir. 1994); Camilo-Robles, 151 F.3d at 7.  Plaintiffs must
establish that had the supervisory defendants not acted with
deliberate indifference, Caceres would not have been killed.  Id.

at 184 (holding that the court may not impose liability when proper screening or supervision mechanisms would not have prevented the constitutional violation) (citing Rodriguez-Cirilo, 115 F.3d at 52; Thayer v. Dion, No. 09-00435, 2010 WL 4961739, at *20 (D.Me. Nov. 30, 2010) (citing Sanchez v. Pereira-Castillo, 590 F.3d 31, 40 (1st Cir. 2009); Maldonado, 568 F.3d at 274-75.  The test is also satisfied when there is a "[A] pattern of misconduct sufficient to put the [defendant] on inquiry notice." Maldonado-Denis, 268 F.3d at 583.

         According to plaintiffs, the supervisory defendants caused Caceres' death when they created an environment within the PRPD such that the field officers thought that they could act illegally with impunity and without consequence, not following policies regarding officers who return from suspension, lacked record-keeping and analyses of officer-involved shootings, conducted pro-forma evaluations, provided excessive delays in the disciplinary system and lacked supervisory staff at the T.O.D.

         Speculation that a police officer felt like they could act with impunity and without consequence is too tenuous, as a matter of law, to establish liability. Febus-Rodriguez, 14 F.3d at 93 (1st Cir. 1994).  In Febus-Rodriguez, the plaintiffs filed suit against PRPD police officers and supervisors claiming that Febus-Rodriguez's constitutional rights were violated when the police officers assaulted him and denied him medical treatment

during an arrest. Id. at 89.  The plaintiffs contended that because
the officer was not sanctioned for five prior incidents, he
believed he could get away with assaulting the plaintiffs.  Id.
at 94.  The district court denied the supervisor's motion for
summary judgment on the grounds of qualified immunity.  Id.  The
First Circuit Court of Appeals reversed the district court and
remanded.  Id.  The court of appeals reasoned that the supervisors
were entitled to summary judgment, because, *inter alia*, "[t]he
inference that because Officer Rodriguez had not been sanctioned
with respect to these grave incidents, he could get away with
anything, including assaulting [plaintiff], is too tenuous.  Id.
at 94.  Here, plaintiffs, like the plaintiff in Febus-Rodriguez,
also claim that PRPD fostered a sense of impunity among the ranks
which resulted in the killing of Caceres.  Accordingly, here, like
in Febus-Rodriguez, summary judgment must be granted.

          Similarly, plaintiffs also fail to establish that the
PRPD's policy regarding officers involved in shootings caused
Caceres' death.  Plaintiffs' expert, Lou Reitner stated that the
PRPD is the only major police force that does not have a policy for
handling officer-involved shootings.  Nevertheless, Reitner
admitted that even if supervisors looked at officer-involved
shootings, their effort would have been fruitless because the field
officers never fired their firearms prior to August 11, 2007.
Therefore, plaintiffs have not established that the failure to have

a policy for officer-involved shootings caused Caceres' death.  See
Rossi-Cortes v. Toledo-Rivera, 540 F.Supp.2d 318, 324 (D.P.R. 2008)
("Allegations that a supervisor failed to train his subordinate
officers and that he should be held liable for such failure,
without identifying the factual underpinnings of such failure, nor
identifying the casual nexus between the failed training and the
subordinate's misconduct, are not enough to sustain a claim of
liability under Section 1983.")

      Plaintiffs' contention that the supervisory defendants
were linked to Caceres' death because the Humacao T.O.D. lacked
sufficient supervisory staff is also without merit.  There is no
indication that additional staff could have prevented Pagan from
shooting Caceres to death during an arrest.  Likewise, plaintiffs'
allegations that there are excessive delays in the PRPD
disciplinary system and that the supervisory defendants gave
pro-forma evaluations are also insufficient.  Plaintiffs merely
outline the PRPD disciplinary process without expanding on the
manner in which the policy was deficient, how it was different than
any other police department or how it caused Caceres' death.
Plaintiffs do argue that Pagan received the highest rank for
"self-control" in an evaluation despite the proposals that he be
expelled.  (Docket No. 262 at ¶ 6.43.)  Nevertheless, the
evaluation covered the period from July 1, 2006 to December 31,
2006.  Id.  Pagan was accused of domestic violence in 1998, a

number of years earlier.  (Docket No. 262 at ¶ 5.5.)  Therefore, the domestic violence complaint was outside the scope of the evaluation.  Plaintiffs' entirely conclusory allegations, without more, are legally insufficient to survive summary judgment.  See Medina-Muñoz, 896 F.2d at 8.  ("conclusory allegations . . . and unsupported speculation" are insufficient.)

        "The deliberate indifference standard was set deliberately high by the Supreme Court to insure that § 1983 did not become a front of constitutional tort liability."  Beal v. Blance, No. 02-12447, 2005 WL 352861 at *7 (D.Mass. Feb. 14, 2005).  Even if the supervisory defendants' conduct may have been negligent, to invoke section 1983 liability the plaintiffs must show more than mere negligence; they must show deliberate indifference.  Maldonado-Denis, 23 F.3d at 582 ("Proof of mere negligence, without more, is inadequate to ground supervisory liability.").  There is no issue of material fact that the supervisory defendants acted with deliberate indifference.

        Accordingly, plaintiffs' motion for summary judgment is **GRANTED**.

   **D.   State Law Claims Under Article 1802**

        Plaintiffs also brought supplemental state law claims
under article 1802.[9]  (Docket No. 64 at ¶ 6.2.)

        Article 1802 permits a plaintiff to recover damages for
causes of action sounding in tort.  Vazquez-Filippetti v. Banco
Popular de P.R., 504 F.3d 43, 49 (1st Cir. 2007).  To recover
damages, article 1802 requires a showing that the defendant
"cause[d] damage to another through fault or negligence."  Id.  To
establish liability under article 1802, a plaintiff must establish:
(1) plaintiff's physical or emotional injury, (2) defendant's
negligent act or omission ("breach of duty"), and (3) a causal
nexus between the plaintiff's injury and defendant's negligent act
or omission ("proximate cause").  Id.

        Article 1802 and section 1983 are composed of similar
requirements.  Rodriguez-Diaz v. Marrero-Recio, No. 10-1317, 2010

_____

        [9] Where, as here, state law claims remain after the court
grants summary judgment as to federal law claims, courts have
"considerable authority" to decide whether to exercise supplemental
jurisdiction.  Newman v. Burgin, 930 F.2d 955, 963-64 (1st Cir.
1991); See Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 117 (1st
Cir. 1995).  If the court dismisses a section 1983 claim against
police supervisors, the court may still decline to exercise
supplemental jurisdiction over article 1802 claims against them,
even where section 1983 claims remain as to other defendants.  See
Cuebas v. Davila, 618 F.Supp.2d 124, 133 (D.P.R 2009) (declining
supplemental jurisdiction over the plaintiff's article 1802 claim
against police supervisors while maintaining supplemental
jurisdiction over the plaintiff's article 1802 claims against other
defendants).  Nevertheless, because of the similarities between
article 1802 and section 1983, the Court, in exercising its
discretion, finds it prudent to address the merits of plaintiffs'
article 1802 claim against the supervisory defendants.

WL 4117214 at *8-9 (D.P.R. Oct. 20, 2010) (reconsideration granted on other grounds by Rodriguez-Diaz v. Marrero-Recio, No. 10-1317, 2010 WL 5375952 (D.P.R. Dec. 28, 2010) (holding that if a plaintiff establishes causality under section 1983, the plaintiff is reasonably entitled to relief under article 1802).  To invoke section 1983 liability, a plaintiff must show more than mere negligence, he must show deliberate indifference.  Maldonado-Denis, 23 F.3d at 582 ("Proof of mere negligence, without more, is inadequate to ground supervisory liability.").  The Court need not address whether plaintiffs have satisfied the "breach of duty" element under article 1802 because, as explained below, plaintiffs have failed to establish the causation that article 1802 requires.  Figueroa, 966 F.Supp at 149 (quoting Maldonado-Denis, at 582); Vazquez-Filippetti, 504 F.3d 43 at 49.

        Plaintiffs have not established that the supervisory defendants were the proximate cause of Caceres' death.  Proximate cause is composed of two sub-elements:  (a) actual cause and (b) foreseeability.  Vazquez-Filippetti, 504 F.3d at 49 n.5.  "A defendant's action may only be the proximate cause of plaintiff's injuries if they in fact caused the injuries and the defendant could have reasonably foreseen that the injuries (or related harms) would result from his actions.  Id. (citing Malave-Fex v. Volvo Car Corp., 946 F.2d 967, 971-72 (1st Cir. 1991).  Here, the Court previously concluded that plaintiffs have not presented an issue of

material fact that the PRPD's acts or omissions were "affirmatively linked" to Caceres' death.  Moreover, the Court has stated that it was not foreseeable that former officer Pagan would violate Caceres' constitutional rights by shooting and killing him, or that officers Diaz and Sustache failed to prevent the use of force, and did not assure that Caceres received medical attention.  Therefore, the supervisory defendants did not cause Caceres' injuries within the meaning of article 1802.

Accordingly, because plaintiffs' have not established that the supervisory defendants behavior was casually related to Caceres' injury, summary judgment is **GRANTED** as to plaintiffs' article 1802 claim against the supervisory defendants.

## IV. Conclusion

For the reasons set forth above, the supervisory defendants' Motion for Summary Judgment is **GRANTED**.  Plaintiffs' section 1983 and article 1802 claims against the supervisory defendants are **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED.**

San Juan, Puerto Rico, December 22, 2011.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE